# COMPENDIUM OF EXPERT DECLARATIONS IN SUPPORT OF LEAD PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS IN PART FOR LACK OF SUBJECT MATTER JUSRISDICTION

## 2

## Declaration of Jonathan Harris

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

In re:

ROYAL DUTCH/SHELL TRANSPORT
SECURITIES LITIGATION

)
)
)
)
)
)

**CIVIL ACTION NO. 04-374(JWB)**
**(Consolidated Cases)**

### DECLARATION OF PROFESSOR JONATHAN HARRIS

I, Professor Jonathan Harris, declare as follows:

### A.    QUALIFICATIONS

1.    I am Professor of International Commercial Law at the University of
Birmingham, where I specialise in private international law. I have written extensively in
this area for many years. I am one of the authors of the forthcoming 14th edition of
England's leading practitioner work on private international law, *Dicey and Morris, The
Conflict of Laws* (which will be published in 2006). I am also the co-editor (and co-
founder) of the *Journal of Private International Law,* which is the world's only English
language journal devoted to private international law, and which is supported by an
advisory board of leading private international law academics and practitioners from
around the world. I am the author of the book *"The Hague Trusts Convention"* and co-
author of the book *"International Sale of Goods in the Conflict of Laws"*. I am also a
major contributor to the books *"Product Liability"* (2nd ed, OUP) and *"Underhill and
Hayton, The Law Relating to Trusts and Trustees"* (16th ed). I have written a large
number of articles on all aspects of private international law in leading journals, including
many on the recognition and enforcement of foreign judgments. I have taught private
international law in every year of my career (including the recognition and enforcement

of foreign judgments) and supervise a substantial number of doctoral theses on the subject. I regularly give seminars to leading law firms in England on aspects of private international law (again, including the recognition and enforcement of foreign judgments) and provide consultancy to barristers and solicitors firms in this area. I have also been extensively involved in the drafting of private international law legislation in the field of international trusts in the British Virgin Islands.

2.    I have also previously worked at the University of Nottingham as a Reader in Law. I initially studied Law at the University of Oxford (at Jesus College), graduating with First Class Honours. I also have a B.C.L. degree from the same institution, and was awarded a doctorate by the University of Birmingham on the basis of my published work in private international law.

## B.    ASSUMED FACTS, QUESTIONS PRESENTED, AND SUMMARY OF CONCLUSIONS

3.    I have read the declaration of Sir Christopher Staughton, including the assumed facts and opinions expressed therein. I have been asked to respond to those opinions, and, specifically, to opine on the following question: whether a judgment in a U.S. securities class action with respect to the European purchasers of the securities in question on European exchanges could be relied upon in an English court, either by the defendants in seeking to dismiss a claim by an absent class member, or by absent class members seeking to enforce the judgment against the defendants.

4.    My opinion is based on the following assumed facts:

5.    Certain securities of a Netherlands company ("ND Co.") and a United Kingdom company ("UK Co.") are registered with the U.S. Securities and Exchange Commission and traded on the New York Stock Exchange. Securities of ND Co. and UK

2

Co. are also traded on securities exchanges in the Netherlands, the UK, Belgium, Germany, Luxembourg, France, Switzerland, and Austria.

6.     Under U.S. law, one or more individuals may bring an action on behalf of a "class" of all persons with similar alleged claims. Although the action is styled a class action upon filing, Federal Rule of Civil Procedure 23 requires the proposed class representative to ask the court to certify the class. Unless and until a class is certified, no member of the proposed class, other than the named plaintiff, can be bound by the result, whether favorable or unfavorable to plaintiffs. If, and only if, the U.S. court certifies the class, the action proceeds as a class action and includes all similarly situated individuals, known as "class members," who do not choose to exclude themselves from (or "opt out" of) the class. All such class members are provided notice of the class action, including their right to opt out, through a combination of direct mail, publication in newspapers, and postings on the Internet. This notice is drafted to be as simple and clear as possible, is given in English and the predominant language in the country or area where the notice is given, and does not require the retention of a lawyer to understand.

7.     I also assume that there is a controversy before between the parties to the action concerning the extent of the defendants' conduct in the United States, that the parties are engaged in discovery on that subject, and that the Court may resolve that issue in deciding the defendants' motion to dismiss for lack of subject matter jurisdiction. For purposes of this declaration, I assume that the Court finds there to have been sufficient conduct in the United States to warrant the exercise of subject matter jurisdiction over the claims of foreign plaintiffs who purchased their securities in ND Co. and UK Co. on foreign exchanges.

3

8.     There is no clear English authority one way or the other as to the recognition and enforcement of a United States class action in England. This means that one cannot say for certain whether the judgment would be enforceable or not. Nevertheless, it is my opinion that, on the present state of English law, a good case can be made for the recognition and enforcement of the judgment in England. A range of arguments can be made to support this viewpoint.

### C.     OPINION

The present law on the recognition and enforcement of foreign judgments

*The schemes of recognition and enforcement of foreign judgments applicable in England*

9.     Four major schemes of recognition and enforcement of foreign judgments are applicable in England. The Brussels I Regulation, the Administration of Justice Act 1920, the Foreign Judgments (Reciprocal Enforcement) Act 1933 and the common law. The appropriate scheme depends upon the court which delivered judgment and/or the basis of its jurisdiction. In the case of a judgment from the United States, the common law rules are applicable.

*The key requirement for recognition of a foreign judgment at common law: jurisdictional competence in the eyes of English law*

10.     A judgment will not be recognised in England if the foreign court was not jurisdictionally competent in the eyes of English law. The English court will assess this question for itself, rather than being concerned with whether the foreign court considered itself to have jurisdiction. The English courts will regard the overseas court as jurisdictionally competent either if the defendant had the requisite territorial connection with the foreign state, or if the defendant submitted to proceedings in that state. We shall consider these alternative requirements in turn.

4

*The defendant was present and/or resident in the overseas jurisdiction:*
*Individuals*

11.     It is somewhat uncertain whether the defendant must be resident in the
state of origin, or whether his presence at the time of instigation of proceedings will
suffice. The judgment of Buckley LJ in *Emanuel v Symon* [1908] 1 KB 302 suggests that
residence is required. However, the court in *Adams v Cape Industries* [1990] Ch 433
reviewed the law and suggested *obiter* that presence would also be sufficient.

*Companies*

12.     Where there is a corporate defendant, it was decided in *Adams v Cape*
*Industries* [1990] Ch 433 that there must be a fixed place of business maintained at the
company's own expense from which it has carried out its own business in the overseas
jurisdiction. It will suffice that its business is transacted at that place through
representatives of the company carrying out the corporation's business. (See also *Letterer*
*Glove Corp v FW Millington* (1928) 44 TLR 746).

13.     I will assume that the requisite territorial connection exists between the
corporate defendants and the United States courts. I shall say more about the position of
individual defendants not present or resident in the United States below.

