**FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| ──────────────────────────── | : |  |
| IN RE: | : | No. 04-374 (JAP) |
|  | : | (Consolidated cases) |
| ROYAL DUTCH/SHELL TRANSPORT | : |  |
| SECURITIES LITIGATION | : | **AMENDED OPINION**[1] |
| ──────────────────────────── | : |  |

APPEARANCES:

**Plaintiffs' Counsel**:

Stanley D. Bernstein
Jeffrey M. Haber
William A. K. Titelman
Mark T. Millkey
Michael S. Bigin
**BERNSTEIN LIEBHARD & LIFSHITZ, LLP**
10 East 40th Street
New York, NY 10016
bernstein@bernlieb.com
haber@bernlieb.com
titelman@bernlieb.com
millkey@bernlieb.com
bigin@bernlieb.com

*Attorneys for the Pennsylvania State Employees' Retirement System and the Pennsylvania Public School Employees' Retirement System, and Lead Counsel for the Class*

John E. Keefe, Jr.
Stephen T. Sullivan, Jr.
**LYNCH KEEFE BARTELS**
830 Broad Street

───────────────────

[1] This Amended Opinion is necessary to correct the list of counsel appearances.  No changes have been made to the substance of the Opinion.

Shrewsbury, NJ 07702
ssullivan@lkblaw.com

*Liaison Counsel for the Class*


Thomas W. Corbett, Jr., Attorney General
Daniel J. Doyle, Senior Deputy Attorney General
**OFFICE OF ATTORNEY GENERAL**
**LITIGATION SECTION**
5th Fl. Strawberry Square
Harrisburg, PA 17120
ddoyle@attorneygeneral.gov

Gerald Gornish, Chief Counsel
Lenann T. Engler, Assistant Counsel
**LEGAL OFFICE OF COMMONWEALTH OF PENNSYLVANIA**
**PUBLIC SCHOOL EMPLOYEES'**
**RETIREMENT SYSTEM**
5 North Fifth Street, 5th floor
Harrisburg, PA 17101
ggornish@state.pa.us
lengler@state.pa.us

Michael A. Budin, Chief Counsel
Brian E. McDonough, Deputy Chief Counsel
**LEGAL OFFICE OF COMMONWEALTH OF PENNSYLVANIA STATE EMPLOYEES'**
**RETIREMENT SYSTEM**
30 North Third Street
Harrisburg, PA 17101
mbudin@state.pa.us
bmcdonough@state.pa.us


**Defendants' Counsel**:

Joseph I. Goldstein
Richard J. Morvillo
Bruce M. Bettigole
Adriaen M. Morse Jr.
**MAYER BROWN ROWE & MAW LLP**
1909 K Street, N.W.
Washington, DC 20006-1101
jgoldstein@mayerbrownrowe.com
rmorvillo@mayerbrownrowe.com

bbettigole@mayerbrownrowe.com
amorse@mayerbrownrowe.com

*Attorneys for Sir Philip R. Watts*

Colby A. Smith
Scott N. Auby
**DEBEVOISE & PLIMPTON LLP**
555 13th Street, N.W.
Washington, D.C. 20004
casmith@debevoise.com
snauby@debevoise.com

and

Ralph C. Ferrara
Ann M. Ashton
Jonathan E. Richman
**LEBOEUF, LAMB, GREENE &**
**MACRAE LLP**
1875 Connecticut Avenue, N.W.
Suite 1200
Washington, DC 20009-5715
rferrara@llgm.com
amashton@llgm.com
jrichman@llgm.com

*Attorneys for Defendants N.V. Koninklijke Nederlandsche Petroleum Maatschappij (Royal Dutch Petroleum Company) and The "Shell" Transport and Trading Company, Public Limited Company*

Jeffrey A. Cohen
Owen J. McKeon
**ROBERTSON, FREILICH, BRUNO & COHEN, LLC**
The Legal Center
One Riverfront Plaza
Newark, NJ 07102-5468
jcohen@rfbclaw.com
omckeon@rfbclaw.com

