**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____
                                :

IN RE:                         :       No. 04-374 (JAP)
                               :       (Consolidated cases)

ROYAL DUTCH/SHELL TRANSPORT   :
SECURITIES LITIGATION        :
_____:

### MEMORANDUM OPINION

PISANO, District Judge.

Currently before the Court is Defendant KPMG International's ("KPMG-I") motion to dismiss the Second Consolidated Amended Class Action Complaint (the "Second Complaint"). In the Second Complaint, Lead Plaintiff[1] alleges that KPMG-I violated Section 10(b) of the Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.  (Second Complaint Count II). For the reasons discussed below, the Court grants KPMG-I's motion to dismiss with prejudice.

## I.  PROCEDURAL HISTORY

This action was filed on January 29, 2004, and the initial complaint has been amended several times.  The operative complaint is the Second Complaint.  Lead Plaintiff filed the Second Complaint on September 19, 2005, following the August 9, 2005 disposition of nine separate motions to dismiss the predecessor to the Second Complaint, the first Consolidated Amended Class Action Complaint (the "First Complaint").  KPMG-I was among the movants.  Chief Judge

_____

[1] "Lead Plaintiff" is comprised of the Pennsylvania State Employees' Requirement System and the Pennsylvania Public School Employees' Retirement System.

Bissell heard extensive oral argument on and ultimately resolved Defendants' motions in a comprehensive opinion and order entered on August 9, 2005.  *See In re Royal Dutch Shell Transport Securities Litigation*, 380 F. Supp. 2d 509, 515 (D.N.J. 2005) ("*Royal Dutch Shell I*"). In pertinent part, the Court's August 9, 2005 order granted KPMG-I's motion to dismiss the applicable count of the First Complaint without prejudice and gave Lead Plaintiff leave to amend the First Complaint so as to plead certain claims against KPMG-I consistent with the Court's August 9, 2005 opinion.

This action was reassigned to the undersigned by order entered August 26, 2005. Subsequent to Lead Plaintiff's filing of the Second Complaint, KPMG-I filed a motion to dismiss the Second Complaint pursuant to Fed. R. Civ. P. 9(b), 12(b)(6), and 15 U.S.C. § 78u-4(b).  This Court heard oral argument on KPMG-I's motion on February 15, 2006.

## II. BACKGROUND

The gravamen of the Second Complaint is securities fraud premised on the dissemination of what Lead Plaintiff characterizes as "materially false and misleading statements" concerning the reported proved oil and natural gas reserves and associated financial metrics of the Royal Dutch Petroleum Company and the Shell Transport and Trading Company, PLC (together, the "Shell Group").  Lead Plaintiff alleges that the Shell Group overstated reserves replacement ratio[2], future cash flow, and proved oil and natural gas reserves figures from 1998 to 2004.  In a series of announcements beginning on January 9, 2004 and ending on May 24, 2004, Shell

---

[2] "Reserves replacement ratio" refers to a metric that expresses the rate at which an oil and gas company replaces extracted hydrocarbons with newly found proved reserves, and is a key performance indicator for investors.

disclosed that it had overstated its proved reserves reported at year-end 2002 by 4.47 billion

barrels of oil equivalent.  Of the 4.47 billion barrels of oil equivalent that the Shell Group had to

recategorize, approximately 36% was attributable to Nigeria.  The Shell Group restated its

proved reserves, lowered its reserves replacement ratio for 2003, and on May 24, 2004,

announced that it would restate certain of its financial results for 2001, 2002, and 2003.

Following the January 9, 2004 announcement, there was a substantial decline in the trading

prices of the ordinary shares of both Shell Transport and Royal Dutch and the American

Depository Receipts of Shell Transport.

Defendants KPMG Accountants N.V. ("KPMG NV"), which is headquartered in the

Netherlands, and PricewaterhouseCoopers LLP ("PwC UK"), which is headquartered in the

United Kingdom, had been engaged by the Shell Group to provide external, independent auditing

and/or consulting services, including the preparation, examination and/or review of the Shell

Group's consolidated financial statements during the relevant time period.  (Second Complaint ¶

58).  In annual reports issued on May 28, 2004 by the Shell Group, KPMG NV and PwC UK

issued a joint report confirming the necessity of a restatement and stating:  "[i]n view of the

inappropriate overstatement of unaudited proved reserves information, it was determined to

restate the Financial Statements of the Shell Group, and each of the Parent Companies, for prior

periods (the Financial Restatement) to reflect the impact of the Reserves Restatement on those

Financial Statements (as announced on April 19, 2004)."  (Declaration of Jeffrey M. Haber, Ex. 1

at 52 of each report).  This joint report also explained:  "[t]he effect of the restatement was to

reduce net income in 2002 by $108 million (2001: $42 million), of which additional depreciation

in 2002 was $166 million (2001:  $84 million), and to reduce the previously reported net assets

as at December 31, 2002 by $276 million." (*Id.*, Ex. 1 at 53 of each report).

Lead Plaintiff alleges that Defendant KPMG-I is a Swiss cooperative of which all KPMG firms are members, and that KPMG-I markets itself as a single global organization.[3] (Second Complaint ¶ 55). Lead Plaintiff alleges that KPMG-I provides assurance, tax and legal, and financial advisory services to customers worldwide. As addressed in detail below, Lead Plaintiff's claim against KPMG-I under Count II of the Second Complaint is twofold. *First*, Lead Plaintiff alleges that KPMG-I is primarily liable because KPMG-I actively participated in the alleged wrongdoing through purported involvement in the audit of Shell Nigeria and the alleged "aggressive and improper booking of proved reserves" at Shell Nigeria. *Second*, Lead Plaintiff alleges that KPMG-I is vicariously liable based on KPMG NV's alleged misconduct because KPMG NV was KPMG-I's agent, KPMG-I controlled KPMG NV, and KPMG NV violated the securities laws by issuing "clean" audit opinions that ultimately proved to be erroneous, ignoring or failing to investigate red flags, and failing to take steps that it might have taken.

