**FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

---

|                                          |   |                       |
|------------------------------------------|---|-----------------------|
| IN RE ROYAL DUTCH/SHELL                  | : | Civ. No. 04-374 (JAP) |
| TRANSPORT SECURITIES                     | : | (Consolidated Cases)  |
| LITIGATION                               | : |                       |
|                                          | : | **OPINION**           |

---

PISANO, District Judge.

        Presently before the Court is a motion by Defendants N.V. Koninklijke Nederlandsche

Petroleum Maatschappij (also known as the Royal Dutch Petroleum Company), a Dutch

corporation with its headquarters located in the Kingdom of the Netherlands, and The "Shell"

Transport and Trading Company, p.l.c., a British corporation with its headquarters located in the

United Kingdon, (collectively "Shell") brought pursuant to Federal Rule of Civil Procedure

53(g), seeking the Court to adopt the September 18, 2007 Report and Recommendation of

Special Master Nicholas H. Politan ("the Report").  This consolidated class action arises from

allegations that Shell violated federal securities law.  The worldwide putative class ("the Class"

or "Plaintiffs") is composed of persons and entities who purchased, between April 8, 1999 and

March 18, 2004 ("the Class Period"), securities issued by Shell.  Lead Plaintiffs are the

Pennsylvania State Employees' Retirement System ("SERS") and the Pennsylvania Public

School Employees' Retirement System ("PSERS").  The proposed Class includes, among others,

"Non-U.S. Purchasers;" that is, those persons or entities who purchased their shares on

exchanges outside of the United States and at the time of such purchase were residents or citizens

of, or were incorporated in or created under the laws of, any jurisdiction other than the United

States.

In December 2004, Shell moved to dismiss the claims asserted by these Non-U.S. Purchasers pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and later renewed that motion on April 18, 2007.  On May 24, 2007, this Court entered an Order, in accordance with the agreement of the parties, whereby it appointed retired United States District Court Judge Nicholas H. Politan as Special Master for the limited purpose of determining whether this Court has subject matter of jurisdiction over the securities claims brought by the Non-U.S. Purchasers.  Special Master Politan issued his Report on September 18, 2007, suggesting that the Court does not have subject matter jurisdiction over these claims.  On motion by Shell and having reviewed the record as it was presented to the Special Master, the Court now adopts the Special Master's Report and Recommendation and dismisses the securities claims asserted by the Non-U.S. Purchasers included in the putative class.

## I.    BACKGROUND

This cause of action arises from Shell's announcements that it would reclassify its previously reported (or "booked") proved oil and gas reserves.  The first such announcement occurred on January 9, 2004, when Shell stated that it would reclassify 3.9 billion barrels of oil equivalent ("boe") that had been reported as proved reserves for 2002.  Again, on March 18, 2004, the last day of the Class Period, Shell announced that it would reclassify an additional 250 million boe that had been reported proved as of December 31, 2002, and would reduce by approximately 220 million boe the amount of proved reserves it had expected to report as of December 31, 2003.  The crux of the allegations have been set forth at length in previous opinions by this Court and, thus, the Court sets forth here only those facts relevant to the present

issue of subject matter jurisdiction over the Non-U.S. Purchasers.  *See in re Royal Dutch/Shell Transp. Sec. Litig.*, 380 F. Supp. 2d 509 (D.N.J. 2005) ("*Royal Dutch I*"); *in re Royal Dutch/Shell Transp. Sec. Litig.*, 2006 WL 2355402 (D.N.J. 2006) ("*Royal Dutch II*").  Relevant to the limited inquiry of subject matter jurisdiction over the Non-U.S. Purchasers' claims, the essence of Plaintiffs' allegations is that Shell "engaged in material and substantial conduct in the United States that was part and parcel of the fraud" and the "U.S. participants in this conduct acted with an awareness of the scheme to book or retain improper proved reserves."  (Lead Plaintiffs' Proposed Findings of Facts & Conclusions of Law ("LPs' PFF") ¶¶ 391-92).

Shell first moved to dismiss the Non-U.S. Purchasers in December 2004 before former Chief Judge John W. Bissell, who denied the motion on August 9, 2005.  *Royal Dutch I*, *supra*, 380 F. Supp. 2d at 548.  Shell argued that Plaintiffs failed to satisfy the "conduct test" for jurisdictional purposes because any conduct allegedly committed in furtherance of Shell's alleged securities violations occurred outside of the United States and thus fell beyond the scope of the federal securities laws.  Shell also contended that the Non-U.S. Purchasers did not suffer any effects within the United States as a result of Shell's alleged violations.  Nevertheless, the Court held that Plaintiffs, at the pleading stage of the case, alleged sufficient conduct to retain jurisdiction over the Non-U.S. Purchasers' claims.  *Ibid.*  Subsequently, the parties engaged in extensive discovery and mediation, revealing further proofs in respect of the alleged U.S.-based conduct.