*Federal jurisdictions*

14.     Where any defendant is sued in a federal jurisdiction, such as the United
States, it was suggested in *Adams v Cape Industries* [1990] Ch 433 that the defendant
must have the requisite territorial connection with the particular state which gave
judgment (i.e., the particular state of the United States where judgment is given, not
simply anywhere in the United States, unless the judgment is from a federal, rather than a
state, court). See also *Dicey and* Morris, p 488. Again, I will assume that this requirement

is met on the facts.

### Submission

15.     A court to which a defendant has submitted will also be seen as jurisdictionally competent in the eyes of English law. The most obvious means of submitting is by voluntarily pleading to the merits. Submission may also occur by acceptance of service of a claim form, or by agreeing to a jurisdiction clause for the courts of a particular state.

16.     It is important to note that a *claimant*, by instigating proceedings, will be deemed to have submitted to the court. This can be very important, since he is then estopped at the enforcement stage from contesting a judgment against him in a counterclaim made by the defendant. Indeed, *Dicey and Morris*, Rule 36, p 487, expressly states that "… a court of a foreign country outside the United Kingdom has jurisdiction to give a judgment *in personam* capable of enforcement or recognition…. If the judgment debtor was claimant, or counterclaimed, in the foreign court."

### No other basis of competence

17.     No other basis of jurisdictional competence in a foreign court can be found at common law. The key point to note is that the requirements of jurisdictional competence are all focused on the position of the *defendant*. There is nothing in English law to suggest that a foreign court's jurisdictional competence in any way depends upon the position of the *claimant* to the action.

18.     I believe that Sir Christopher Staughton does not describe the orthodox position in English private international law when he says (para 34) that "…unless an absent plaintiff could be shown to fall under one of the jurisdictional categories set out

6

above (and, as I understand it, he would not), an English court would not consider the US court to have had jurisdiction over the absent plaintiff, with the result that the judgment would not be recognised to preclude reiteration by the absent plaintiff of his claims." This does not make it clear that English rules on jurisdictional competence of foreign courts are about the *defendant's* position. There is no recognised requirement of competence over the claimant. As Lindley M.R. remarked in *Pemberton v Hughes* [1899] 1 Ch. 781, 791: "There is no doubt that the courts of this country will not enforce the decisions of foreign courts which have no jurisdiction in the sense above explained - i.e., over the subject matter or over the persons brought before them . . . But the jurisdiction which alone is important in these matters is the competence of the court in an international sense - i.e., its territorial competence over the subject matter and over the *defendant*. Its competence or jurisdiction in any other sense is not regarded as material by the courts of this country". (Emphasis added).

19.     Furthermore, this view is fortified by the fact that the private international law rules on the jurisdiction of English courts at common law are all about competence *over the defendant*.

20.     Hence, assuming that the requisite connection exists between the defendant and the court giving judgment, it may be argued that the orthodox position in English law is that the jurisdictional competence requirement for recognition of the foreign judgment is satisfied.

### *Judgment must be a final and conclusive judgment on the merits*

21.     The judgment must be final, and conclusive on the merits and for a fixed sum of money. The word "final" means that the judgment is binding in the court which

gave judgment and cannot be reopened in that court, even if the same matter can be appealed to a higher court. (*Nonunion v Freeman* (1889) 15 App Cas 1). A default judgment may thus be final until the time for setting aside has expired. (Briggs and Rees, *Civil Jurisdiction and Judgments*, 3rd ed, p 483). The judgment will not be conclusive if further defences to its recognition are available in the overseas court. I will assume for present purposes that the United States judgment will be final and conclusive on the merits.

### Enforcement of foreign judgments

22.     Enforcement of a judgment is required where the claimant seeks a remedy from the English court, such as damages. For a judgment to be enforced, it must first be entitled to recognition.

23.     If a judgment is to be enforced in England, then it must be for a fixed sum; accordingly a judgment for specific performance will not normally be enforced. A claim for damages can be enforced only if the amount to be paid has been definitively quantified. What matters is that the total amount payable has been determined (even if the instalments by which payments are made can be varied by the court).

24.     The English court will also not enforce a foreign penal, revenue or public law judgment. This is but a part of the general private international law rule that such laws will not be enforced or applied in an English court. An order to pay penal damages will certainly not be enforceable if payable to a state authority (*Huntington v Attrill* [1893] AC 150). However, penal damages which are awarded to a private individual should not be caught by this exclusion (*SA Consortium General Textiles v Sun & Sand Agencies Ltd* [1978] QB 279). In any event, if it is possible to sever the compensatory

8

part of a judgment, that alone may be enforced (*Raulin v Fisher* [1911] KB 93).

25.     The judgment must also not order the payment of multiple damages. The Protection of Trading Interests Act 1980 is particularly concerned with certain types of orders made in the courts of the United States. It provides that where a judgment is "for an amount arrived at by ... multiplying' the sum assessed as compensation, it shall not be enforced (s. 5). If the defendant has already paid the multiple, he may reclaim it in an English court (s 6).

### *Defences to recognition and enforcement*

26.     Assuming that these various requirements are satisfied, the foreign judgment meets the basic requirements for recognition and enforcement in England. If so, then the real question is as to the possibility that a valid defence to recognition and enforcement of the judgment exists. Two defences appear particularly relevant in the present context: that the foreign judgment is in breach of natural justice; and that it is contrary to English public policy. It is to these defences that I now turn.

### *The judgment was in breach of natural justice*

27.     The defendant must have had the opportunity adequately to defend himself. This means that he must have been served with proper notice of the proceedings, been allowed properly to arrange his defence, and that the procedures of the foreign court must have been acceptable. However, it is important to note that the English courts have traditionally been reluctant to condemn foreign procedures. In the judgment of Lindley M.R. in *Pemberton v Hughes* [1899] 1 Ch. 781, 790, his Lordship remarked that: "If a judgment is pronounced by a foreign court over persons within its jurisdiction and in a matter with which it is competent to deal, English courts never investigate the propriety of

the proceedings in the foreign court, unless they offend against English views of substantial justice. Where no substantial justice, according to English notions, is offended, all that English courts look to is the finality of the judgment and the jurisdiction of the court, in this sense and to this extent - namely, its competence to entertain the sort of case which it did deal with, and its competence to require the defendant to appear before it. If the court had jurisdiction in this sense and to this extent, the courts of this country never inquire whether the jurisdiction has been properly or improperly exercised, provided always that no substantial injustice, according to English notions, has been committed."

28.     In *Adams v Cape Industries* [1990] Ch 433, it was confirmed that the court could refuse to recognise and enforce a foreign judgment if the foreign proceedings amounted to a denial of substantial justice. In that case, the judge in Texas, with the assistance of counsel for the plaintiffs, had assessed damages to be awarded to some 206 plaintiffs on the basis of an average amount per plaintiff, rather than in respect of their individual entitlements. The Court of Appeal held that compensation should be objectively and independently assessed and said *obiter* that this amounted to a breach of natural justice.