*Attorneys for Defendants N.V. Koninklijke Nederlandsche Petroleum Maatschappij (Royal Dutch Petroleum Company), The "Shell" Transport and Trading Company, Public Limited Company, Sir Philip R. Watts, and Judith Boynton*

Nancy J. Sennett
Rebecca E. Wickhem

3

**FOLEY & LARDNER, LLP**
777 East Wisconsin Avenue
Milwaukee, WI 53202
nsennett@foley.com
rwickhem@foley.com

and

Samuel J. Winer
**FOLEY & LARDNER, LLP**
Washington Harbour
3000 K Street, N.W., Suite 500
Washington, D.C. 20007-5109
swiner@foley.com,

*Attorneys for Judith Boynton*

William R. Maguire
Derek J. T. Adler
**HUGHES HUBBARD & REED LLP**
One Battery Park Plaza
New York, NY 10004-1482
maguire@hugheshubbard.com
adler@hugheshubbard.com

and

Wilfred P. Coronato
John N. Poulos
**HUGHES HUBBARD & REED LLP**
101 Hudson Street, Suite 3601
Jersey City, New Jersey 07302
coronato@hugheshubbard.com
poulos@hugheshubbard.com

*Attorneys for Defendant PricewaterhouseCoopers LLP*

John M. Dowd
Evangeline C. Paschal
Paul W. Butler
Jeffrey M. King
**AKIN GUMP STRAUSS HAUER & FELD LLP**
Robert S. Strauss Building
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036-1564
jdowd@akingump.com

4

epaschal@akingump.com
pbutler@akingump.com
jking@akingump.com

*Attorneys for Walter van de Vijver*

Steven F. Molo
John Gueli
**SHEARMAN & STERLING LLP**
599 Lexington Avenue
New York, NY 10022-6069
smolo@shearman.com
jgueli@shearman.com

and

Donald A. Robinson
Leda Dunn Wettre
**ROBINSON & LIVELLI**
2 Penn Plaza East
Newark, NJ 07105
drobinson@robinsonlivelli.com
lwettre@robinsonlivelli.com

*Attorneys for Defendant KPMG Accountants N.V.*

James R. Warnot, Jr.
Michael J. Osnato, Jr.
**LINKLATERS**
1345 Avenue of the Americas
19th Floor
New York, NY 10150
jim.warnot@linklaters.com
mike.osnato@linklaters.com

and

J. Michael Riordan
**BRESSLER, AMERY & ROSS P.C.**
325 Columbia Turnpike
Florham Park, NJ 07932
jmriordan@bressler.com,

*Attorneys for Defendant KPMG International*

PISANO, District Judge.

## I.  INTRODUCTION

The claims in this putative securities fraud class action stem from the dissemination of what Lead Plaintiff characterizes as "materially false and misleading statements" concerning the reported proved oil and natural gas reserves of the Royal Dutch Petroleum Company and the Shell Transport and Trading Company, PLC (together, "Royal Dutch/Shell").  *See* Consolidated Amended Class Action Complaint ("Complaint") ¶ 3.  Defendants filed motions to dismiss the Complaint, on which Chief Judge Bissell heard extensive oral argument and ultimately resolved in a comprehensive opinion filed on August 9, 2005.  *See In re Royal Dutch/Shell Transport Securities Litigation*, 380 F. Supp. 2d 509, 515 (D.N.J. 2005).

The parties filed multiple motions for reconsideration of various portions of the Order. Among these was Lead Plaintiff's motion for reconsideration of the dismissal of the Section 10(b) claims asserted by those who purchased Royal Dutch/Shell securities during the Class Period[2] but had not yet sold their securities as of the time of the Court's decision ("Holding Plaintiffs"), as set forth in Paragraph 8 of the Court's August 9, 2005 Order and at page 557 of the Opinion.  On August 26, 2005, this litigation was reassigned to the undersigned.  After the reassignment, the Court entered an order on November 9, 2005 denying all motions for reconsideration except Lead Plaintiff's motion concerning the dismissal of Holding Plaintiffs' claims.  Because Chief Judge Bissell did not have the benefit of briefing on the pertinent issues and authorities, the Court granted Lead Plaintiff's motion for reconsideration.