## III. LEGAL STANDARDS

### A. Pleading Requirements

#### 1. Rule 12(b)(6)

In determining whether a complaint fails to state a claim upon which relief can be granted under Fed. R. C. Pro. 12(b)(6), a court must reasonably read the complaint and decide whether

---

[3] KPMG-I's United States headquarters is in New York, New York. *Id.*

4

the plaintiff has pled a cognizable cause of action entitling it to relief.  *Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir. 1996).  In making this determination, a court accepts as true all of the well-pleaded factual allegations within the complaint and any reasonable inferences drawn therefrom.  *Hayes v. Gross*, 982 F.2d 104, 105-06 (3d Cir. 1992).  The court may also consider exhibits attached to the complaint, matters of public record, and documents that form a basis of plaintiff's claim.  *Lum v. Bank of Am.*, 361 F.3d 217, 222 n.3 (3d Cir. 2004).  However, the court need not consider a plaintiff's bald assertions or legal conclusions.  *Morse v. Lower Merion School Dist.*, 132 F.3d 902, 906 (3d Cir. 1997).

### 2.  *Rule 9(b)*

Independent of the standard applicable to Rule 12(b)(6) motions, securities fraud claims are subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b).  Rule 9(b) provides, *inter alia*:  "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b).  This particularity requirement has been rigorously applied in securities fraud cases.  *See, e.g., In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir. 1997).  Plaintiffs asserting securities fraud claims must specify "the who, what, when, where, and how: the first paragraph of any newspaper story."  *In re Advanta Corp. Sec. Litig.*, 80 F. 3d 525, 534 (3d Cir. 1999) (quotations and citation omitted).  "Although Rule 9(b) falls short of requiring every material detail of the fraud such as date, location, and time, plaintiffs must use 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud'."  *In re Rockefeller Center Properties, Inc., Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002) (quoting *In re Nice Sys., Ltd. Sec. Litig.*, 135 F. Supp. 2d 551, 577 (D.N.J.2001)).  While the rigid requirements of Rule 9(b) may be relaxed if it is can

shown that the requisite factual information is peculiarly within the defendant's knowledge or control, Lead Plaintiff has not made allegations that would entitle it to the benefit of the relaxed standard.  *See In re Exxon Mobil Corp. Sec. Litig.*, 387 F. Supp. 2d 407, 427 (D.N.J. 2005) ("In order to receive the benefit of the relaxed standard, at the very least plaintiffs must allege that the necessary information lies within the defendants' control.") (internal quotations and citation omitted).  Failure to meet the threshold pleading requirements of Rule P. 9(b) justifies dismissal apart from Rule 12(b)(6).  *See California Public Employees' Retirement System v. Chubb Corp.*, 394 F.3d 126, 145 (3d Cir. 2004)

### 3.  *The PSLRA*

In addition to Rule 9(b), plaintiffs alleging securities fraud must also comply with the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b).  *See, e.g., Rockefeller*, 311 F.3d at 217.  The PSLRA "imposes another layer of factual particularity to allegations of securities fraud."  *Id.* at 217.  A complaint that fails to comply with the requirements of the PSLRA must be dismissed.  15 U.S.C. § 78u-4(b)(3)(A).

With respect to claims that require proof that the defendant acted with a particular state of mind, such as those made under any of the three subsections of Rule 10b-5, § 78u-4(b)(2) requires that "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity the facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  In actions under Rule 10b-5, a plaintiff may establish the requisite strong inference of *scienter* by stating either:  "(1) facts which show that defendants had both motive and opportunity to commit fraud"; or (2) "by setting

forth facts that constitute circumstantial evidence of either recklessness or conscious behavior." *Advanta*, 180 F.3d at 534-35.  Further, in actions under Rule 10b-5, § 78u-4(b)(2)'s requirement supersedes the provisions of Fed. R. Civ. P. 9(b) to the extent that Rule 9(b) would otherwise permit a state of mind to be averred generally.[4]  *Advanta*, 180 F.3d 525, 531 n.5 (3d Cir.1999)).

Further, with respect to allegations of misleading statements and omissions, such as those made under Rule 10b-5(b), § 78u-4(b)(1) requires plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity the facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  This provision requires plaintiffs to set forth the details of allegedly fraudulent statements or omissions, including "who was involved, where the events took place, when the events took place, and why any statements were misleading."  *Rockefeller*, 311 F.3d at 217.

### 4. *Confidential Source Allegations*

Where, as here, a plaintiff attempts to inject the particularity required by Rule 9(b) and the PSLRA into a securities fraud claim by relying on a confidential source, standards applicable to pleadings that rely on confidential sources must be applied.  *See California Public Employees' Retirement System v. Chubb Corp.*, 394 F.3d 126, 146-47 (3d Cir. 2004).[5]  In *Chubb*, the Third

---

[4] The text of Fed. R. Civ. P. 9(b) that is superceded by the PSLRA in actions under Rule 10b-5 provides:  "[m]alice, intent, knowledge, and other conditions of mind of a person may be averred generally."  Fed. R. Civ. P. 9(b).

[5] While the *Chubb* Court initially discussed confidential source information in the context of the PSLRA's requirements pertaining to material misstatements or omissions as set forth in 15 U.S.C. § 78u-4(b)(1), the *Chubb* Court incorporated its analysis of confidential source information in the context of other fraud-based claims necessitating the application of Rule

Circuit stated that a complaint relying on confidential sources can satisfy the particularity

pleading requirements of Rule 9(b) and the PSLRA by providing "sufficient documentary

evidence and/or a sufficient description of the personal sources of the plaintiff's beliefs." *Chubb*,

394 F.3d at 147.  Where documentary evidence does not supply the requisite particularity, use of

a confidential source assumes a "heightened importance." *Chubb*, 394 F.3d at 148.  Assessing

the particularity of the allegations that rely on confidential sources "entails an examination of the

detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the

sources, the corroborative nature of other facts alleged, including from other sources, the

coherence and plausibility of the allegations, and similar indicia." *Id.* at 147.  Where a

confidential source is not described "'with sufficient particularity to support the probability that a

person in the position occupied by the source would possess the information alleged'", such

allegations fail to supply the requisite particularity to securities fraud claims.  *Chubb*, 394 F.3d at

148 (quoting *Novak v. Kasaks*, 216 F.3d 300, 313-14 (2d Cir. 2000)).