On April 11, 2007, Shell notified the Court and Lead Plaintiffs that it had entered into a Settlement Agreement, filed in the Amsterdam Court of Appeals in the Netherlands, that would resolve all asserted and unasserted claims of Non-U.S. Purchasers.  The other parties to that

-3-

Settlement Agreement include a foundation specifically formed to represent the interests of all Non-U.S. Purchasers ("the Foundation"), the Vereniging van Effectenbezitters ("VEB"), a Dutch shareholder advocacy group, and two pension funds that purchased hundreds of millions of shares of Shell stock during the putative class period and that previously had filed securities law actions in this Court.  As a joint request by those parties to the Settlement Agreement, Shell sought the Amsterdam Court of Appeals to declare the Settlement Agreement binding on all Non-U.S. Purchasers pursuant to the Dutch Collective Financial Settlement Act.  *Wet Collectieve Afwikkeling Massaschade*, *BW* Art. 907-10 (the Civil Code of the Netherlands) and 14 *Rv* Art. 1013-18 (the Code of Civil Procedure of the Netherlands).  In response, on April 30, 2007, Lead Plaintiffs filed before this Court a motion to enjoin Shell from seeking such a declaration. Consequently, that Settlement Agreement is conditioned in part on this Court's deciding whether to exercise subject matter jurisdiction over the Non-U.S. Purchasers.

Resulting from that Settlement Agreement, Shell renewed before this Court its motion to dismiss the Non-U.S. Purchasers' claims, pursuant to Federal Rule of Civil Procedure 12(b)(1), for failure to show that sufficient conduct occurred in the United States such that the federal securities laws applies to those claims and for failure to show that the Non-U.S. Purchasers experienced any effect in the United States from Shell's alleged violation of the federal securities laws.  Shell also moved to sever and dismiss the Non-U.S. Purchasers' claims based on the doctrines of *forum non conveniens* and comity.  Based on Judge Politan's previous involvement with the parties to this suit in respect of their mediation sessions, this Court, on May 24, 2007 and upon the joint proposal by the parties, appointed Judge Politan as Special Master to "consider and review the extensive evidentiary record on the conduct test issues and report to the

-4-

Court on his findings and recommendations[.]"  The parties also stipulated that the Court would adjourn Shell's motion to sever and dismiss based on the doctrines of *forum non conveniens* and comity until after the Court reviews the Special Master's Report pursuant to Federal Rule of Civil Procedure 53(g).  The parties also agreed that Lead Plaintiffs' motion to enjoin Shell in respect of the Settlement Agreement's binding effect would be withdrawn without prejudice and that, if this Court ultimately dismisses the Non-U.S. Purchasers' claims from the present action, that motion will be deemed withdrawn with prejudice.

On September 18, 2007, in a comprehensive thirty-nine-page opinion, Special Master Politan determined that, despite considering "a multitude of boxes overflowing with transcripts and other exhibits[,] . . . Plaintiffs have not satisfied the 'conduct test' under the operative analysis[.]"  (R. at 3).  Therefore, Special Master Politan "recommend[ed] that the District Court decline to exercise subject matter jurisdiction over the Non-U.S. Purchasers and exclude them from any class potentially certified in this action."  (R. at 3).

Shell now moves to have the Court adopt the Special Master's Report, including Special Master Politan's findings of facts and conclusions of law, in its entirety.  Lead Plaintiffs object, contending that the evidence submitted is sufficient to establish subject matter jurisdiction over the Non-U.S. Purchasers' claims.

## II.     DISCUSSION

### A.      Standards of Review

Pursuant to Federal Rule of Civil Procedure 53(g), a Court, after affording an opportunity to be heard, may "adopt or affirm; modify; wholly or partly reject or reverse; or resubmit to the master with instructions[]" a special master's order, report, or recommendations.  Fed. R. Civ. P.

53(g)(1).  The Court decides *de novo* "all objections to conclusions of law made or recommended by a master[,]" Fed. R. Civ. P. 53(g)(4), and "all objections to findings of fact made or recommended by a master" unless otherwise stipulated by the parties, Fed. R. Civ. P. 53(g)(3).