29.     Unfortunately, considerable uncertainty still surrounds the meaning of the term "substantial justice". But, it must be stressed that it is very rare for a court to deny recognition to a foreign on natural justice grounds. Indeed, *Dicey and Morris* point out (p 528) that "*Adams v Cape Industries* appears to be the only English case in which the defence of natural justice was established in relation to a judgment *in personam*". *Cheshire and North's Private International Law*, 13th ed, 451, observes that "The English courts are reluctant to criticise the procedural rules of foreign countries ... and

will not measure their fairness by reference to the English equivalents…". They continue:
"If the foreign court, in proceedings *in personam*, is prepared to dispense with notice of
the proceedings, or to allow notice to be served in a manner inadequate to satisfy an
English court, it is not for the English court to dispute the foreign judgment…" (citing
*Jeannot v Fuerst* (1909) 100 LT 816 and *Vallée v Dumergue* (1849) 4 Exch 290, 303).

30.     Although there is some uncertainty on the matter, it appears that it is open
to a party to allege that standards of natural justice have been violated, even if such an
allegation had been made overseas. It does not seem that the objecting party must take
advantage of any procedures existing in the state of origin to make his complaint (*Adams
v Cape Industries* [1990] Ch 433).

### *Recognition would be contrary to English public policy*

31.     This defence is rarely used. The mere fact that a foreign judgment was
obtained on the basis of laws of which an English court disapproves should be irrelevant,
as the defence relates to the judgment itself and not the underlying cause of action. *Dicey
and Morris*, 13<sup></sup> ed, p 525 remark that "There are very few reported cases in which
foreign judgments *in personam* have been denied enforcement or recognition for reasons
of public policy at common law". The defence was, however, applied in *Re Macartney*
[1921] 1 Ch 522 to deny enforcement of a perpetual maintenance order made against a
father for his illegitimate child.

32.     In *Israel Discount Bank of New York v Hadjipateras* [1983] 3 All ER 129,
the defendant alleged that a New York judgment for the claimant was obtained because his
father had exercised undue influence over him to make him enter into a contract of
guarantee. The public policy defence to enforcement was rejected by the Court of Appeal,

on the basis that New York law on undue influence was substantially similar to English law. Accordingly, the defendant could have raised the issue overseas. Having failed to do so, the defendant could not now raise the defence in the English court.

### Application of the law to the facts of the instant case

#### *Judgment in the claimants' favour*

33.     If the judgment were to be delivered in the claimants' favour, then it appears somewhat unlikely that it would need to be enforced in England, as opposed to the United States. Nevertheless, if this were to be the case, I suggest that a strong case for enforcement exists. A party who has himself been denied natural justice overseas may have the *right* to contest a foreign judgment on that basis. However, a right is meaningless if it cannot be waived by its holder. That would turn it into an obligation or burden. A party who has in some way been denied access to natural justice, but who nevertheless chooses to rely upon a judgment, has effectively simply waived any objections to that judgment.

34.     Any defense to recognition of a foreign judgment based upon natural justice should be pleaded by the person relying upon it. If the claimant chooses not to plead that defence, there is no reason to deny recognition to the judgment. In particular, it would be very curious if the *defendants* could in such circumstances seek to resist recognition and enforcement of the judgment on the basis that the *claimants* were denied natural justice.

35.     I do not agree with Sir Christopher Staughton's view (para 45) that justice necessarily requires the same approach to be adopted whether the judgment is in the claimant's favour or the defendant's favour. This is the difference between a benefit and a burden being conferred upon the claimant by the foreign judgment. Justice cannot

12

sensibly require that a class action claimant who succeeds abroad cannot rely upon a foreign judgment in his favour *if he chooses to do so and waives any right that he had to object to the foreign proceedings*. All of the examples presented in Sir Christopher Staughton's opinion are concerned with burdens being imposed on a party in breach of natural justice, not *benefits* conferred upon a claimant. Indeed, it would surely be manifestly unjust if a claimant who succeeded in the United States was denied the right to enforce the judgment in England on the basis that his own rights abroad were alleged in some way to have been infringed.

36.    It is curious that Sir Christopher Staughton also considers Article 6(1) ECHR relevant to the enforcement of the judgment by the claimants (para 44) and worries "… that rights of absent plaintiffs may be impaired". In such circumstances, it is hard to see why the claimants would wish to object on these grounds if the judgment is in their favour and it is they that wish to enforce it. A *right* must be capable of being waived. In any event, we shall see below that the relevance of the ECHR is dubious even where a judgment is delivered in favour of the defendants. It is much more difficult to see its relevance where it is delivered in favour of the claimants.

37.    Of course, it is possible that the judgment might be delivered in the claimant's favour, but for a lesser sum than he had hoped to recover. He might seek to disregard the United States court's judgment and instead to sue afresh in England. Normally, a successful claimant overseas is estopped from doing so by s 34 of the CJJA 1982, which provides that: "no proceedings may be brought by a person in England and Wales or Northern Ireland on a cause of action in respect of which a judgment has been given in his favour in proceedings between the same parties, or their privies, in a court in another part of

13

the United Kingdom or in a court in an overseas country, unless that judgment is not enforceable or entitled to recognition in England and Wales or, as the case may be, Northern Ireland." Moreover, I understand that a class member in the United States who accepts the benefit of a settlement is typically required to sign a release of his or her claims. Having accepted the settlement, the class member should not normally be permitted to object in an English court that the settlement is inadequate and seek to sue afresh in England.

38.    It is, of course, possible that a defendant might seek to argue that the United States judgment is not entitled to recognition in England. I have assumed above that the requisite territorial connection exists between corporate defendants and the United States court. However, I understand that there may be certain individual defendants who do not have the requisite territorial connection to the United States. For such persons, the question arises as to whether they have submitted to the United States court. By way of example, my attention has been drawn to the language used by one defendant, Mr. van de Vijver, in a footnote:

> "Mr. van de Vijver understands that, for purposes of any subsequent proceeding in the United Kingdom, an English court would not view this Court as having jurisdiction over him unless he was present in the United States (he is not) or failed to protest this Court's exercise of jurisdiction. See Adams v. Cape Inds. p.l.c., [1990] Ch. 433 (C.A. England & Wales 1989). Thus, to protect his existing enforcement position in the United Kingdom, van de Vijver (i) respectfully submits that, by seeking dismissal of plaintiffs' claims, he does not consent to this Court's jurisdiction or concede that jurisdiction would exist under the laws of any other country, and (ii) respectfully protests this Court's exercise of personal jurisdiction."

39.    It is certainly the case that a defendant who objects to the merits of an action brought against him but does not object to the jurisdiction of the court will be taken to have submitted to the jurisdiction of that court. However, s 33 of the Civil Jurisdiction and Judgments Act 1982 states that if the defendant appeared only for the

14

purpose of contesting the jurisdiction of the court, he will not be taken to have submitted. This gives rise to two questions.