---

[2] The "Class Period" is between April 8, 1999 and March 18, 2004.  *Royal Dutch/Shell Transport Securities*, 380 F. Supp. 2d at 515.

The Court has now reconsidered those portions of the Court's August 9, 2005 Order and Opinion that dismissed Holding Plaintiffs' claims.  The instant opinion addresses the merits of Defendants' motions to dismiss the claims of Holding Plaintiffs.  For the reasons expressed below, the Court denies Defendants' motions to dismiss the claims of Holding Plaintiffs.

## II. DISCUSSION

In their motions to dismiss, Defendants, citing *Dura Pharmaceuticals, Inc. v. Broudo*, __ U.S. __, 125 S. Ct. 1627 (April 19, 2005), had challenged the adequacy of the Complaint's allegations of loss causation and economic loss.  Among Defendants' arguments was that, because the stock had recovered its lost value, any putative class member who did not sell the subject securities within 90 days after the end of the Class Period could not establish the economic loss or loss causation elements of a Section 10(b) securities fraud claim as to those unsold shares.

In the August 9, 2005 Opinion, the Court dismissed Holding Plaintiffs' claims as follows:

> *Shares of Purchasers Who Have Purchased During the Class Period and Have Not Yet Sold*
> Defendants also argue that the claims of those purchasers that have not yet sold the securities cannot survive this motion to dismiss. In light of the *Dura* decision, this Court agrees. Such purchasers are invoking the exact insurance policy that *Dura* warned against and any such losses are speculative, at best.  Those who purchased during the Class Period but have yet to sell their securities have not alleged proximate causation and economic loss; therefore those purchasers may not join the putative class.

*Royal Dutch/Shell Transport Securities*, 380 F. Supp. 2d at 557; *see also* Order ¶ 8 (August 9, 2005).  Underlying the Court's conclusion was the assumption that, in order to adequately plead, and ultimately to prove, loss causation and economic loss, a plaintiff who purchased during the

Class Period also must have subsequently sold the subject securities.

In moving for reconsideration of the Court's dismissal of the Holding Plaintiffs' claims, Lead Plaintiff challenges the Court's application of *Dura* because *Dura* did not address whether securities fraud victims must sell their securities after revelation of wrongdoing in order to adequately plead economic loss or loss causation, and argues that the Court's ruling conflicts with the Private Securities Litigation Reform Act ("PSLRA"), decades of jurisprudence, and public policy. In opposition, Defendants in relevant part argue that *Dura* requires both a purchase of and a sale of securities in order for a plaintiff to plead economic loss, and thus that the Court's construction of *Dura* was correct.

Upon reconsideration, the Court concludes that Holding Plaintiffs' securities fraud claims should not have been dismissed solely because the Holding Plaintiffs retained the subject securities. In order to plead and prove loss causation and economic loss, a plaintiff alleging fraud in connection with the purchase of securities is not necessarily required to sell the subject securities. First, the statutory scheme that provides the measure of damages available to securities fraud plaintiffs does not mandate sale of the securities. Second, holding plaintiffs have long been permitted to litigate securities fraud claims. Third, policy concerns dictate against the imposition of a sell-to-sue requirement. Finally, *Dura* neither expressly nor implicitly mandates that the subject securities be sold in order for a plaintiff to have suffered cognizable economic loss.

A. **Requiring Sale of the Securities Is Inconsistent with the Statutory Scheme**

Section 21D(e) of the PSLRA sets forth a limitation on damages available to plaintiffs alleging a violation of Section 10(b). PSLRA Section 21D(e) provides:

(1) In general

Except as provided in paragraph (2), in any private action arising under this chapter in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price[3] of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market.