### B.  Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5

Section 10(b) of the Securities Exchange Act of 1934 prohibits the "use or employ, in

---

9(b)'s particularity requirement.  *See Chubb*, 394 F.3d at 145, 163 (stating that "Plaintiffs' allegations are insufficient to satisfy either Fed. R. Civ. P. 9(b)'s particularity requirement or the PSLRA's information and belief pleading requirement", and rejecting fraud-based claims under Securities Act § 11, stating "[a]s detailed exhaustively in the preceding section, Plaintiffs have not met their burden of pleading fraud with particularity"); *see also In re Tellium, Inc. Sec. Litig.*, No. 02-CIV-5878 (FLW), 2005 WL 1677467, *15 n.17 (June 30, 2005).  In the instant matter, the confidential source information at issue is used to support Lead Plaintiff's claims against KPMG under Rule 10b-5(a) and (c).  As discussed below, although Lead Plaintiff's claims under Rule 10b-5(a) and (c) do not trigger the requirements of 15 U.S.C. § 78u-4(b)(1), Rule 9(b) is applicable to these claims.  Thus, the Third Circuit's reasoning regarding the use of confidential sources to state a claim with particularity is applicable to Lead Plaintiff claims under Rule 10b-5(a) and (c).  *Cf. id.*

connection with the purchase or sale of any security, . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . . ."  15 U.S.C. § 78j(b); *see also In re Ikon Office Solutions, Inc.*, 277 F.3d 658, 666 (3d Cir. 2002).  Section 10(b) is enforced through Rule 10b-5, which provides:

> It shall be unlawful for any person, directly or indirectly, . . .
>> (a) To employ any device, scheme, or artifice to defraud,
>> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

## IV.  PRIMARY LIABILITY ALLEGATIONS

### A.  The Second Complaint's Allegations[6]

Lead Plaintiff makes a series of allegations against KPMG-I asserting primary liability under Section 10(b) and Rule 10b-5.  Lead Plaintiff alleges that KPMG-I "actively participat[ed]" in the Shell Nigeria audits and the "aggressive and improper booking of proved reserves."  (Second Complaint ¶¶ 75, 237-56).  Of the 4.47 billion barrels of oil equivalent that the Shell Group recategorized, approximately 36% was attributable to Nigeria.  The Nigeria recategorization was the Shell Group's largest reduction in any geographic area.

---

[6] In addition to the allegations summarized in connection with Lead Plaintiff's primary liability claim, Lead Plaintiff makes certain other allegations in the Second Complaint that reference KPMG-I.  The Court does not address such allegations in the context of the primary liability claim because they pertain to Lead Plaintiff's allegations that KPMG NV acted as KPMG-I's agent and that KPMG-I is thereby vicariously liable for the challenged conduct of KPMG NV, which are addressed, and rejected, below.  *See* discussion at Part V. *infra*.

To support its allegations regarding KPMG-I's involvement in the alleged wrongdoing, Lead Plaintiff relies on a confidential source referred to as "CS 8". CS 8 is alleged to be a "former partner of KPMG Nigeria and its predecessor firm." (Second Complaint ¶ 75). CS 8 was employed at KPMG Nigeria's predecessor beginning in 1977. (*Id.*). CS 8 handled the Shell Nigeria account beginning in 1979. (*Id.*). Lead Plaintiff maintains that "CS 8 has information about KPMG International's active participation in the Shell Nigeria audits conducted during the Class Period, as well as the aggressive and improper booking of proved reserves by the Companies in Nigeria." (*Id.*).

Lead Plaintiff makes allegations concerning the history and practices of KPMG Nigeria, which is not named as a defendant in this litigation. Lead Plaintiff alleges that KPMG Nigeria became part of "the KPMG organization" in October 1998. Prior to the time that it joined the KPMG organization, the entity that became KPMG Nigeria had represented Shell Nigeria. KPMG Nigeria had performed "full scope audits" of Shell Nigeria's operations, including its hydrocarbon reserves. At the conclusion of each audit, KPMG Nigeria, and later, its successors, would send a report to the lead partner at KPMG NV on the Shell account, detailing its conclusions, as well as any problems or issues that may have been discovered. (Second Complaint ¶¶ 237-40).

Lead Plaintiff alleges that KPMG-I instituted and implemented a plan to formally take over KPMG Nigeria's lucrative practice. In December 1998, at a 75th anniversary party for KPMG Nigeria, the Chief Operating Officer of KPMG-I, Colin Holland, told CS 8 that he believed they were "sitting on a gold mine in Nigeria", in part because of the Shell Nigeria account. Shortly thereafter, Holland conveyed these beliefs to the Chairman of KPMG-I,

10

Michael Rake.  Subsequently, Rake contacted CS 8 and advised that, because KPMG Nigeria was a "potential gold mine", KPMG-I wanted to expend more resources on KPMG Nigeria. Rake indicated that he was sending a team to Nigeria to assess what further resources were required.  Rake's team completed its review in early 1999.  Rake then contacted CS 8 and advised that KPMG-I was receiving numerous complaints from large auditing clients, including Shell Nigeria, about KPMG Nigeria.  Rake advised that his team was going to take control of KPMG Nigeria audits, including Shell Nigeria.  Rake ordered CS 8 to "stay away from the Shell account"; however, he stated that CS 8 could continue to assist with the audits if he worked with the KPMG-I audit team.  Rake assigned an auditor from KPMG Australia, Bill Laurie, to work on the Shell Nigeria account.  Laurie was instructed to report to Rake.  Rake sent other auditors to assist Laurie on the Shell Nigeria account on behalf of and under the direction and control of KPMG-I:  Jim Daboo from KPMG London and another from KPMG Russia. (Second Complaint ¶¶ 241-44).