Federal Rule of Civil Procedure 12(b)(1) allows a party to move for dismissal of a case based on lack of subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  When a defendant makes a motion for lack of subject matter jurisdiction pursuant to that Rule, "the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Mortensen v. First Fed. Sav. and Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).  Further, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Ibid.* Ultimately, the plaintiff bears the burden of proving that subject matter jurisdiction properly exists in the federal court. *Ibid.*

> ### B.  Analysis
>
> #### 1.  *Contacts Test*

As a threshold matter, the Court finds that the Special Master properly defined the "conduct test" applicable to determine whether the Court has subject matter jurisdiction over the Non-U.S. Purchasers' claims.  (R. 25-35)  Generally, Congress has endowed the district courts with "exclusive jurisdiction of violations" of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*, ("the Act") and the rules and regulations adopted under the Act.  15 U.S.C. § 78aa. However, because the Act is silent as to its extraterritorial application, "in addressing transnational frauds, courts must ascertain whether Congress would have wished the precious resources of the United States courts to be devoted to such transactions." *Alfadda v. Fenn*, 935

F.2d 475, 478 (2d Cir.), *cert. denied*, 502 U.S. 1005 (1991) (internal quotation marks omitted). Although "two tests have emerged for determining whether a federal court has subject matter jurisdiction over a foreign plaintiff's claim under the antifraud provisions of the securities laws[,]" the parties here agree that the conduct test is controlling.[1]  *Ibid.*

Under the conduct test, the Court has subject matter jurisdiction "if the defendant's conduct in the United States was more than merely preparatory to the fraud, and particular acts or culpable failures to act within the United States directly caused losses to foreign investors abroad."  *Ibid.*  It is generally accepted that "merely preparatory" acts within the United States cannot independently support subject matter jurisdiction.  *See Robinson v. TCI/US West Commc'n Inc.*, 117 F.3d 900, 905-06 (5th Cir. 1997).  Rather, the Third Circuit has found the existence of such jurisdiction where "it is evident that the defendants' conduct occurring within the borders of this nation was *essential* to the plan to defraud the [plaintiffs]."  *Sec. & Exch. Comm'n v. Kasser*, 548 F.2d 109, 115 (3d Cir.), *cert. denied*, *Churchill Forest Indus. Ltd. v. Sec. & Exch. Comm'n*, 431 U.S. 938 (1977) (emphasis supplied).  The Third Circuit explained that "[t]he federal securities laws . . . do grant jurisdiction in transnational securities cases where at least some activity designed to further a fraudulent scheme occurs within this country."  *Id.* at 114.  Although the Third Circuit has not explicitly decided whether jurisdiction requires a showing of direct causation, at least one district court has noted that the Third Circuit does require that "the level of domestic conduct, at the very least, must be significant and material to the fraud."  *Tri-Star Farms Ltd. v. Marconi, PLC*, 225 F. Supp. 2d 567, 576 (E.D. Pa. 2002).

---

[1]  In contrast, the other standard, the "effects test," "asks whether conduct outside the United States has had a substantial adverse effect on American investors or securities markets."  *Robinson v. TCI/US West Commc'n, Inc.*, 117 F.3d 900, 905 (5th Cir. 1997) (footnote omitted).

Despite the uncertainty as to the precise standard the Third Circuit would apply, the Court recognizes that courts universally have declined to apply federal securities laws in cases involving merely preparatory acts within the United States.  *See, e.g.*, *Butte Mining PLC v. Smith*, 76 F.3d 287, 291 (9th Cir. 1996); *IIT v. Vencap, Ltd.*, 519 F.2d 1001, 1018 (2d Cir. 1975). Ultimately, the parties agree that the case law sets forth that the conduct test focuses on where the alleged fraud was either conceived, planned, or executed, or any combination thereof.  *See, e.g.*, *Straub v. Vaisman & Co., Inc.*, 540 F.2d 591, 595 (3d Cir. 1976).  Thus, there must be some nexus between the conduct in the United States and the alleged fraud.