40.     First, did the defendant properly contest the jurisdiction of the court? There is some doubt on this point, since the defendant has expressly stated that his only reason for objecting to the court's jurisdiction is his concern that otherwise the judgment might be recognised in England. Moreover, point (ii) of Mr van de Vijver's statement suggests that he does not believe that the United States court has jurisdiction according to its own law. But no substantive justification is given for this assertion. One might argue that the defendant has not presented a properly reasoned case as to why the United States court lacks jurisdiction. That being the case, one could doubt whether this is a properly formulated challenge to the jurisdiction of the court. If a properly formulated challenge to the court's jurisdiction is not made, there remains a possibility that an English court could conclude that the defendant has submitted to the jurisdiction of the United States court.

41.     Second, section 33 of the Civil Jurisdiction and Judgments Act 1982 protects a person who appears solely for the purpose of contesting jurisdiction. But it may be argued that the defendant does not appear solely for this purpose; he also appears to broadly contest the sufficiency of the pleading against him (by, among other things, challenging the facts alleged therein). Furthermore, it may be contended that the primary purpose of Mr. van de Vijver is to contest the sufficiency of the pleading and the facts alleged. As we have seen, the objection to the jurisdiction of the court is stated very briefly, without further particulars as to why the court lacks jurisdiction.

42.     For these reasons, there is a possibility that an English court might take the view that the individual defendant has submitted to the United States court for the

15

purposes of recognition of its judgment in England.

### The effect in England of a judgment in favour of the defendants

43.    The much more difficult scenario is where the judgment is in favour of the defendants, who seek to rely upon this in England as a defence to a further action by the claimants. It is normally the case that a decision of a foreign court, between the same parties and concerning the same cause of action, creates a cause of action estoppel in England, preventing the matter from being reopened in England (see Briggs and Rees, *Civil Jurisdiction and Judgments*, 3rd ed, 493- 6). But this, of course, applies only if the foreign judgment is entitled to recognition.

44.    On this question, we have seen the position in England is very uncertain. One cannot, accordingly, give clear guidance as to what an English court would decide. Nevertheless, a strong case for the recognition and enforcement of the judgment can be made out. A number of issues need to be considered.

### Natural justice

45.    We have seen that English law has a defence that the foreign judgment was in breach of natural justice. We have also seen that this defence is normally pleaded by the overseas *defendant*. Indeed, all of the law and learning on the recognition of foreign judgments concerns the position of the defendant. The claimant's position is not normally regarded as relevant. Hence, unless and until a specific exception to this approach evolves (and none has evolved yet in English private international law), orthodoxy would suggest that the judgment is entitled to recognition.

46.    Even if it were the case that the natural justice defence could be pleaded by a claimant to a foreign action, it does not follow that the defence would be made out

16

on the facts. Sir Christopher Staughton argues for a broader interpretation of the natural justice exception (para 39). But, as we have seen, the leading private international law commentators in England recognise that that the natural justice defence is, in fact, narrowly construed and that examples of its successful establishment are very few and far between.

47.     Although decided under a different regime (in relation to a judgment from within the European Union under the Brussels Convention), it is worth noting the decision of the European Court of Justice in Case C- 78/95, *Hendrikman v Magenta Druck & Verlag GmbH* [1996] E.C.R. I-4943. In that case, the defendant was unaware that proceedings had been instigated against him and did not appoint counsel for its own defence. A lawyer was appointed to act on behalf of the defendant. The Court of Justice held that the defendant must have the opportunity to instruct his own counsel and to arrange the defence *as he sees fit*. One could argue, by analogy, that a claimant who does not opt in to a class action procedure, appoint his own lawyers and present his own case as he sees fit should not be bound by a judgment delivered. However, it must be stressed: (1) that case was decided on the basis of a different regime of recognition of foreign judgment; and (2) it is consistent with the general approach, which looks to the position and notice supplied to the *defendant* and not the *claimant*. So, it is still possible to distinguish the present case, which is concerned with the position of the claimant.

48.     Sir Christopher Staughton places reliance (paras 37 and 40) on the Court of Appeal's decision in *Jacobson v Frachon* [1927] 138 LT 386, and in particular on the comment of Atkin LJ that the principles of natural justice require that the court "has given notice to the litigant that they are about to proceed to determine the rights between him and

17

the other litigant" (p 392). However, it is clear that Atkin LJ did not have in mind in that case the rights of the *claimant* in an action overseas. Moreover, the remark by Atkin LJ was made when considering the judgment of Lindley M.R. in *Pemberton v Hughes* [1899] 1 Ch. 781, 792, who had stated the general principle (to which a limited natural justice exception exists) that "A judgment of a foreign Court having jurisdiction over the parties and subject-matter - i.e., having jurisdiction to summon the *defendants* before it and to decide such matters as it has decided - cannot be impeached in this country on its merits" (Emphasis added). In other words, these cases had in mind the position of the defendant to the foreign action and do not provide clear support for the non-recognition of a judgment where it is the claimant who is bound by proceedings which he did not expressly opt into.

49.     It must be accepted that, by analogy to the facts and views expressed in *Adams v Cape Industries* [1990] Ch 433 (above), there is a risk that the English courts might find that a United States judgment in a class action which did not accurately reflect the individual losses of a particular claimant might similarly be found to be contrary to natural justice as a denial of "substantial justice". Nevertheless, in *Adams*, the situation was somewhat different, in that the defendants had not contested the proceedings in Texas and the damages had been fixed by consultation between the plaintiffs and the judge. If in the present action an impartial and *bona fide* attempt is made to assess the proper level of damages for each claimant, and that is done on the basis of the assumed loss of particular claimants, then the position would be materially different to that in *Adams*.

50.     In this respect, it may be argued that the present situation does not amount to

a denial of substantive justice. Notice is provided to the claimants of the class action and the right of opt out, in clear language. There is no reason to suppose that the action on behalf of the class will not be fairly and rigorously heard by the foreign court, or any reason to suppose that it will reach a decision that is substantively unfair to the claimant. We shall consider this argument further in the following paragraphs.

### Representative and group actions in English courts

51.    As Sir Christopher Staughton notes, English law permits group and representative actions. The Civil Procedure Rules (CPR) Part 19.6 allow for representative actions. It states that:

> (1) Where more than one person has the same interest in a claim –
>
> (a) the claim may be begun; or
>
> (b) the court may order that the claim be continued,
>
> by or against one or more of the persons who have the same interest as representatives of any other persons who have that interest.
>
> (2) The court may direct that a person may not act as a representative.
>
> (3) Any party may apply to the court for an order under paragraph (2).
>
> (4) Unless the court otherwise directs any judgment or order given in a claim in which a party is acting as a representative under this rule –
>
> (a) is binding on all persons represented in the claim; but
>
> (b) may only be enforced by or against a person who is not a party to the claim with the permission of the court.