(2) Exception

In any private action arising under this chapter in which the plaintiff seeks to establish damages by reference to the market price of a security, if the plaintiff sells or repurchases the subject security prior to the expiration of the 90-day period described in paragraph (1), the plaintiff's damages shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the security and the mean trading price of the security during the period beginning immediately after dissemination of information correcting the misstatement or omission and ending on the date on which the plaintiff sells or repurchases the security.

15 U.S.C. § 78u-4(e)(1), (2).  Nothing in Section 21D(e) requires a sale of the subject

securities, either before or after the expiration of the 90-day period, in order for a plaintiff

potentially to be eligible for damages.  Requiring a sale of the subject security thus would be

inconsistent with this statutory scheme.

Section 21D(e) is consistent with prior case law that did not mandate a sale of the subject

securities.  Congress is presumed to be aware of relevant legal precedents when it legislates.  *See,*

*e.g., Faragher v. City of Boca Raton*, 524 U.S. 775, 792 (1998).  The Court, therefore, may

presume that Congress knew when it passed the PSLRA that holding plaintiffs could maintain an

action for securities fraud and potentially be eligible for damages, and that Congress therefore

would have drafted PSLRA Section 21D(e) to require a sale of the subject securities if that were

---

[3]  For purposes of this provision, the "mean trading price" of a security is defined as "an average of the daily trading price of that security, determined as of the close of the market each day during the 90-day period. . . ."  15 U.S.C. § 78u-4(e)(3).

9

its intention.  *Cf. Farmer v. Litscher*, 303 F.3d 840, 842-43 (7th Cir. 2002).

More fundamentally, the plain language of Section 21D(e) neither expressly requires
shareholders to sell the subject securities nor implies that a sale is required for damages to be
calculable.  *See Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 93 (3d Cir. 2000)
("It is axiomatic that any inquiry as to the meaning of a statute must begin with its language");
*see also Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992).  Subsection (1) of
Section 21D(e) requires that a shareholder's damages be limited by taking into account the value
of the security when the shareholder originally purchased the security and the average market
price of the security during the 90 days after curative disclosure.  *Id.*  Subsection (1) renders
irrelevant to the calculation of damages any movement in the price of the security after the end of
the 90-day look-back period.  By its terms, Subsection (1) does not mandate sale of the subject
securities.  To the extent that Section 21D(e) addresses sale of the subject securities at all, it does
so in Subsection (2).

Subsection (2) sets forth the calculation of damages where the subject securities were
sold during the 90-day look-back period.  Subsection (2) does not require a plaintiff to sell
prior to the expiration of the 90-day period.  First, by its plain terms, Subsection (2) applies
"*if* the plaintiff sells" during that period.  *See* 15 U.S.C. § 78u-4(e)(2) (emphasis added).
Second, Subsection (2) is an exception to the general rule prescribed in Subsection (1).  *See*
15 U.S.C. § 78u-4(e)(1) (indicating that Subsection (1) applies "Except as provided in
paragraph (2)"), (2) (entitled, "Exception").  If a plaintiff has not sold by the expiration of the
90-day period to qualify for the exception in Subsection (2), the general rule in Subsection (1)
applies.  The default scenario established in Section 21D(e) is, therefore, that a shareholder

will retain the subject security beyond the end of the 90-day period.  Third, because Section 21D(e) defines a sale of securities during the 90-day period to be an exception to the default scenario in which no sale is made prior to the expiration of the 90-day period, Subsection (2) cannot be read to mandate a sale of the subject securities during the 90-day period.  An interpretation of Section 21D(e) requiring sale prior to the expiration of the 90-day period would render Subsection (1) superfluous.  Principles of statutory construction do not permit an exception to render superfluous the general rule.  *See, e.g., Comm'r v. Clark*, 489 U.S. 726, 739 (1989); *see also Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992).