Later in 1999, KPMG-I proposed altering the basic principles of association of member firms to operate on a regional basis.  In 2001, Holland "unilaterally amended" a merger agreement among the KPMG West African national practices to give KPMG-I a 60% controlling interest.  In 2001, KPMG-I incorporated two companies:  KPMG West Africa Ltd. and KPMG West Africa (Nigeria).  In November 2001, KPMG Nigeria transferred the Shell Nigeria account to KPMG West Africa Ltd., under threat of having its KPMG sublicense withdrawn.  Further, KPMG Nigeria agreed that KPMG West Africa Ltd. would be the only full-scope service provider to global and regional clients throughout West Africa.  KPMG-I, through its officer Geoff Russell, Rake's special assistant, contacted Shell Nigeria to ensure that its audit was

11

transferred from KPMG Nigeria.  In 2002, KPMG-I rolled KPMG West Africa Ltd. and KPMG

West Africa (Nigeria) into an entity named KPMG Professional Services (Nigeria), which had

been formed from Arthur Andersen's former Nigeria practice.  KPMG-I named Geoff Russell to

be Chairman of KPMG Professional Services (Nigeria) and other representatives of KPMG-I to

be CEO and Administration Manager.  These individuals, along with Laurie and Daboo, led the

team that handled the Shell Nigeria account, including the audits, on behalf of KPMG-I.  Because

the KPMG-I personnel were not licensed accountants in Nigeria, KPMG-I forced KPMG Nigeria

to lend or make available its staff to KPMG Professional Services (Nigeria).  Consequently staff

and partners of KPMG Nigeria worked for KPMG-I.  KPMG Professional Services (Nigeria) and

its predecessors were formed and given actual authority by KPMG-I to act as its agents and

conducted the audits of the Shell Group in Nigeria on behalf of and under the direction, influence

and control of KPMG-I.  At the conclusion of each audit, KPMG Professional Services (Nigeria)

and its predecessors had sent reports to KPMG NV detailing their conclusions as well as

problems or issues that may have arisen.  (Second Complaint ¶¶ 245, 248-56).

Through CS 8, Lead Plaintiff also alleges that the Nigeria government offered Shell

Nigeria an incentive to increase reserves in the form of tax breaks.  In 2000, CS 8 was advised by

a member of the Nigerian government that there was a discrepancy between Shell Nigeria's

books and the Nigerian government's books, and that the government believed Shell Nigeria was

cheating them.  Lead Plaintiff alleges that CS 8 offered to conduct an audit, which was rejected

by Shell Nigeria.  CS 8 also asserts that the KPMG auditors were required "to check the

consistency of the numbers."  (Second Complaint ¶¶ 246-47).

Further, in a series of allegations not expressly attributed to CS 8, Lead Plaintiff claims

that KPMG-I performed review services and conducted the audit of the Shell Group's Nigeria operations during the times relevant to this action.  Lead Plaintiff claims that such unqualified audit opinions and reports violated GAAS and greatly enhanced and facilitated the fraud alleged. Lead Plaintiff alleges that KPMG-I had "virtually limitless access to information concerning the Group's true financial condition and status of the Companies' proved reserves" and that KPMG-I "was present at Shell Nigeria Headquarters frequently throughout each reporting year."  In addition, KPMG-I is alleged to have had "unfettered access to documents and employees at all Group offices and knew or recklessly disregarded that the Companies were improperly reclassifying reserves as proved when circumstances did not permit classification of reserves as proved under SEC guidelines."[7]  KPMG-I had conversations with Group[8] management and employees about the Companies accounting practices, and attended Group Audit Committee meetings and answered questions about the Companies' internal controls and financial statements.  KPMG-I is alleged to have known or recklessly disregarded that, contrary to SEC guidelines, the Group had been improperly classifying reserves proved.  Consequently, KPMG-I's unqualified audit opinions and/or reports were knowingly or recklessly improper and without any reasonable basis.  KPMG-I is alleged to have had actual knowledge of the misrepresentations and omissions of material facts set forth in the Second Complaint, or deliberately acted with reckless disregard for the truth in that it failed to ascertain and disclose such facts, even though such facts were available to them.  Further, Lead Plaintiff alleges that, "[i]n ignorance of the false and misleading nature of the statements described above and the deceptive and manipulative

---

[7] "Companies" refers to Royal Dutch and Shell Transport.

[8] The "Group" refers to Royal Dutch and Shell Transport.

devices and contrivances employed by said Defendants, Lead Plaintiff . . . relied . . . on the integrity of the market in purchasing the Companies' securities."  (Second Complaint ¶ 557). Consequently, KPMG-I is alleged to have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  (Second Complaint ¶¶ 536-58).

## B. Discussion

### 1. *Rule 10b-5(b)*

While, as noted above, the overarching theory of this litigation pertains to the dissemination of allegedly materially false and misleading statements (Second Complaint ¶ 3), Lead Plaintiff has failed to allege that KPMG-I actually made a material misstatement or omission on which Rule 10b-5(b) liability could be predicated.  *See Royal Dutch Shell I*, 38 F. Supp. 2d at 559-60.  In order to state a valid claim under Rule 10b-5(b), a plaintiff must demonstrate that a defendant "(1) made a misstatement or an omission of a material fact (2) with scienter (3) in connection with the purchase or the sale of a security (4) upon which the plaintiff reasonably relied and (5) that the plaintiff's reliance was the proximate cause of his or her injury." *In re Ikon*, 277 F.3d at 666 (citing *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 212 (3d Cir.2001); *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 315 (3d Cir.1997)).  Further, "in order to be liable [under Rule 10b-5(b)], a person must actually make the material misstatement or omission. . . ." *Royal Dutch Shell I*, 38 F. Supp. 2d at 559-60.  Lead Plaintiff has failed to allege that KPMG-I actually made an actionable material misstatement or omission.[9]  In addition to the

---

[9] To the extent that Lead Plaintiff intended to allege that KPMG-I made a material misstatement or omission by virtue of KPMG-I's alleged role in the audits of Shell Nigeria and review of reserves numbers that ultimately were disseminated in the Shell Group's public filings, such allegations would run afoul of *Central Bank*'s prohibition of aider and abettor liability.  *See*

lack of such an allegation in the Second Complaint, Lead Plaintiff fails to argue in its brief in

opposition that KPMG-I actually made a material misstatement or omission, and at oral

argument, conceded that KPMG-I is not alleged to have actually made any misstatement of

omission.[10]  Accordingly, the Court concludes that Lead Plaintiff has failed to state a claim

against KPMG-I under Rule 10b-5(b).