Requiring a threshold showing of conduct within the United States is consonant with the canon that, "[u]nless Congress has expressed intent otherwise, courts should avoid the extraterritorial application of laws."  *Blechner v. Daimler-Benz AG*, 410 F. Supp. 2d 366, 368 (D. Del. 2006).  Indeed, "the line has to be drawn somewhere if the securities laws are not to apply in every instance where something has happened in the United States, however large the gap between the something and a consummated fraud and however negligible the effect in the United States or on its citizens."  *IIT*, *supra*, 519 F.2d at 1018.  In the absence of clear Congressional intent, the Court must take into account policy considerations to determine whether it has subject matter jurisdiction over these claims.  *Kasser*, *supra*, 548 F.2d at 116.  Accordingly, the Court recognizes the possibility that denying jurisdiction "may embolden those who wish to defraud foreign securities purchasers or sellers to use the United States as a base of operations[,]" whereas assuming jurisdiction may bolster "the prospect of reciprocal action against fraudulent schemes aimed at the United States from foreign sources."  *Ibid.*

Nevertheless, because the Non-U.S. Purchasers are presented to the Court as potential

class members, the Court must also consider that "[c]lass actions may require different treatment from cases in which there are individual plaintiffs due to 'the likelihood that a very small tail may be wagging an elephant and . . . the doubt that a judgment of an American court would protect the defendants elsewhere.'" *Blechner*, *supra*, 410 F. Supp. 2d at 373 (quoting *IIT*, *supra*, 519 F.2d at 1018 n.31). Finally, the Court must consider the ultimate goals of the Exchange Act: that is, "to insure high standards of conduct in securities transactions *within this country* in addition to protecting *domestic* markets and investors from the effects of fraud." *Kasser*, *supra*, 548 F.2d at 116 (emphasis supplied).

Considering the case law and the policy implications, the Special Master aptly concluded that "the conduct test is satisfied and [courts will] exercise subject matter jurisdiction over foreign investors' foreign transactions only where the alleged fraud was contrived in or from the United States or arose from activities in the United States." (R. 35). Finding this conclusion a correct reiteration of the conduct test, the Court adopts the Special Master's conclusions of law as to the proper standard under which the Court must determine whether subject matter jurisdiction exists over the Non-U.S. Purchasers' claims. Accordingly, the Court next must determine anew whether Shell's conduct within the United States was significant and material to the alleged fraud such that the Court has jurisdiction over the Non-U.S. Purchasers' claims. *See Tri-Star Farms*, *supra*, 225 F. Supp. 2d at 576. Therefore, the Court now turns to the Special Master's findings of fact as to the alleged U.S.-based conduct.

## 2.    *Findings of Fact*

Having reviewed the parties' factual submissions to the Special Master, the Court now adopts the Special Master's findings of facts and sets them forth herein. As found by the Special

Master, Plaintiffs categorize Shell's alleged fraud within the United States into three series of actions: (1) investor relations activities; (2) the estimation and calculation of proved reserves by a U.S.-based Shell service organization, Shell Deepwater Services ("SDS"); and (3) services performed by another U.S.-based Shell service organization, Shell Exploration and Production Technology, Applications and Research ("SEPTAR"), which permitted Shell operating units ("OUs") to either maintain proved reserves bookings or book additional proved reserves.  (R. at 5-6 (citing LPs' PFF ¶ 393)).

Shell, its executives, and its key employees are all predominantly based in Europe.  (R. at 6).  Because both Royal Dutch and Shell Transport listed shares on the New York Stock Exchange, both companies were required to comply with federal securities laws, including the filing of a joint Annual Report on Form 20-F with the Securities and Exchange Commission ("SEC").  (Capell Decl. Ex. B-106).  Nevertheless, the Special Master found that "a great majority of the securities traded during the Class Period were traded on foreign exchanges and by the Non-U.S. Purchasers."  (R. at 8).  Generally, the majority of the combined shares of Royal Dutch and Shell Transport were registered in Amsterdam and London, not in the United States. (Clark Decl. ¶ 10; Scaturro Decl. ¶ 4(c)).

To perform the corporations' operational functions, Royal Dutch and Shell Transport owned shares of two Group Holding Companies, Shell Petroleum N.V. and The Shell Petroleum Company Limited (collectively, "the Group Holding Companies").  (Capell Decl. Ex. B-106; Haber Decl. Ex. 71 at MISC0004562 & Ex. 90 at RJW00890158).  The Group Holding Companies, in turn, owned the OUs and the service companies within the Royal Dutch/Shell Group of Companies ("the Group").