52.    Hence, a representative action will normally bind those on whose behalf

the claim is brought. (Compare *Moon v Atherton* [1972] 2 QB 435, 441). It is true that

such actions would not be available where damages would have to be proved individually

(*Markt & Co v Knight Steamship Co* [1910] 2 KB 1021) and it may well be that such an

action would not be permitted on the facts of the instant case (although I understand that,

in the United States, a procedural mechanism to administer a plan of allocation is put into

place after a class action judgment favorable to plaintiffs, whether by settlement or

otherwise, to determine individual losses). Moreover, in *Markt & Co v Knight Steamship*

*Co* [1910] 2 KB 1021, 1039, Fletcher Moulton LJ commented that "In representative

actions... [t]he plaintiff is the self-elected representative of the others. He has not to

obtain their consent. It is true that consequently they are not liable for costs, but they will

be bound by the estoppel created by the decision".

     53.    It is also the case, as Sir Christopher Staughton notes (para 17), that s.

151(1) of the Supreme Court Act 1981 defines a "party" as "any person who pursuant to

or by virtue of rules of court or any other statutory provision has been served with notice

of, or has intervened in, those proceedings". But even if one accepts that an English

representative action would not be available on the facts of the present case, it by no

means follows that an English court would not enforce a foreign class action judgment.

The approach taken in the United States may be viewed as a legitimate, albeit different,

method of dealing with actions involving multiple claimants overseas, to which due

deference should be given in English courts.

     54.    As Sir Christopher Staughton also notes, English law now recognises the

concept of the Group Litigation Order (GLO), where actions raise common issues of fact or

law, but where the interests of the parties concerned are not identical. CPR 19.12 states

that:

    (1) Where a judgment or order is given or made in a claim on the group register in relation to one or more GLO issues –

        (a) that judgment or order is binding on the parties to all other claims that are on the group register at the time the judgment is given or the order is made unless the court orders otherwise; and

        (b) the court may give directions as to the extent to which that judgment or order is binding on the parties to any claim which is subsequently entered on the group register.

55.    Sir Christopher Staughton notes (para 22) that English law would require a person "to take positive steps to issue a claim against the defendant and then seek… to be added to the register of group litigants". However, one must recognise that, inevitably, some differences in the procedural approach of English and United States' courts exist.

56.    In *Campos v. Kentucky & Indiana Terminal Railroad Company* [1962] 2 Lloyd's Rep 459, 473, McNair J commented that: "…in accordance with English private international law a foreign judgment could not give rise to a plea of *res judicata* in the English Courts unless the party alleged to be bound had been served with the process which led to the foreign judgment." [One must accept that this casts some doubt upon the question of the enforcement of the United States court's judgment.] However, this remark did not form part of the *ratio* of the case, since the claim failed on other grounds. Moreover, the context of the decision shows that this comment was induced partly by the prior finding that even in the United States, the claim in *Campos* was not thought to be a class action capable of binding the claimants. Some sentences previously (p 473), McNair J had said that "…the defendants…. have not satisfied me that the… action was a true class action or that in accordance with American law the judgment in that case bound anyone who was not an original party or did not intervene". The present case is clearly

21

distinguishable, in that the intention of the United States action is to bind all members of the class. Hence, although the *Campos* decision certainly requires due consideration, it is by no means a clear or binding authority.

57.    The question is whether the "opt out" approach in a class action distinguishes it sufficiently from English law's "opt in" approach as to lead to the non-recognition of the United States court's judgment on natural justice grounds. In this respect, although one cannot be certain, it can be contended that the procedures are not sufficiently different to justify the non-recognition of a foreign judgment. Both the English and United States actions are concerned with the virtues of efficient and consistent handling of multiple claimants' actions against the same defendants. Both are concerned, in different manners, with trying to take reasonable steps to ensure that the action is brought to the attention of the potential claimant, and that he is given sufficient time to decide whether to participate in the action. It is true that the class action requires an "opt out"; but if all reasonable steps are taken to bring this to the attention of potential claimants, and a reasonable period of time given to opt out, then it can be argued the mere fact that the procedure adopted in the United States is different ought not to be reason enough in and of itself to refuse to recognise the judgment.

58.    Above all, it is in the very essence of private international law, and the recognition of foreign judgments in particular, that English courts will be faced by procedures, and substantive rules, applied in a foreign court which are different to those that an English court might have applied. Something more is needed before the judgment can be denied recognition. Briggs and Rees, *Civil Jurisdiction and Judgments*, 3rd ed, p 272, comment that: "All civilised systems of civil procedure strike their own balance to

22

protect the rights of the parties; it is inappropriate to point to an isolated difference

between the corresponding rules of English and foreign law, wrenched out of their

context, and allege that it is the source of an injustice to the claimant". *Dicey and Morris*,

p 528, state that a judgment of a foreign court is not "…impeachable because the court

admitted evidence which is inadmissible in England or did not admit evidence which is

admissible in England or otherwise followed a practice different from English law".

59.     In a different, but relevant context, Lord Goff had this to say on the English

common law rules on taking jurisdiction, and the question whether an English court should

refuse to stay proceedings where the centre of gravity of a case lies overseas but the

claimant alleges that he would not obtain justice in the foreign court (*Spiliada Maritime*

*Corp* v *Cansulex Ltd* [1987] AC 460, 482):

> "The key to the solution of this problem lies, in my judgment, in the underlying
> fundamental principle. We have to consider where the case may be tried suitably for
> the interests of all the parties and for the ends of justice… Now, as a general rule, I
> do not think that the court should be deterred from granting a stay of proceedings, or
> from exercising its discretion against granting leave under R.S.C. Ord. 11, simply
> because the plaintiff will be deprived of such an advantage, provided that the court is
> satisfied that substantial justice will be done in the available appropriate forum.
> Take, for example, discovery. We know that there is a spectrum of systems of
> discovery applicable in various jurisdictions, ranging from the limited discovery
> available in civil law countries on the continent of Europe to the very generous pre-
> trial oral discovery procedure applicable in the United States of America. Our
> procedure lies somewhere in the middle of this spectrum. No doubt each of these
> systems has its virtues and vices; but, generally speaking, I cannot see that,
> objectively, injustice can be said to have been done if a party is, in effect, compelled
> to accept one of these well-recognised systems applicable in the appropriate forum
> overseas."

60.     In *Lubbe v Cape plc* [2000] 2 Lloyd's Rep 383, 393, the English court was

faced with an action by a large number of claimants who had suffered asbestos poisoning

in South Africa. They had worked for the South African subsidiary of an English

company. In deciding whether the English courts should hear the case, Lord Bingham

23

said the following:

> "The plaintiffs, as a ground for challenging the appropriateness of the South African
> forum, relied on the absence of established procedures in South Africa for handling
> group actions such as the present. They compared that situation with the procedural
> situation here, where the conduct of group actions is governed by a recently-
> developed but now tried and established framework of rules, practice directions and
> subordinate legislation. I do not regard this objection, standing alone, as compelling.
> It involves the kind of procedural comparison which the English Court should be
> careful to eschew and the evidence is clear that South African Courts have inherent
> jurisdiction to adopt procedures appropriate to the cases they are called upon to
> handle."