Further, nothing in Section 21D(e) can be read to require a sale of the subject securities after the expiration of the 90-day period.  Section 21D(e) is silent as to the effect, if any, of a sale of the subject securities after the 90-day period expires.  Indeed, for the purposes of calculating damages, Section 21D(e) renders irrelevant anything occurring after the 90th day following the dissemination of curative information.  Because the default scenario is that a shareholder will not sell the subject securities prior to the end of the 90-day look-back, and because Section 21D(e) disregards what may occur after the 90th day, in enacting Section 21D(e) Congress must have contemplated that allegedly defrauded shareholders who continued to retain the subject securities after the 90-day period expires would bring an action and potentially be eligible for damages under the calculation set forth in Subsection (1).  Section 21D(e) cannot, therefore, be interpreted to require a purchasing plaintiff to sell the subject securities in order to maintain a securities fraud action.

**B.  Because a Securities Fraud Plaintiff's Damages Are Based Upon Decline in the Security's Value, Holding Plaintiffs Have Long Been Permitted to Maintain Securities Fraud Actions**

The limitation on damages set forth in Section 21D(e) is consistent with the out-of-pocket loss measure of damages traditionally applied by courts.  Both prior to and after the enactment of the PSLRA in 1995, "[t]he damages of a purchaser were always understood to be the difference between the purchase price and the true value of the shares (adjusted for any negative causation) as disclosed after the revelation of the fraud to the public, followed by a reasonable period (usually no longer than a week or ten days) during which the market took cognizance of the fraud and the publicly traded price was presumed, under the 'efficient market' hypothesis . . ., to reflect an adjustment for the fraud."  *See In re Oxford Health Plans, Inc. Sec. Litig.*, 244 F. Supp. 2d 247, 250 (S.D.N.Y. 2003).[4]  Under this conception of a plaintiff's economic loss, sale of the securities is logically unnecessary.

Section 28(a) of the Exchange Act limits private plaintiffs suing under the Exchange Act to "actual damages."  15 U.S.C. 78bb(a).  While "Congress did not specify what is meant by 'actual damages,'" *Loftsgaarden*, 478 U.S. at 662, courts generally had determined that the proper measure of damages in a 10(b) action is "out-of-pocket losses."  *Sowell v. Butcher & Singer, Inc.*, 926 F.2d 289, 297 (3d Cir. 1991); *see also In re Oxford Health Plans, Inc. Sec. Litig.*, 244 F. Supp. 2d 247, 250 (S.D.N.Y. 2003).  The out-of-pocket rule permitted a purchaser to recover the difference between the purchase price and the true value of the securities absent

---

[4] The only real change effected by Section 21D(e) is that this provision set at 90 days "the time period during which the efficient market is deemed to have recognized and adjusted for the fraud, and has begun to reflect (again) the 'true value' of the security," which "substantial[ly] enlarge[d]" the look-back period.  *Oxford Health*, 244 F. Supp. 2d at 250.

the alleged fraud as measured by the correction in the market price following curative disclosure; "i.e., the price paid minus the inflation attributable to the defendants' alleged wrongful acts." *Sowell*, 926 F.2d at 297; *see also Randall v. Loftsgaarden*, 478 U.S. 647 (1986); *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 155 (1972); *Semerenko v. Cendant Corp.*, 223 F.3d 165, 185 (3d Cir. 2000).