### 2.   Rule 10b-5(a) and (c)

Instead of a claim under Rule 10b-5(b), Lead Plaintiff asserts that it has stated a claim

under Rule 10b-5(a) and (c) against KPMG-I.  These subsections allow suit against defendants

who, with scienter, employ a "device, scheme, or artifice to defraud" or engage in an "act,

practice, or course of business which operates or would operate as a fraud or deceit upon any

person, in connection with the purchase or sale of any security."  17 C.F.R. §§ 240.10b-5(a) and

(c); *see also In re Alstom SA*, 406 F. Supp. 2d 433, 474 (SDNY 2005).  In order to state a valid

claim for a primary violation under Section 10(b) and Rule 10b-5(a) or (c), "a plaintiff must

allege that defendant '(1) committed a manipulative or deceptive act (2) in furtherance of the

alleged scheme to defraud, (3) scienter, and (4) reliance.'"  *Royal Dutch Shell I*, 380 F. Supp. 2d

509, 559-60 (quoting *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 336 (S.D.N.Y.

2004)).  While the pleading requirements of 15 U.S.C. § 78u-4(b)(2) and Rule 9(b) apply to Rule

---

*Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164 (1994).

[10] In response to the Court's questions, "Who made the false statements?  Who uttered or published incorrect statement?", Lead Plaintiff's counsel responded:  "With regard to KPMG International, those false statements were made by the companies.  That's not in dispute."

10b-5(a) and (c) claims, the pleading requirements of 15 U.S.C. § 78u-4(b)(1) do not.[11]  To plead a violation of Rule 10b-5(a) and (c) with the particularity mandated by Rule 9(b), a plaintiff "must specify, with particularity, what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed and what effect the scheme had on the securities at issue." *In re Parmalat Sec. Litig.*, 414 F. Supp. 2d 428, 432 (SDNY 2006) (internal quotations and citation omitted).  In addition, where, as here, a plaintiff attempts to supply the requisite particularity by relying on statements attributed to a confidential source, the standards for confidential source allegations articulated by the Third Circuit apply.

Moreover, where a complaint alleges violations of Rule 10b-5(b) as well as Rule 10b-5(a) or (c), a plaintiff's allegations under Rule 10b-5(a) or (c) must entail a defendant's undertaking of a deceptive scheme or course of conduct that went beyond misrepresentations.  *In re Alstrom SA*, 406 F. Supp. 2d 433, 475 (SDNY 2005).  While it is possible for liability under both subsection (b) and subsections (a) and (c) of Rule 10b-5 to arise out of the same set of facts, "a plaintiff may not seek to hold a defendant liable for misleading statements under subsections (a) and (c) by alleging that the defendant is liable for the misleading statements because he or she was a participant in a scheme through which the statements were made." *Alstrom*, 406 F. Supp. 2d at

---

[11] *See, e.g., In re Parmalat Sec. Litig.*, 414 F. Supp. 2d 428, 432 (SDNY 2006) (applying Rule 9(b) to Rule 10b-5(a) and (c) claims); *In re National Century Financial Enters., Inc., Investment Litig.*, No. 03-1565, 2006 WL 469468 (Feb. 27, 2006) (applying Rule 9(b) to Rule 10b-5(a) and (c) claims); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 372 n.25 (D. Md. 2004) ("While paragraph (b)(1) of the PSLRA, which provides the particularity requirements for alleging misleading statements or omissions, does not apply [to Rule 10b-5(a) and (c) claims], paragraph (b)(2) of the PSLRA, which requires that plaintiffs state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,' does apply to the Rule 10b-5(a) and (c) claims.").

475; *see also Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 177 (2d Cir. 2005) (preventing plaintiff from attempting to recast misrepresentation claims as claims under Rule 10b-5(a) or (c)).  Not only would such a theory permit a plaintiff to evade the pleading requirements of 15 U.S.C. § 78u-4(b)(1) that are imposed in misrepresentation cases, *see Alstrom*, 406 F. Supp. 2d at 475, but it would also permit a plaintiff to "circumvent *Central Bank*'s limitations on liability for a secondary actor's involvement in the preparation of false and misleading statements."  *In re Dynegy, Inc., Sec. Litig.*, 339 F. Supp. 2d 804, 916 (S.D. Tex. 2004).  Neither result is proper. Accordingly, a plaintiff claiming violations of Rule 10b-5(a) or (c) must allege that the defendant engaged in a manipulative or deceptive scheme or conduct that encompasses acts beyond misrepresentations.  *Alstrom*, 406 F. Supp. 2d at 475.

*First*, the Court concludes that the Second Complaint fails to comply with Rule 9(b) because it does not satisfy the standards set forth in *Chubb* for pleading confidential source allegations.  The Second Complaint expressly attributes the allegations of KPMG-I's alleged primary violation to CS-8.  Indeed, CS 8 is the sole source of information substantiating KPMG-I's "active participation" pleaded in the Second Complaint (Second Complaint ¶¶ 237-56),[12] and

---

[12] The only pertinent documentary material that Lead Plaintiff points to is a declaration of John Darley, "the Director of EP Technology with Shell International Exploration and Production, N.V."  However, the Darley Declaration was submitted in support of Lead Plaintiff's opposition to the instant motion to dismiss by KPMG-I.  (Decl. of Jeffrey Haber Ex. 3).  Lead Plaintiff does not appear to rely on Mr. Darley's statements in the Second Complaint, nor was the Darley Declaration appended to the Second Complaint.  Accordingly, the Declaration of John Darley is not properly before the Court on this motion to dismiss, and consequently the Court declines to consider it.  *See Lum v. Bank of Am.*, 361 F.3d 217, 222 n.3 (3d Cir. 2004) (indicating that, on a motion to dismiss, a court may consider exhibits attached to a complaint, matters of public record, and documents that form a basis of a plaintiff's claim); *cf. Marks v. Struble*, 347 F. Supp. 2d 136, 148 (D.N.J. 2004) (refusing to consider plaintiff's allegations made for the first time in response to defendant's motion to dismiss); *Parastino v. Conestoga Tel. & Tel. Co.*, No.

thus use of this confidential source assumes a "heightened importance."  *Chubb*, 394 F.3d at 148.