Although the Group's operations were divided into five business components, only one of those five—Exploration and Production ("EP")—is relevant to the present case.  (Capell Decl. Ex. B-106; Aalbers Decl. ¶ 5).  EP, which maintained its headquarters in the Netherlands, operated to locate and produce crude oil and natural gas through its OUs.  EP also designed and operated infrastructure needed to deliver hydrocarbons to the marketplace.  (Capell Decl. Ex. B-106).  The EP Executive Committee ("ExCom") supervised EP's operations from the Netherlands, and the Regional Business Directors supervised EP's OUs from a base located in The Hague, Netherlands until the second half of 2002.  (Brass Decl. ¶ 12; Brass Dep. at 88:18-20; Dmitronow Decl. Ex. A-3 at PBW0016403; Sidle Decl. ¶ 1).

a.    <u>Investor Relations Activities</u>

Plaintiffs argue that activities involving Shell's communications to the investing public occurred within the United States.  However, the Special Master determined that "the genesis of all original disclosures relevant to the investing public was [in] Europe."  (R. at 12).  All conduct relating to preparing and approving Shell's aggregate proved reserves occurred outside the United States.  The process was such that, after receiving data from OUs worldwide, Shell would compile, review, and approve its aggregate proved reserves from its Netherlands headquarters.  The Group Reserves Coordinator ("the GRC"), who was based at EP headquarters in the Netherlands throughout the Class Period, was the leader of this process.  (Roosch Decl. ¶ 8; Barendregt Decl. ¶ 32).  Ultimately, Shell reported proved reserves to the investing public and the SEC from the Netherlands or the United Kingdom.

Notably, the Group Reserves Auditor ("the GRA"), located in the Netherlands, periodically audited the OUs and reported to EP in respect of each OUs compliance with Shell

Guidelines in their estimates of proved reserves.  (Barendregt Dep. at 195:2-9, 98:5 to 99:16).

The GRA reviewed the GRC's aggregate proved reserves estimate, in addition to the proved

reserves estimates submitted by each OU for the Annual Review of Petroleum Resources

("ARPR").  (Barendregt Decl. ¶ 33).  After the submission of the ARPR, Shell's external

auditors, KPMG International, based in the Netherlands, PricewaterhouseCoopers ("PwC"),

based in the United Kingdom, ExCom, and the Deputy Group Controller, based in London,

reviewed the GRA's Year-End Review.  (Barendregt Decl. ¶ 35; van Poppel Decl. ¶¶ 6, 8, 12,

17-19, 20; van Poppel Dep. at 90:15-23, 91:2-5; Brass Decl. ¶ 30).  Ultimately, ExCom reviewed

and approved the proposed estimates and, at that point, Shell would disclose those estimates to

the public and to the SEC, via its Form 20-F.  (Brass Decl. ¶ 30; Aalbers Dep. at 119:10-24;

Roosch Dep. at 267:8-20; Brass Decl. ¶ 32; Capell Decl. Ex. B-106).

Shell's Investor Relations ("IR") and External Affairs groups were based in London.

(Henry Decl. ¶ 15).  However, Shell maintained separate IR offices in London, The Hague, and

New York, each responsible for communicating with analysts and investors within their

respective regions.  (Sexton Decl. ¶ 4).  The manager of each of these offices reported to the

Head of Group Investor Relations in London; then, Shell's External Affairs Department

communicated with the media primarily from London and, at times, from The Hague.  (Henry

Dep. 23:24 to 24:17, 55:13-16, 55:19 to 56:5; Jacobi Dep. 20:18-24, 21:9-16, 22:3-8, 140:1-2).

In addition, the IR group generated all presentations and communications with investors in

London or The Hague.  (Sexton Decl. ¶ 16).

Moreover, the New York IR office was not involved in the preparation of Shell's Fourth

Quarter and Full-Year Results Announcements ("4th Quarter QRA"), which included

information on Shell's proved reserves replacement ratio ("RRR").  (Sexton Decl. ¶ 13(a)).  The New York IR office similarly did not handle the SEC filings of the 4th Quarter QRA, (Henry Decl. ¶ 21), and all press conferences in respect of the 4th Quarter QRA were held in The Hague and London, but never in the United States, (van der Steenstraten Decl. ¶ 5(c); Sexton Dep. at 63:11-14, 63:18-22; Jacobi Dep. at 63:21-24, 68:20 to 69:4).

Although Shell executives conducted meetings or "road shows" with large shareholders and analysts in the United Kingdom, Continental Europe, and the United States, (van der Steenstraten Decl. ¶ 5(d)), none of the meetings held in the United States were with European-based investors or analysts, (Henry Decl. ¶ 38).  Also, even though EP made a presentation in Houston in 2002, (Henry Decl. ¶ 45), there is nothing in the record that suggests that the presentation involved proved reserves, (Henry Dep. at 220:5-11, 222:9-16, 228:18-20).