A similar principle emerges in *Connelly Respondent v. R.T.Z. Corporation Plc.* [1998] AC

854.

61.     In summarising the principles of jurisdiction of English courts at common

law, *Briggs and Rees* observe (p 272): "Moreover, the courts have been firm and consistent

in their assertion that any attempt by a claimant to make general and disparaging

comparisons between English and foreign procedures is impermissible, the more so if there

is no firm evidential basis for the allegations advanced".

62.     English courts should accordingly show considerable caution before

condemning United States' procedure as a breach of natural justice. If English courts

routinely did this when the procedural law of a state of origin differed from English civil

procedure, the recognition and enforcement of foreign judgments would largely break

down. With due respect, it is suggested that Sir Christopher Staughton's comments are

not sufficient to demonstrate that simply because United States' procedural law differs

from English law, the foreign judgment would necessarily not be recognised in England.

### *Dicey and Morris*

63.     Sir Christopher Staughton makes reference to "the leading work on

English private international law", L Collins (ed) *Dicey and Morris*, 13th ed, and observes

24

"there is not a single example of a US class action being enforced by the English courts" (paras 27 and 28). I am an author of the forthcoming 14th edition of *Dicey and Morris*. With respect, Sir Christopher Staughton does not give a wholly accurate picture of the approach that the book takes. *Dicey and Morris* states the general position in the law using a series of rules, and gives examples based upon case law. We have already stated the general rules above; this tends to suggest that the judgment meets the orthodox criteria for jurisdictional competence in the eyes of English law. *Dicey and Morris* also goes on to state exceptions/defences to the general rules and again gives examples, based on actual case law. We have seen that examples of successful use of the natural justice defence in English courts have been concerned with the position of the defendant only. The fact that *Dicey and Morris* does *not* give a single example of a foreign class action judgment being *denied* recognition on natural justice grounds (or any other basis) is the relevant point. In other words, the inference to be drawn is exactly the opposite one to that which Sir Christopher Staughton draws from *Dicey and Morris*. It suggests that, at present, there is no case in English law which denies recognition and enforcement to a judgment against the claimant. Unless and until an English court decides to the contrary, general principle would tend to suggest that a class action may be entitled to recognition in England.

### *Public policy*

64.      We have seen that successful use of the public policy defence in English courts is extremely rare. Briggs and Rees, *Civil Jurisdiction and Judgments*, 3rd ed, 481 comment that: "The usual extreme examples are an order to pay damages for breach of a contract to kidnap, or those based on openly racist laws". It is clear that, on the facts of

25

the present case, we are very far from the typical, extreme cases where the public policy

has successfully been used. Moreover, this defence normally relates either to the award

itself, or, occasionally, to the substance of the law applied in the foreign court. In the

instant case, there is no reason to object to the law applied in the foreign court, and

certainly no reason at this stage to believe that any ensuing court judgment will be

repugnant to an English court on its substance. The only arguments are procedural; and

we have already seen that English courts are loathe to make comparisons between the

procedures of different states. It is suggested that the public policy defence adds nothing

in the present context to the defence of natural justice. If the foreign judgment is

unobjectionable on natural justice grounds, there is no reason to think that it will be

objectionable on public policy grounds.

### *Estoppel*

65.   In para 41, Sir Christopher Staughton questions whether the principle of

*res judicata* could apply, since the claimants might be found not to be "parties" to an

action overseas which they did not expressly opt into. But if the overseas court is

jurisdictionally competent against the defendants, and if the judgment is not contrary to

natural justice or public policy, this point does not appear to add anything to the

argument. In such circumstances, the claimants should be considered "parties" to the

action in the United States (and are so considered in the United States, I understand, after

the action is "certified" as a class action).

66.   Nevertheless, there may be a separate point here. If the English

representative action is somewhat different in nature to the class action in the United

States, would the court consider the causes of action to be the same? Sir Christopher

26

Staughton refers to *Carl Zeiss Stiftung v Rayner & Keeler* [1967] 1 AC 753. It is true that in that case the court urged caution in the application of the estoppel doctrine, stressing that it may be very hard to determine whether a foreign court has decided a particular issue in reaching its judgment. A court must satisfy itself that the issue in question in the foreign and English courts is identical, that the parties are identical and that the foreign ruling was final and conclusive.

67.     However, the court in that case was concerned with issue estoppel. The major issue in the instant case is one of cause of action estoppel. The question is if the United States judgment, otherwise entitled to recognition, creates a cause of action estoppel such as to prevent the matter being litigated afresh in England. Recent case law tends to suggest that the phrase "cause of action" is broadly construed in this context. In the House of Lords case of *The Indian Grace*, [1993] AC 410, goods were damaged in transit. A small amount of the cargo was discarded in France; the remained was found to be unusable when unloaded in India. An action was brought in India *in personam* for short delivery of the cargo discarded in France. A second action was then brought *in rem* in the English courts in relation to the remaining cargo. The House of Lords held that cause of action estoppel prevented the second action, notwithstanding that it concerned a different portion of the cargo. The cause of action was held to be the same. Nor did the fact that the first action was *in personam* and the second action was *in rem* shake the court's view (*The Indian Grace (No 2)* [1998] AC 878). In short, if the United States action is otherwise entitled to recognition in England, I believe that it is more likely than not that an English court would conclude that this estopped the claimant from bringing a fresh action in England on the basis of English rules of procedure.

### The impact of the European Convention on Human Rights

68.     Sir Christopher Staughton makes reference to the European Convention on

Human Rights (ECHR) and its potential impact. At this stage, the possible impact of the

ECHR on the recognition of foreign judgments is highly uncertain and undeveloped and

one cannot be sure what effect it will have (see *Dicey and Morris, Fourth Supplement to

the 13th ed,* pp 175-6). In *Pellegrini v Italy* (2002) 35 E.H.R.R. 44, it was suggested that

an Italian court was bound to deny recognition to a judgment of a non-Member State of

the European Union (Vatican) where a fair trial had not taken place in the state of origin.