Since both the traditional out-of-pocket loss rule and Section 21D(e) of the PSLRA provide that a purchaser's loss may be calculated by reference to the amount that the purchaser overpaid and the true value of the securities, a purchaser has not needed to sell the securities to have suffered or to recover "actual damages."   Accordingly, courts have long permitted holding plaintiffs to maintain actions for securities fraud.  *See, e.g., In re Cendant Corp. Litig.*, 264 F.3d 201, 219, 244 (3d Cir. 2001); *Sowell v. Butcher & Singer, Inc.*, 926 F.2d 289, 297 (3d Cir. 1991); *Harris v. Union Elec. Co.*, 787 F.2d 355, 372 (8th Cir. 1986); *Harris v. Am. Inv. Co.*, 523 F.2d 220, 227 (8th Cir. 1975); *In re Honeywell Int'l Inc. Sec. Litig.*, 211 F.R.D. 255, 261-62 (D.N.J. 2002); *In re Olympia Brewing Co. Sec. Litig.*, No. 77 Civ. 1206, 1985 WL 3928, at *8 (N.D. Ill. Nov. 13, 1986).  For example, in *Cendant Corporation*, the Court of Appeals for the Third Circuit rejected a challenge to settlement that was premised upon the status of the lead plaintiff, a large institutional investor, as holder of the securities.  *Cendant Corp. Litig.*, 264 F.3d 201 at 244.  In connection with its discussion of provisions of the PSLRA that encourage large institutional investors to serve as lead plaintiffs in class actions, the Third Circuit specifically noted:  "We must presume that Congress was aware that an institutional investor with enormous stakes in a company is highly unlikely to divest all of its holdings in that company, even after a securities class action is filed in which it is a class member."  *Id.* at 244.  Similarly, in *Honeywell*

*International*, the District of New Jersey certified a class over objections to class certification based on purported conflict between purchasers who retained the securities and purchasers who subsequently sold the securities.  *Honeywell Int'l Inc.*, 211 F.R.D. at 261-62.  In both of these cases, the courts considered allegations of conflicts based on the status of certain plaintiffs as holders of the securities and, in each case, found no conflict to exist.  While the status of these plaintiffs was a central issue in both decisions, no concern was raised that such plaintiffs would be unable to establish proximate cause or economic loss because they had not sold the subject securities.

Thus, because the calculation of a securities fraud plaintiff's damages has been based on the decline in the security's value following the dissemination of curative information, in decades of precedent decided both before and after the enactment of the PSLRA, holding plaintiffs have not been precluded from maintaining securities fraud actions.

### C.  **Imposition of a Sell-to-Sue Requirement Would Conflict with Policy Concerns**

In addition to precedent and statutory language, policy concerns dictate against the imposition of a judicially-created "sell-to-sue" requirement.  First, market efficiencies dictate against the imposition of such a requirement.  Mandating that defrauded investors liquidate their holdings in order to preserve their right to pursue damages "might have harmful consequences." *Small v. Fritz Cos.*, 65 P.3d 1255, 1268 (Cal. 2003) (Kennard, J., concurring).  While the potential effect of a sell-to-sue requirement is an unanswered empirical question, as a matter of logic, requiring shareholders to sell their holdings at a time when share value may already be declining could cause additional precipitous drops in the stock's market price and ultimately could cause a market imbalance.  *See id.*  Second, from a damage-calculation perspective,

complications would be presented by distinguishing between decline in value attributable to the alleged fraud and decline in value attributable to the influx of sell orders.  Third, the operation of Rule 23 suggests defrauded shareholders could be denied a meaningful opportunity to respond to class notification because they could be unaware that securities fraud class action litigation was initiated until after such a judicially-created sell-to-sue requirement extinguished their rights.  Finally, a sell-to-sue requirement could run afoul of the PSLRA's provisions that encourage institutional investors to serve as lead plaintiff.  The PSLRA establishes a presumption that the class member "'most capable of adequately representing the interests of class members' is the shareholder with the largest financial stake in the recovery sought by the class."  *In re Cendant Corp. Litigation*, 264 F.3d 201, 243 (3d Cir. 2001) (citing 15 U.S.C. 78u-4(a)(3)(B)(I) & (iii)(I)).  "The plaintiff with the largest stake in a given securities class action will almost always be a large institutional investor."  *Id.* at 243-44.  However, because of the very size of an institutional investor's shareholdings, an institutional investor might be discouraged from divesting itself of the stock.  *Id.* at 244.  Thus, imposition of a sell-to-sue requirement could frustrate the PSLRA's purpose of encouraging institutional investors to serve as lead plaintiff.  Such policy considerations counsel against mandating sale.