The key information that Lead Plaintiff alleges CS 8 is able to provide concerns "KPMG International's active participation in the Shell Nigeria audits conducted during the Class Period, as well as the aggressive and improper booking of proved reserves by the Companies in Nigeria." (Second Complaint ¶ 75).  Applying the *Chubb* standard, the Court concludes that Lead Plaintiff has failed to plead its Rule 10b-5(a) and (c) claims against KPMG-I with the particularity demanded by Rule 9(b) because CS 8 is not accompanied by corroborative facts.  First, with the possible exception of certain of the allegations relating to KPMG-I's purported institution and implementation of a plan to formally take over KPMG Nigeria's practice, Lead Plaintiff fails to allege dates on which CS 8 acquired the information that he or she supposedly possesses.  *Cf. Chubb*, 394 F.3d at 150.  Moreover, while the Second Complaint alleges that Rake told CS 8 that "he could continue assisting with the audits if he worked with the KPMG International audit

---

Civ. A. 99-679, 1999 WL 636664, at *2 (E.D. Pa. Aug. 18, 1999) (refusing to consider new factual allegations made for the first time in response to a motion to dismiss because "new factual allegations made in the parties' legal memoranda may not be considered in resolution of a 12(b)(6) motion to dismiss").

Further, the Court notes that, even if the Court were to consider and credit Mr. Darley's testimony, it fails to provide corroboration for Lead Plaintiff's claims.  The Darley Declaration purports only to "describe in general terms the procedures Shell employed in gathering and reporting its proved oil and gas reserves during the Class Period."  (Decl. of Jeffrey Haber Ex. 3). At best, the Darley Declaration supports Lead Plaintiff's assertion in its memorandum of law that "the reserves figures given to Shell by its regional operating companies, such as Shell Nigeria, were the same figures it incorporated into its Forms 20-F."  (Lead Pltf's Mem. of Law at 17). Even assuming Mr. Darley's testimony to be accurate, it does not evidence, for example, any alleged performance of any manipulative or deceptive act by KPMG-I, nor does it corroborate CS-8's alleged claim of KPMG-I's role in either the Shell Nigeria audits or the "aggressive and improper booking of proved reserves by the Companies in Nigeria"   (Second Complaint ¶ 75). Indeed, while Mr. Darley appears to reference KPMG NV, he fails to make any assertions about KMPG-I.  Consequently, even if it were properly before the Court, the Darley Declaration would decisively fail to supply Lead Plaintiff's claims against KPMG-I with the requisite particularity.

team", the Second Complaint fails to allege that CS 8 did work with the KPMG-I audit team.
Lead Plaintiff also fails to state when CS 8 became a "former partner" of Shell Nigeria.
Similarly, while the Second Complaint alleges that KPMG Nigeria staff was "seconded" to
KPMG Professional Services (Nigeria) and consequently worked for KPMG-I, the Second
Complaint fails to allege whether or not CS 8 was among such staff.  Nor does the Second
Complaint identify or at least describe either those KPMG Nigeria partners or staff who actually
worked with the KPMG-I audit team, or what various KPMG Nigeria and KPMG-I personnel's
roles entailed.  Thus, the Second Complaint fails to reconcile how an individual who was
directed to "stay away from the Shell Nigeria account" and whose statements attest that
responsibility for the Shell Nigeria account was transferred from essentially his or her control to
that of KPMG-I would have had access to reliable information regarding KPMG-I's "active
participation in the Shell Nigeria audits [and] the aggressive and improper booking of proved
reserves by the Companies in Nigeria."  Consequently, the Court is left to speculate as to whether
the knowledge attributed to CS 8 was obtained by firsthand knowledge or by rumor.  *Cf. Chubb*,
394 F.3d at 148 (noting that the plaintiff's failure to make certain allegations was significant
because the Court was "left to speculate whether the anonymous sources obtained the
information they purport[ed] to possess by firsthand knowledge or rumor").  Moreover, the Court
notes that there have been no factual allegations plead to support the claim that KPMG-I was
involved in "the aggressive and improper booking of proved reserves by the Companies in
Nigeria."  The Court is left to speculate as to why, if CS 8 had such information, no such
information was included in the Second Complaint.  *Cf. Chubb*, 394 F.3d at 147 (noting that
assessing the particularity of the allegations that rely on confidential sources "entails an

examination of the detail provided by the confidential sources").  The Court concludes that CS 8 has not been described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged, and consequently finds that the *Chubb* standard has not been met with respect to CS 8.

*Second*, the Court concludes that, even if the *Chubb* standard had been met with respect to CS 8, Lead Plaintiff's claim against KPMG-I nonetheless fails because Lead Plaintiff has failed to substantiate its claims with the requisite factual particularity required by Rule 9(b).  In sum, the Second Complaint alleges that KPMG-I "active[ly] participat[ed] in the Shell Nigeria audits conducted during the Class Period, as well as the aggressive and improper booking of proved reserves by the Companies in Nigeria".  In support of this allegation, the Second Complaint attributes to CS 8 statements concerning KPMG-I's institution and implementation of a plan to formally take over KPMG Nigeria's lucrative practice and the Nigerian government's view that there was a discrepancy between Shell Nigeria's books and the Nigerian government's books.  Further, in allegations not attributed to CS 8, the Second Complaint claims that KPMG-I conducted the audit of Shell Nigeria during relevant times, issued unqualified audit opinions and reports that violated GAAS and "enhanced and facilitated" the fraud alleged with knowledge or reckless disregard of the fact that the Group had been improperly classifying reserves.  In addition, the Second Complaint generally references "deceptive and manipulative devices and contrivances employed by said Defendants."  These allegations fail to allege a claim under Rule 10b-5(a) or (c) in compliance with Rule 9(b).