### b.      Activities of U.S.-Based Shell Service Organizations

Plaintiffs also argue that sufficient conduct within the United States could be established by Shell's activities via the actions of two U.S.-based service organizations, SDS and SEPTAR.  SDS specialized in deepwater exploration, appraisal, development, and production, (Sears Dep. at 27:7-17; Warren Dep. at 51:12-17, 52:2-6; Capell Decl. Ex. B-8A), and its staff members were located either in Houston, Texas or New Orleans, Louisiana, (Bichsel Dep. at 106:7-10).  SDS provided deepwater technical services primarily to Shell's Exploration and Production Company ("SEPCo"), EP's U.S.-based OU, which operated certain deepwater assets in the Gulf of Mexico.  (Platenkamp Dep. at 272:7-16).  Although one division of SDS sometimes provided estimates of hydrocarbon resource volumes to one OU, (Kennett Dep. at 270:11 to 271:8), SDS never assumed any OU's obligation to estimate and report its proved reserves in its ARPR submission

-13-

to the GRC in the Netherlands, (Bichsel Dep. at 155:2-6; Hines Dep. at 122:25 to 123:7).

While SDS specialized in deepwater development and production, SEPTAR specialized in research and development of technology.  (Hoffman Dep. at 27:14-15; Percival Decl. ¶ 9; Capell Decl. Ex. B-5; Darley Dep. at 11:4 to 12:2).  During the relevant time period, a majority of SEPTAR's staff was based in Rijswijk, Netherlands, but a minority worked in Houston, Texas.  (Capell Decl. Ex. B-9; Percival Decl. ¶ 11; Henderson Decl. ¶ 7).  Specifically, Plaintiffs argue that two of SEPTAR's five "clusters" engaged in conduct relevant to Shell's alleged fraudulent conduct: the Shared Earth Model ("SEM") cluster and the Geosciences and Integrated Services ("GIS") cluster.  (Capell Decl. Ex. B-9; Percival Decl. ¶ 9; Henderson Decl. ¶ 8).  During the Class Period, SEM began to develop software designed to enhance seismic pictures by filtering out "noises" created during seismic imaging of the Earth's subsurface.  (Hoffman Dep. at 19:11-15, 113:22-25).  Plaintiffs contend that the use of this technology was used in connection with ascertaining Shell's proved reserves.

The other SEPTAR cluster, GIS, provided subsurface technical services for Shell's OUs.  (Henderson Decl. ¶¶ 8, 22; Percival Decl. ¶¶ 9, 25).  GIS consisted of several sub-clusters, including AGI, its largest sub-cluster, and AGH, one of its smallest sub-clusters.  (Capell Decl. Ex. B-22; Percival Decl. ¶ 12).  AGH performed technical services and field studies primarily for SEPCo in Houston, in addition to Shell OUs located outside of the United States.  (Warren Dep. at 50:15-22; Henderson Decl. ¶ 19; Barendregt Decl. ¶ 18).  The majority of AGH's employees was located in Houston, Texas.  (Henderson Decl. ¶ 9).  However, neither AGH nor AGI held responsibilities that included any reporting or maintaining of proved reserves.  (Percival Dep. at 150:21-25, 68:24 to 69:8; Percival Decl. ¶ 17-20; Okon Decl. ¶ 6; Kluesner Dep. at 175:7-12;

Darley Dep. at 22:23 to 23:4).

     **3.**     *Analysis*

The issue is thus formed: whether Shell's conduct discussed above is sufficient to establish subject matter jurisdiction under the Exchange Act over the claims of the Non-U.S. Purchasers. Plaintiffs challenge the Special Master Report's findings of fact and conclusion that there is insufficient proof as to Shell's U.S.-based conduct. Specifically, Plaintiffs submit that it proffered sufficient proof that the U.S.-based organizations, SDS and SEPTAR, did engage in conduct within the United States aimed to further the fraudulent scheme alleged by the Non-U.S. Purchasers.

First, the Court finds that the Special Master correctly found that, based on the record, Shell did not engage in any fraud-related activity targeted at the Non-U.S. Purchasers within the United States by virtue of its investor relations activities. (R. at 14). Second, the activities of SDS and SEPTAR were not related to either the reporting of proved reserves or maintaining the allegedly overstated reserves. (R. at 15). In respect of SDS, that organization was not involved in the estimation or reporting of proved reserves, the source of the alleged fraud. Further, regarding SEPTAR's SEM cluster, the Court agrees with the Special Master's finding that, because SEM's technology was undeveloped during the Class Period, "the OUs could not have used meaningfully any of SEM's technology or capabilities for any purpose, let alone for some purpose connected with proved reserves." (R. at 16).