But in *Government of USA v Montgomery (No 2)* [2004] H.R.L.R. 36, the House of Lords

distinguished the decision in *Pellegrini* (on the basis that a special Concordat existed

between Italy and the Vatican) and held that the ECHR does not normally apply with

respect to an order from a United States court. Lord Carswell, at 1014, commented thus:

> "In considering these arguments it is necessary to have regard to the territoriality
> principle, governing the territorial reach of the Convention and its limitations, aptly
> described in para.[86] of the judgment of the European Court in *Soering v United
> Kingdom* (1989) 11 E.H.R.R. 439, 466:
>
>> 'Article 1 of the Convention, which provides that 'the High Contracting Parties
>> shall secure to everyone within their jurisdiction the rights and freedoms defined
>> in Section 1,' sets a limit, notably territorial, on the reach of the Convention. In
>> particular, the engagement undertaken by a contracting state is confined to
>> 'securing' ('reconnaitre' in the French text) the listed rights and freedoms to
>> persons within its own ' jurisdiction'. Further, the Convention does not govern the
>> actions of states not parties to it, nor does it purport to be a means of requiring the
>> contracting states to impose Convention standards on other states.'
>
> Given this territorial limitation, it is difficult to see how registration of the US court's
> order could constitute a direct breach of its terms…".

69.     He went on to note that, in exceptional cases, the provisions of the ECHR,

and Article 6 in particular, could be applied to a judgment of a state not party to that

Convention but noted that (1017) "…the European Court has strongly emphasised the

28

exceptional nature of such a jurisdiction and the flagrant nature of the deprivation of an applicant's rights which would be required to trigger it." (See the *Soering* case; and see *R. (Ullah) v Special Adjudicator* [2004] UKHL 26; [2004] 3 W.L.R. 23 and *R. (Razgar) v Secretary of State for the Home Department* [2004] UKHL 27; [2004] 3 W.L.R. 58). The latter two cases suggested, according to Lord Carswell in *Montgomery* (p 1017), that this "...would have to amount to a virtually complete denial or nullification of his Art.6 rights, which might be expressed in terms familiar to lawyers in this jurisdiction as a fundamental breach of the obligations contained in the article." Accordingly, even if it were the case that the ECHR may provide a separate defence to recognition of foreign judgments from outside Europe in certain cases, it is clear that the threshold for this to be invoked is extremely high.

70.     Nevertheless, let us consider the position if, for the sake of argument, the ECHR could be applied to a United States court's judgment. Article 6(1) ECHR provides that: "In the determination of his civil rights and obligations or of any criminal charge against him, everyone is entitled to a fair and public hearing within a reasonable time by an independent and impartial tribunal established by law." There is no reason to suppose that the action in the United States will not be "fair", given "within a reasonable time" and "by an independent and impartial tribunal established by law".

71.     It is true that in the case from which Sir Christopher Staughton quotes (at para 43 of his declaration), *Miragall Escolano and Others v Spain* Nos 38366/97 et al, §37, E Ct H Rts Rep 2000, (2002) 34 E.H.R.R.24 (25 January 2000), the court did say (para 37 of the judgment) that: "The parties must be able to avail themselves of the right to bring an action or to lodge an appeal from the moment they can effectively apprise

themselves of court decisions imposing a burden on them or which may infringe their legitimate rights or interests". However, in the preceding sentence, it showed that the facts of the case were concerned with a different point, namely an allegation that the Spanish court had infringed the applicants' right to a fair hearing by ruling that for the purposes of lodging an appeal, time had started to run from the date of delivery of its judgment in proceedings. This was alleged to be "…an unreasonable construction of a procedural requirement which prevented a claim for compensation being examined on the merits and thereby entailed a breach of the right to the effective protection of the courts." In the present case, there is absolutely no suggestion that the United States' courts will have done anything other than properly and fairly apply its own law on the permissibility of bringing a class action.

72.    One might argue that the United States action allows a proper consideration of the claim for compensation and allows the claimant the effective protection of the courts. It would be difficult to argue that the United States court had shown a "… flagrant… deprivation of an applicant's rights." (see para 65 above). Accordingly, there is no clear reason to think that Article 6(1) of the ECHR will provide a basis for refusal to recognise the United States judgment.

**D.    CONCLUSION**

69.    I therefore conclude that one cannot be certain on the existing state of English law whether this judgment would be recognised and enforced in England. However, in my view, there is a strong case for the judgment's recognition and enforcement in England. This is on the assumption that the United States court is jurisdictionally competent in the eyes of English law over the defendants and meets the criteria for recognition considered above. English law does not normally apply its rules

30

on jurisdictional competence to claimants. Nor does it apply its natural justice defence to claimants. Even if it were now to do so, the court might still conclude that the fact that United States rules of procedure differ from the English law on group and representative actions does not prevent the recognition of the judgment in England.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 11th day of May 2005, in Birmingham, England.


Professor Jonathan Harris

## PROFESSOR JONATHAN M. HARRIS, BCL, MA, PhD

**Academic position:**

January 2002- *Professor of International Commercial Law, School of Law, University of Birmingham.*

I am a specialist in Private International Law.

**Previous positions:**

September 2000- December 2001- *Reader in Law, University of Nottingham.*

September 1995- August 2000- *Lecturer in Law, University of Birmingham.*

**Authored Books**

*The Hague Trusts Convention* (Oxford, Hart Publishing, 2002). This book, published in May 2002, is the first monograph to address the subject. It is some 544 pages in length (over 220,000 words). The book is sole authored. It has been the subject of outstanding reviews.

*International Sale of Goods in the Conflict of Laws* (Oxford, OUP, 2005)- co-authored with Prof. James Fawcett (Nottingham University) and Prof. Michael Bridge (UCL). This is the first ever monograph on this subject. It is 1458 pages in length. I wrote 9 of the 21 chapters (some 600 pages).

*Dicey and Morris*

I have recently become one of the authors of the United Kingdom's leading work on private international law, *Dicey and Morris, The Conflict of Laws.* I am working on the fourteenth edition of this classic text, which is due for publication in 2006.

**Authorship of substantial parts of books**

*Underhill and Hayton, Law Relating to Trusts and Trustees* (16th edition, 2003). I have written one of the six parts of the book, which deals with trusts with foreign elements (the book is 1100 pages long).

*Product Liability* by Prof. John Miller and Dr Richard Goldberg (Oxford, OUP, 2004). I wrote around 100 book pages of this work and am named as a major contributor to it.

**Journal Publications and Chapters in Books**

"The Ambivalent Plaintiff and the Scope of *Forum Non Conveniens*", (1996) 15 *Civil Justice Quarterly* 279-283.

"Recognition of Foreign Judgments at Common Law- the Anti-Suit Injunction Link", (1997) 17 *Oxford Journal of Legal Studies* 477-498.

"Anti-Suit Injunctions- a Home Comfort?", [1997] *Lloyd's Maritime and Commercial Law Quarterly* 413-422.

"Rights *in Rem* and the Brussels Convention", (1997) 22 *European Law Review* 179-185.

"Staying Proceedings for another Contracting State to the Brussels Convention", (1997) 113 *Law Quarterly Review* 557-562.

"Restraint of Foreign Proceedings- the View from the other Side of the Fence", (1997) 16 *Civil Justice Quarterly* 283-289.