   **D.  *Dura* Does Not Require Both Purchase and Sale of Securities as a Prerequisite to Establishing Economic Loss and Loss Causation**

   The jurisprudential, statutory, and policy context now properly before the Court, it is clear that *Dura* does not mandate that a securities fraud plaintiff plead both purchase and subsequent sale of securities to establish economic loss and loss causation.  Nothing in *Dura* indicates that the Supreme Court intended to overrule the established precedent permitting holding plaintiffs to

maintain actions for securities fraud, to call into question the statutory scheme by creating a sell-to-sue requirement, or to undermine relevant policy concerns without any analysis.  Moreover, *Dura*'s holding was limited to rejecting the Court of Appeals for the Ninth Circuit's standard for pleading loss causation and economic loss in a securities fraud action, which had required only an allegation of inflated purchase price because of a misrepresentation; the Supreme Court expressly stated that it did not "consider other proximate cause or loss-related questions."  *See Dura*, 125 S. Ct. at 1630, 1634.  Accordingly, *Dura* cannot be read to require both purchase and sale of the subject securities.

In *Dura*, the Supreme Court held that, while purchase price inflation may be a necessary condition for a later loss, pleading purchase price inflation as a result of a misrepresentation is not by itself sufficient to satisfy plaintiff's burden of proving that defendant's alleged fraudulent act "caused the loss for which the plaintiff seeks to recover damages."  *Dura*, 125 S. Ct. at 1632-33 (citing 15 U.S.C. § 78u-4(b)(4)).  The complaint under review in *Dura* had alleged only harm in the form of inflated purchase prices.  *Id.* at 1634.  The Supreme Court found that "the 'artificially inflated purchase price' is not itself a relevant economic loss[ a]nd the complaint nowhere else provides the defendants with notice of what the relevant economic loss might be or of what the causal connection might between that loss and [Dura's] misrepresentation."  *Id.*  For example, the Supreme Court noted that the complaint failed "to claim that Dura's share price fell significantly after the truth became known."  *Id.* at 1634.  Because the *Dura* plaintiffs failed to plead adequately economic loss and loss causation, the Supreme Court found that the complaint was legally insufficient.  *Id.* at 1635.

The Third Circuit's standard for pleading loss causation and economic loss is consistent

16

with *Dura*.  As recognized by *Dura*, the Third Circuit had not used the "Ninth Circuit's 'inflated

purchase price' approach to proving causation and loss."  *Id.* at 1630, 1632.[5]  In *Semerenko*, the

Third Circuit recognized that prior Third Circuit precedent held that "where the claimed loss

involves the purchase of a security at a price that is inflated due to an alleged misrepresentation,

there is a sufficient causal nexus between the loss and the alleged misrepresentation to satisfy the

loss causation requirement."  *Semerenko v. Cendant Corp.*, 223 F.3d 165, 185 (3d Cir. 2000).

However, the Third Circuit emphasized that:

> [T]he "artificial inflation [must] actually [be] 'lost' due to the alleged fraud.  *Where the
> value of the security does not actually decline as a result of an alleged misrepresentation,
> it cannot be said that there is in fact an economic loss* attributable to that misrepresentation.
> In the absence of a *correction in the market price*, the cost of the alleged misrepresentation
> is still incorporated into the value of the security and may be recovered at any time simply
> by reselling the security at the inflated price.
>
> Because a plaintiff in an action under § 10(b) and Rule 10b-5 must prove that he or she
> suffered an actual economic loss, we are persuaded that *an investor must also establish that
> the alleged misrepresentations proximately caused the decline in the security's value to
> satisfy the element of loss causation*.