To comply with Rule 9(b), Lead Plaintiff must specify, with particularity, what manipulative acts KPMG-I performed, when such manipulative acts were performed, and what

effect the scheme had on the securities at issue.  *See Parmalat*, 414 F. Supp. 2d at 432.  The Second Complaint fails to specify any conduct of KPMG-I as manipulative or deceptive.  The only relevant express allegation is a reference to "the deceptive and manipulative devices and contrivances employed by said Defendants."  (Second Complaint ¶ 557).  However, not only is this allegation is patently conclusory, but the Second Complaint also fails expressly link it to any actual conduct of KPMG-I.  Further, even if the Court were to assume that all the of the conduct attributed to KPMG-I in connection with Lead Plaintiff's primary liability claim is intended to inform the allegation of  "deceptive and manipulative devices and contrivances employed by [KPMG-I]", the Second Complaint's allegations nonetheless fail to pass muster.

Lead Plaintiff's allegation that KPMG-I actively participated in "the aggressive and improper booking of proved reserves by the Companies in Nigeria" is deficient because it is devoid of factual support or particularity.  As best the Court can discern, this supposed participation is by virtue of KPMG-I's alleged role as Shell Nigeria's auditor, which theory must be rejected for the same reasons as the foregoing allegations.

Similarly, to the extent that the Second Complaint impugns KPMG-I's audit opinions and reports stemming from its alleged audits of Shell Nigeria, such allegations are likewise deficient. Whether alleging primary or aiding and abetting liability, such allegations are nothing more than a Rule 10b-5(b) fraudulent misrepresentation claim, which this Court has already rejected and which may not be recast as a Rule 10b-5(a) or (c) claim.  *See, e.g., Alstrom*, 406 F. Supp. 2d at 475; *Dynegy*, 339 F. Supp. 2d at 916.

To the extent that Lead Plaintiff alleges that KPMG-I's institution and implementation of

a plan to formally take over KPMG Nigeria's lucrative practice was itself a scheme to defraud or manipulative or deceptive conduct, such allegations fail because such conduct is not, in and of itself, manipulative or deceptive or having the tendency to defraud.[13]  *Cf. Alstrom*, 406 F. Supp. 2d at 476.  As best the Court can discern from the Second Complaint, any deceptiveness resulted from the issuance by KPMG-I of unqualified audit opinions and reports that violated GAAS, which is nothing more that a misrepresentation claim.  Moreover, the Court notes that the Second Complaint attributes KPMG-I's implementation of this plan to the fact that KPMG Nigeria's practice was a "lucrative" "gold mine", and not to any course of conduct or scheme to defraud investors in the Shell Group.

To the extent that Lead Plaintiff premises its 10b-5(a) or (c) claim on the theory that KPMG-I's supposed expropriating KPMG Nigeria's practice, deficient audits of Shell Nigeria, or issuance of unqualified audit opinions and reports that violated GAAS "enhanced and facilitated" the fraudulent misrepresentations alleged against other Defendants, this claim must fail.  Such allegations plainly fail to allege that there was a scheme to defraud that went beyond the misrepresentations.  Moreover, such allegations run afoul of *Central Bank*'s prohibition of aider and abettor liability.  *See Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164 (1994).

Finally, Lead Plaintiff's allegation of wrongdoing in connection with Nigerian

---

[13] As used in Section 10(b) itself, the term "manipulative" "connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976) (noting that the word "manipulative" "is and was virtually a term of art when used in connection with securities markets").

government's view that there was a discrepancy between Shell Nigeria's books and the Nigerian government's books plainly fails to comply with the particularity requirements of Rule 9(b). These allegations make no effort whatsoever to plead any manipulative or deceptive act performed by KPMG-I.  Indeed, except for the patently conclusory and unspecific assertion that "the KPMG auditors were required to check the consistency of the numbers", the Second Complaint fails even to link these allegations to KPMG-I:  CS 8 reports only that CS 8 was advised of a discrepancy in Shell Nigeria's books by the Nigerian government, and that Shell Nigeria declined an audit after CS 8 offered to conduct one.

For the reasons set forth above, Lead Plaintiff has failed to plead a Rule 10b-5(b) claim in accordance with Rule 12(b)(6), and has failed to plead a Rule 10b-5(a) or (c) claim in accordance with Rule 9(b).  Consequently, the Court grants KPMG-I's motion to dismiss Count II of the Complaint to the extent alleging primary liability under Section 10(b) and Rule 10b-5.

## V.  VICARIOUS LIABILITY ALLEGATIONS

### A.  The Second Complaint's Allegations

The remaining allegations in the Second Complaint against KPMG-I are premised on vicarious liability.[14]  Defendant KPMG-I is alleged to be a cooperative of which all KPMG firms are members.  KPMG-I purportedly markets itself as a single global organization and provides assurance, tax and legal, and financial advisory services to customers worldwide.   Lead Plaintiff alleges that KPMG-I controlled KPMG NV as well as member firms in other countries.  Further,

---

[14] Lead Plaintiff's memorandum in opposition to KPMG-I's motion clarifies that Lead Plaintiff relies on an agency theory, not an alter ego or "one firm" theory.

Lead Plaintiff alleges that Defendant KPMG NV acted as KPMG-I's agent in connection with the conduct at issue in the Second Complaint.  KPMG-I's website, www.kpmg.com, and documents available therein allegedly demonstrate that KPMG NV was KPMG-I's agent and was under KPMG-I's control.  As referenced above, KPMG NV was an independent auditor of the Shell Group, and Lead Plaintiff claims that KPMG NV violated the securities laws in connection therewith.[15]  Finally, Lead Plaintiff argues that KPMG-I is liable since KPMG-I controlled its agent KPMG NV and that, through this purported agency relationship and the actions of KPMG NV, KPMG-I audited the financial statements of the Shell Group and violated the federal securities laws as alleged in the Complaint.[16]  (*Id.* ¶ 55).