Plaintiffs also argue that the OU Shell Nigeria Exploration and Production Company ("SNEPCO") retained the Bonga Integrated Studies Team ("BIST"), a subset of SDS, to provide technical and economic services necessary to develop Nigeria's deepwater fields and to calculate

proved reserves for SNEPCO.  However, as found by the Special Master, the facts show that

SNEPCO, which maintains its headquarters in Nigeria—and not BIST—was the entity ultimately

responsible for the estimate and report to the GRC of its proved reserves; indeed, the evidence

does not suggest that SDS's work for SNEPCO involved those proved reserves that were later

recategorized.  (R. at 17-18 (citing McFadden Decl. ¶¶ 13-14; Bichsel Decl. ¶ 10; Varley Decl. ¶

12; Kennett Dep. at 270:11 to 271:8; McVeigh Dep. at 74:25 to 75:6, 109:7-12)).

     Next, Plaintiffs allege that Shell Development Angola ("SDAN") hired SDS in 2000 to

perform the technical work that would lead to a reserves booking in a deepwater resource

operated by a subsidiary of BP, p.l.c. ("BP") as part of a joint venture between BP and Shell.  (R.

at 18).  Plaintiffs also submit that SDS participated in calculating 121 million boe in proved

reserves that SDAN reported during the Class Period and that were later recategorized in 2004.

(R. at 18).  Although SDS did give preliminary input into SDAN's reporting of the proved

reserves in Angola, SDAN maintained exclusive control of its proved reserves calculations and

its ARPR submission to the GRC.  (Inglis Decl. ¶ 8; Hines Dep. at 203:17-19; Hines Decl. ¶ 13;

Parry Dep. at 184:7-15; Capell Decl. Ex. B-138 and -163A).  Similarly, the Court rejects

Plaintiffs' arguments that SDS was involved with the reporting of proved reserves submitted by

Brunei Shell Petroleum ("BSP") and SBEP, a Brazilian organization.  (R. at 19).  There is

nothing in the record tending to show that SDS's field study and development work related to

BSP's or SBEP's reporting of their proved reserves.

     In respect of SEPTAR's conduct, Plaintiffs contend that SEPTAR worked for Shell

Venezuela S.A. ("SVSA") to perform field studies relating to the boe of proved reserves that

were later recategorized and that its Houston-based sub-cluster, AGH, performed work relating to

proved and expectation reserves reported by Petroleum Development Oman ("PDO") and Shell

Exploration China Limited ("SECL").  Specifically, Plaintiffs assert that SVSA hired SEPTAR

to conduct field studies of the Urdaneta West fields in Venezuela between 1998 and 2002 and

that this work is somehow linked to 46 million boe of restated proved reserves.  (Pls. Fact Stmt.

at 61-63).  As noted by the Special Master, SEPTAR was not formed until July 1, 1999; thus,

SEPTAR could not have been involved with SVSA in 1998.  (R. at 22 (citing Capell Decl. Ex.

B-16; Percival Dep. at 25:3-12; Percival Decl. ¶ 8; Henderson Decl. ¶ 7)).  In addition, when

AGH conducted its field study for SVSA in 2002, SVSA had already reported the 46 million boe

for 2000 and 2001.  (Pls. Ex. 146 at V00220021).  Ultimately, there is insufficient evidence to

suggest that U.S.-based SEPTAR was involved in the reporting of the proved reserves in issue in

this case by virtue of its field studies conducted for SVSA.

Turning to AGH's conduct with PDO, the Court also finds that such conduct was

unrelated to the alleged overstated proved reserves.  In 2004, PDO restated previously booked

proved reserves for 37 of its 125 fields.  (Pl. Ex. 96).  Indeed, between 2001 and 2003, AGH

performed technical services for eight of those thirty-seven fields.  (Percival Decl. ¶ 28;

Henderson Dep. at 108:11-25, 142:13 to 143:8, 143:21 to 144:25).  However, the services

provided by AGH, which included a report on improved recovery for some of PDO's oil fields,

did not include any recommendations in respect of reporting proved reserves.  (Pls. Ex. 44 at 6 &

attachments 1-3; Henderson Decl. ¶ 22; Henderson Dep. at 126:20-23; Percival Decl. ¶ 25;

Capell Decl. Ex. B-24).  In addition, AGH's enhanced oil recovery ("EOR") feasibility reports on

five of PDO's fields did not include any estimate or report on proved reserves, (Henderson Decl.