"Launching the Rocket- Capacity and the Creation of *Inter Vivos* Transnational Trusts", (1997) 6 *Journal of International Trusts and Corporate Planning* 118-132 and 165-179 (two-part article) ISSN 1350-7605; also published in Glasson (ed) *International Trust Laws* (Jordans), Chapter C.3, pp. 1- 28.

"Choice of Law in Tort- Blending in with the Landscape of the Conflict of Laws?", (1998) 61 *Modern Law Review* 33-55.

"Jurisdiction Clauses and Void Contracts" (1998) 23 *European Law Review*" 279-285.

"Related Actions and the Brussels Convention" [1998] *Lloyd's Maritime and Commercial Law Quarterly* 145-152.

"Public Policy and the Enforcement of International Arbitration Awards: Controlling the Unruly Horse" [1998] *Lloyd's Maritime and Commercial Law Quarterly* 568-578 (with Frank Meisel).

"Transnational Trust Litigation: Jurisdiction and the Enforcement of Foreign Judgments", Glasson (ed) *International Trust Laws* (1998, Jordans), Chapter C.1, pp. 1-71. Substantially revised and updated in 2000 for the same publication; Chapter C.1 pp. 1-74. *Substantially revised and updated* in December 1999 for publication in the *Journal of International Trusts and Corporate Planning* as a three-part article: see (1999) 7 J Int P 227-254; (2000) 8 J Int P 37-57; (2000) 8 J Int 101-132.

"Civil Jurisdiction and Judgments" and "Enforcement of Foreign Judgments"- Book Reviews, (1999) 18 *Civil Justice Quarterly* 185-188.

"Justiciability, Choice of Law and the Brussels Convention", [1999] *Lloyd's Maritime and Commercial Law Quarterly* 360-369.

"Use and Abuse of the Brussels Convention," (1999) 115 *Law Quarterly Review* 576-583.

"Autonomy in International Contracts"- Book Review, (2000, January) 19 *Civil Justice Quarterly* 92-94.

"Contractual Freedom and the Conflict of Laws", (2000) 20 *Oxford Journal of Legal Studies* 247-269.

"Transnational Health Care Litigation and the Private International Law (Miscellaneous Provisions) Act 1995, Part III" , in Goldberg and Lonbay (eds) *Pharmaceutical Medicine, Biotechnology and European Law* (Cambridge University Press, 2000), chapter 9, pp. 205-229.

"Consumer Protection in Private International Law", in *Property and Protection: Essays in Honour of Brian Harvey* (Oxford, Hart Publishing, 2000), chapter 11, pp. 245-268.

"Law's Future(s)- the Conflict of Laws", in Hayton (ed) *Law's Future(s)* (Oxford, Hart Publishing, 2000) (with Prof. David McClean), chapter 9, pp.161-184.

"Forum Shopping in International Libel", (2000) 116 *Law Quarterly Review* 562-569.

Ordering the Sale of Land Situated Overseas" [2001] *Lloyd's Maritime and Commercial Law Quarterly* 205-214.

"The Brussels Regulation" (2001) 20 *Civil Justice Quarterly* 218-224.

"Joinder of Parties Located Overseas", (2001) 20 *Civil Justice Quarterly* 290-300

"Jurisdiction and the Enforcement of Foreign Judgments in Transnational Trusts Litigation", in J Glasson (ed), *The International Trust*, chapter 1, pages 9-87.

"Launching the Rocket- Capacity and the Creation of *Inter Vivos* Transnational Trusts" in J Glasson (ed), *The International Trust*, chapter 2, pages 89-119.

"The Trust in Private International Law" in *Festschrift for Sir Peter North* (Oxford, OUP, 2002), pp 187-213.

"Tracing and the Conflict of Laws", (2002) 73 *British Yearbook of International* Law, 65-102.

3

"Variation of Trusts Governed by Foreign Law upon Divorce" (2005) 121 *Law Quarterly Review* 16-23.

### Awaiting publication

"Does Choice of Law Make Any Sense?" accepted for publication in "*Current Legal Problems*" (26,000 words).

"Arbitration Clauses and the Restraint of Proceedings in Another Member State of the European Union", forthcoming [2005] *Lloyd's Maritime and Commercial Law Quarterly* 159-167.

### Book contract

I have a contract to write a sole authored monograph for Hart Publishing, Oxford entitled *'The Private International Law of Trusts: Equity and Jurisdiction'*, upon which I intend to start work in late 2005.

### Founding editorship of journal

I am one of two editors of the *Journal of Private International Law*, (with Prof. Paul Beaumont, Aberdeen) to be launched by Hart Publishing of Oxford in April 2005. This is the first English language journal dedicated to the subject and is to be a truly international journal. We have assembled an editorial advisory board of some of the very biggest names in the world in Private International Law.

I am co-organising a launch conference for the journal at the University of Aberdeen on 29 and 30 March 2005. We have leading private international law speakers from across the world speaking at this conference.

### Other editorial work

I am on the editorial board of the *Journal of International Trust and Corporate Planning*. This is a leading international trusts journal and attracts contributions from many distinguished academics and practitioners.

I was an Assistant Editor of *Civil Justice Quarterly* for more than seven years. I have recently stepped down from this role to concentrate upon the co-editorship of the *Journal of Private International Law*.

### Teaching

I am course leader for the LLB Commercial Conflict of Laws course in Birmingham, on which I am the sole teacher. I am also course leader for the LLB Commercial Conflict of

Laws dissertation module and for the LLM Conflict of Laws course. I have taught these courses for many years at Birmingham and established them all from scratch.

I also teach the LLM Conflict of Laws course at the University of Nottingham.

I supervise four doctoral students pursuing research in Private International Law.

I also teach Equity and Trusts.

I have previously taught Contract Law, Land Law and Criminal Evidence.

### External examining

I am an external examiner on the LLB degree at University College, London.

I am also an external examiner on the LLM degree at King's College, London and the London School of Economics (one of the largest in the country).

### Administration

*Director of Research-* I am Director of Research in the Law School and have overall responsibility for monitoring and managing the level of research performance of all colleagues in the School.

Previously, I was co-Director of the taught LLM degree.

### Drafting legislation

I have been extensively involved in the drafting of a new Trusts Act for the British Virgin Islands and have had a major influence upon the content of the new Private International Law provisions of the Act. The approach adopted is a unique development, which, it is hoped, will prove an inspiration for other offshore jurisdictions around the world.

### Other professional work

I regularly provide advice and opinions on private international law matters to leading barristers and to major city law firms.

I also deliver seminars at leading city law firms, such as Freshfields and Baker and McKenzie, on topics in private international law.

### Previous education and qualifications

5

I graduated in 1994 with a first class honours degree in law from Oxford University, where I studied at Jesus College. I completed the postgraduate BCL degree at the same institution in 1995.

I received a substantial number of prizes at Oxford for academic excellence during my studies, including a prize for my Finals results and for being the outstanding law student at Jesus College.

I was subsequently awarded a PhD degree by Birmingham University on the basis of my published work.