*Semerenko*, 223 F.3d at 185 (citations omitted) (emphasis added).  In requiring a plaintiff to

plead and prove that the alleged misrepresentations (1) "proximately caused" (2) "the decline in

the security's value," *Semerenko* is entirely consistent with *Dura*'s holding that "the Ninth

Circuit's approach [was] inconsistent with the law's requirement that a plaintiff prove that the

defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's

---

[5] Indeed, in the opinion overturned by the Supreme Court, the Ninth Circuit distinguished
its standard from the Third Circuit's standard.  *Broudo v. Dura Pharm., Inc.*, 339 F.3d 933, 938
n.4 (9th Cir. 2003), *overruled by* __ U.S. __, 125 S. Ct. 1627 (April 19, 2005).  Citing *Semerenko
v. Cendant Corp.*, 223 F.3d 165, 185 (3d Cir. 2000), the Ninth Circuit stated that "other circuits
are less favorable to plaintiffs and do require demonstration of a corrective disclosure followed
by a stock price drop to be alleged in the complaint."  *Broudo*, 339 F.3d at 938 n.4.

economic loss." *Dura*, 125 S.Ct. at 1633; *Semerenko*, 223 F.3d at 185.  The standard for pleading economic loss and loss causation in the Third Circuit thus was not undermined by *Dura*.

      *Dura* held only that the Ninth Circuit's pleading standard was inconsistent with the PSLRA's mandate that "plaintiffs adequately allege and prove the traditional elements of causation and loss."  *Id.* at 1633.  The Supreme Court did not define the terms "economic loss" or "actual loss," which it employs to describe the loss a plaintiff must allege and prove.  The Supreme Court stated neither that "economic loss" excludes economic loss in the form of "the decline in the security's value" nor that a plaintiff must have both purchased and subsequently sold the securities in order to plead economic loss.  To the contrary, consistent with the traditional "decline in the security's value" conception of economic loss controlling in the Third Circuit, in finding the *Dura* complaint inadequate, the Supreme Court remarked that the complaint failed "to claim that Dura's share price fell significantly after the truth became known."  *Id.* at 1634.  Furthermore, in observing that the Ninth Circuit's approach was alone in differing from the general agreement reached by other courts, the Supreme Court noted that the Restatement (Second) of Torts reflects "judicial consensus" "that a person who 'misrepresents the financial condition of a corporation in order to sell its stock' becomes liable to a relying purchaser 'for the loss' the purchaser sustains 'when the facts . . . become generally known' and 'as a result' share value '*depreciate[s]*.'"  *Id.* at 1633 (citing Restatement (Second) of Torts § 548A, Comment b, at 107) (alteration in *Dura*) (emphasis added).  Particularly in light of the Supreme Court's clear limitation on its holding, *id.* at 1633, indicating that it did not intend to reach questions such as whether a plaintiff must sell the subject securities in order to suffer economic loss, and because a contrary result would be inconsistent with the statutory scheme

*Dura* applies with no critical commentary, *Dura* cannot be read to overrule established precedent binding on this Court that permits holding plaintiffs to maintain actions for securities fraud.

     **E.  Defendants' Motions to Dismiss Holding Plaintiffs' Section 10(b) Claims Must Be Denied to the Limited Extent Addressed Herein**

     For the reasons discussed above, to the extent Defendants moved to dismiss Holding Plaintiffs' claims solely on the theory that Holding Plaintiffs would be unable to plead and prove loss causation and economic loss because they had not sold their Royal Dutch/Shell securities, the motions to dismiss must be denied. The instant opinion reconsiders only Paragraph 8 of this Court's August 9, 2005 Order and the accompanying text under the heading "Shares of Purchasers Who Have Purchased During the Class Period and Have Not Yet Sold" at page 557 of the August 9, 2005 Opinion. The instant opinion does not reconsider the dismissal of claims addressed by any other portions of the August 9, 2005 Order and Opinion.

## III.  CONCLUSION

     For the foregoing reasons, the Court denies the Defendants' motions to dismiss the Holding Plaintiffs' claims to the extent these claims had been dismissed by Paragraph 8 of the Court's August 9, 2005 Order and at page 557 of the Court's August 9, 2005 Opinion, *In re Royal Dutch/Shell Transport Securities Litigation*, 380 F. Supp. 2d 509, 557 (D.N.J. 2005). An appropriate order will follow.

                                     s/ Joel A. Pisano
                                     JOEL A. PISANO, U.S.D.J.

DATED: December 19, 2005