### B.  Discussion

In the Court's August 9, 2005 opinion and order, the Court dismissed the First Complaint against KPMG-I without prejudice.  In so doing, the Court rejected Lead Plaintiff's argument that KPMG is a "'unitary, worldwide firm[],' i.e., that these firms hold themselves out to the world as one firm with accountants in office world-wide."  *Royal Dutch Shell I*, 380 F. Supp. 2d at 571-72 (collecting cases that reject the application of the "one firm", "unified company" theory to

_____

[15] In brief, Lead Plaintiff alleges that KPMG NV and PwC UK violated the securities laws by providing unqualified independent auditors' reports for the Shell Group's annual reports for the years 1998 through 2002, that these "unqualified audit opinions and reports violated GAAS and greatly enhanced and facilitated the fraud . . . .", that KPMG NV and PwC UK ignored or failed to investigate red flags and failed to take steps that it might have taken, including with respect to the Shell Group's internal controls.

[16] While the Second Complaint adds allegations that KPMG-I "audited" the Shell Group, Lead Plaintiff's brief clarifies that this is not a new claim.  Rather, the added allegations refer only to Lead Plaintiff's claim that KPMG NV was KPMG-I's agent, and that KPMG-I audited Shell by virtue of its agent's, namely KPMG NV's, audits of the Shell Group.

accounting firms).  The Court also rejected Lead Plaintiff's arguments based on vicarious

liability.  *Id.* at 572 n.19.  Further, the Court found that the First Complaint failed to allege any

facts suggesting the affiliation of KPMG-I with the Defendant Companies.  *Id.* at 572.

      Law of the case is a discretionary doctrine that "directs courts to refrain from re-deciding

issues that were resolved earlier in the litigation."  *Public Interest Research Group of New*

*Jersey, Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 116 (3d Cir. 1997); *see also*

*Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800, 816 (1988) (stating that the law

of the case doctrine posits "that when a court decides upon a rule of law, that decision should

continue to govern the same issues in subsequent stages in the same case") (quotations and

citation omitted).  While "'[a] court has the power to revisit prior decisions of its own or of a

coordinate court in any circumstance, [] as a rule courts should be loathe to do so in the absence

of extraordinary circumstances such as where the initial decision was "clearly erroneous and

would work a manifest injustice."'"  *Id.* (quoting *Christianson v. Colt Industries Operating*

*Corp.*, 486 U.S. at 816).  Such extraordinary circumstances that may warrant a court's

reconsideration of an issue decided earlier in the course of litigation include situations in which:

"(1) new evidence is available; (2) a supervening new law has been announced; or (3) the earlier

decision was clearly erroneous and would create manifest injustice."  *Id.* at 116-17.

      None of these circumstances is applicable here.  First, Lead Plaintiff fails to present new

evidence relating to its agency liability allegations.  Instead, Lead Plaintiff relies on essentially

the same allegations and materials in connection with the Second Complaint as it relied on in

connection with the First Complaint which were under consideration in the Court's August 9,

2005 Opinion and Order.  Second, the parties do not rely on and the Court has not identified any

pertinent supervening new law.  Third, the Court's August 9, 2005 Opinion determining that

KPMG-I is not legally responsible for the acts of KPMG NV in the context of this litigation was

thorough, well-reasoned, and well-supported by established precedent.  *See Royal Dutch Shell I*,

380 F. Supp. 2d at 571-72 (citing *Rocker Mgmt. v. Lernout & Hauspie Speech Prods.*, No. 00-

CIV-5965, 2005 WL 1365772 (D.N.J. June 8, 2005); *In re Royal Ahold N.V. Sec. & ERISA*

*Litig.*, 351 F. Supp. 2d 334, 385 (D. Md. 2004); *Skidmore v. KPMG*, No. 03-CIV-2138B, 2004

WL 3019097, at *4 (N.D. Tex. Dec. 28, 2004); *In re Asia Pulp & Paper Sec. Litig.*, 293 F. Supp.

2d 391 (SDNY 2003); *In re Lernout & Hauspie Sec.*, 230 F. Supp. 2d 152, 173 (D. Mass. 2002)).

Moreover, the Court notes that this Court's August 9, 2005 Opinion and Order did not

give Lead Plaintiff leave to replead the allegations premised on vicarious liability.  Rather, the

Court expressly based its decision to make the dismissal as to KMPG-I without prejudice

"because Plaintiff has summarily alleged possible participation by KPMG-I itself in audits of

Shell Nigeria reserves and accounts" and permitted Lead Plaintiff to "file a second amended

Complaint (or an amendment to the present Complaint) incorporating, *inter alia*, allegations

against KPMG-I and its alleged involvement in the audits and accounting practices of Shell

Nigeria."[17]  *Id.* at 572.

In light of the foregoing, the Court will not revisit the August 9, 2005 determination that

KPMG-I is not vicariously liable for the alleged acts of KPMG NV.  Consequently, the Court

grants KPMG-I's motion to dismiss Count II of the Complaint to the extent premised on agency

---

[17] The Court notes that PricewaterhouseCoopers International Limited was dismissed
from this litigation with prejudice.  Lead Plaintiff had made only agency and vicarious liability
claims against PwC-I parallel to those asserted against KPMG-I.

26

or other vicarious liability.

## VI.  CONCLUSION

The Court has considered all of Lead Plaintiff's other arguments, and finds them to be without merit.  The claims in Count II of the Second Complaint against KPMG-I are dismissed with prejudice because the Court foresees no reasonable likelihood that an amended pleading complying with Fed. R. Civ. P 11 could adequately assert that this Defendant is liable. Therefore, such an attempted argument would likely be futile.

Accordingly, for the reasons expressed above, KPMG-I's motion to dismiss Count II of the Second Complaint is GRANTED with prejudice.  An appropriate order will follow.


Dated:  August 14, 2006.


/s/ Joel A. Pisano
JOEL A. PISANO
United States District Judge