¶ 23), but were limited to whether the use of a particular EOR technique is feasible on a specific

field, (Henderson Decl. ¶¶ 23-24; Henderson Dep. at 157:9-13).  Also, there is nothing to suggest

that AGH's assistance to PDO in creating reservoir models of three PDO fields involved reserves

estimates or PDO's booked proved or expectation reserves.

Next, the Court rejects Plaintiffs' contention that AGH was involved in approximately

one million boe that SECL restated.  (R. at 22).  As found by the Special Master, "[t]he proofs

show that[,] while AGH performed 'petroleum engineering work,' its work for any [OU] never

involved estimating or reporting proved reserves."  (R. at 22 (citing Percival Decl. ¶ 30;

Henderson Decl. ¶ 19)).  Ultimately, SECL, not AGH, was responsible for reporting its reserves

to Shell EP in the Netherlands.  (Barendregt Decl. ¶ 18).  Because there is insufficient evidence

to suggest that SDS or SEPTAR, through either SEM or GIS's sub-clusters AGI and AGH,

engaged in conduct relating to the recategorized proved reserves, the Court adopts the Special

Master's conclusion that neither of those U.S.-based organizations "acted so as to commit and/or

further fraud on the Non-U.S. Purchasers."  (R. at 15).

Lastly, Plaintiffs allege that Shell engaged in sufficient conduct within the United States

through GRA's audits performed within the United States during the Class Period and through

the actions of Rodney Sidle ("Sidle"), the Reserves Manager of SEPCo from 1999 to 2004.  (Pls.

Fact Stmt. at 4-5; Pls. Rebuttal Facts at 9-10, 12).  Indeed, the GRA performed six audits from

the Houston office, using SDS's technical data.  (Barendregt Decl. ¶¶ 17, 19, 21).  Two of those

six audits were for SNEPCO and SDAN.  However, there is no proof that any of the audits added

to or furthered any alleged fraud.  In fact, the GRA's SNEPCO audit in 2002 resulted in a

recommendation that SNEPCO reduce some of its reported proved reserves.  (Pls. Ex. 88).  In

respect of Sidle, the Court, like the Special Master, finds that he could not have participated in

-18-

the booking of the proved reserves that were later reclassified because SEPCo did not restate any proved reserves during the Class Period.  (Cooper Decl. ¶ 72).  Further, Sidle did not control the reporting of proved reserves, or ARPR submissions, by any Shell OU other than those that were part of SEPCo.  (Sidle Decl. ¶¶ 25-26).  Sidle's roles as a member to various committees within Shell and his knowledge of SEC reserves reporting requirements do not suggest that he "was a vital participant in the events leading to the Recategorization[,]" as alleged by Plaintiffs.  (Pls. Rebuttal Facts at 11).  Thus, the Court agrees with the Special Master's conclusion that Plaintiffs have not met their burden of showing that "Sidle's conduct played sufficient part in the allegedly fraudulent scheme[.]"  (R. at 24).

Considering all of Plaintiffs' factual submissions to the Special Master, the Court, like the Special Master, finds that Plaintiffs have not shown that Shell engaged in conduct that amounted to more than mere preparatory acts in furtherance of the alleged fraud as to the Non-U.S. Purchasers.  As a result, the Court holds that there is insufficient evidence to show that Shell's "conduct occurring within the borders of this nation was essential to the plan to defraud [the Non-U.S. Purchasers]." *Kasser*, *supra*, 548 F.2d at 115.  The Court also emphasizes that this holding does not leave the Non-U.S. Purchasers without an alternative recourse to address their alleged injuries.  Significantly, the Non-U.S. Purchasers can seek recovery through the Settlement Agreement entered into before the Amsterdam Court of Appeals or through procedures available within their respective jurisdictions.  Therefore, the result reached here does not prejudice the Non-U.S. Purchasers and ultimately serves to preserve "the precious resources of the United States courts[.]" *Alfadda*, *supra*, 935 F.2d at 478.

III.   CONCLUSION

In conclusion, Plaintiffs have not shown sufficient conduct within the United States on the part of Shell such that the Court may exercise subject matter jurisdiction over the federal securities claims of the Non-U.S. Purchasers.  As a result, the Court adopts the Special Master's Report in its entirety and, accordingly, dismisses from the action the claims brought by the Non-U.S. Purchasers.  An appropriate Order accompanies this Opinion.


_____ /s/ JOEL A. PISANO_____
Joel A. Pisano
United States District Judge


Dated: November 13, 2007