**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____
                                      :

IN RE ROYAL DUTCH/SHELL      :    Civ. No. 04-374 (JAP)
TRANSPORT SECURITIES        :    (Consolidated Cases)
LITIGATION                      :
_____:    **OPINION**

PISANO, District Judge.

Presently before the Court is a motion for an award of attorneys' fees and costs by Keefe Bartels & Clark LLC ("KBC"), a law firm that served as liaison counsel in this action from August 5, 2004 to February 27, 2008. This motion presents a fee dispute between liaison counsel and lead counsel in a consolidated putative class action. For the reasons set forth herein, the Court denies KBC's application for fees and expenses on a percentage-of-recovery basis. Rather, the Court holds that KBC is entitled to recover the reasonable value of the services it rendered on behalf of lead counsel under the theory of _quantum meruit_ and refers the calculation of that reasonable value to a panel of three arbitrators appointed by the Court.

## I.    BACKGROUND

### A.    Underlying Class Action and Procedural History

This class action, consolidated on June 30, 2004, arises from allegations that Shell violated federal securities law. The crux of the allegations have been set forth at length in previous opinions by this Court and, thus, the Court sets forth here only those facts relevant to the present issue of liaison counsel's motion for fees. _See in re Royal Dutch/Shell Transp. Sec. Litig._, 380 F. Supp. 2d 509 (D.N.J. 2005) ("_Royal Dutch I_"); _in re Royal Dutch/Shell Transp._

*Sec. Litig.*, 2006 WL 2355402 (D.N.J. 2006) ("*Royal Dutch II*"); *in re Royal Dutch/Shell Transp. Sec. Litig.*, 522 F. Supp. 2d 712 (D.N.J. 2007) ("*Royal Dutch III*").  The putative class ("the Class" or "Plaintiffs") is composed of persons and entities who, between April 8, 1999 and March 18, 2004 ("the Class Period"), purchased securities issued by Shell.  Originally, the proposed Class included, among others, "Non-U.S. Purchasers;" that is, those persons or entities who purchased their shares on exchanges outside of the United States and at the time of such purchase were residents or citizens of, or were incorporated in or created under the laws of, any jurisdiction other than the United States.

### 1.      Forming of Relationship Between Lead Counsel and Liaison Counsel

On June 30, 2004, the Court appointed as Lead Plaintiffs the Pennsylvania State Employees' Retirement System ("SERS") and the Pennsylvania Public School Employees' Retirement System ("PSERS") (collectively, "Lead Plaintiffs"), and as lead counsel Bernstein Liebhard & Lifshitz, LLP ("BLL").  In its Order, the Court granted BLL exclusive control over the distribution of work among plaintiffs' counsel.  Specifically, the court ordered:

> Subject to this Court's exercise of discretion to review any disputed material decision, lead counsel shall have *sole authority* over the following matters on behalf of all plaintiffs in their respective cases: . . . *such work assignments to other plaintiffs' counsel as they may deem appropriate*; . . . designation of which attorneys may appear at hearings and conferences with the Court; . . . and [] other matters concerning the prosecution or resolution of their respective cases.

*In re Royal Dutch/Shell Transp. Sec. Litig.*, 04-374, Order at 7 (D.N.J. June 30, 2004) (emphasis supplied).

The Court also ordered BLL to propose an appointment of liaison counsel to the Court by July 12, 2004.  The Court expressed that BLL "will not itself be designated liaison counsel, even

though that firm has an office in New Jersey."[1]  *In re Royal Dutch/Shell Transp. Sec. Litig.*, 04-374, Opinion at 44 (D.N.J. June 30, 2004).  In the accompanying Order, the Court ordered that liaison counsel, once appointed, will assume the duty of effecting service in accordance with that Order.  *In re Royal Dutch/Shell Transp. Sec. Litig.*, 04-374, Order at 8-9 (D.N.J. June 30, 2004). The Court made no other mention of the duties and obligations required of liaison counsel. Accordingly, Lead Plaintiffs and BLL proposed as liaison counsel the law firm of Lynch, Martin, Kane, Kuper, Keefe & Bartels, predecessor of Keefe Bartels & Clark LLC ("KBC").  On August 5, 2004, the Court appointed KBC as liaison counsel, ordering that KBC "shall assume all rights and duties assigned to liaison counsel as set forth in this Court's aforesaid Order of June 30, 2004."  *In re Royal Dutch/Shell Transp. Sec. Litig.*, 04-374, Order at 2 (D.N.J. Aug. 5, 2004). However, apart from effecting service, neither the order of appointment nor the order of June 30, 2004 detailed the "rights and duties assigned to liaison counsel[.]"

After the appointment, KBC and BLL did not enter into a retainer agreement.  Presently, the firms dispute what their intentions were in respect of KBC's compensation upon its appointment as liaison counsel.  KBC's managing partner, John E. Keefe, Jr. ("Keefe"), submits that he had a telephone conference with Stanley D. Bernstein ("Bernstein"), a partner at BLL, on July 12, 2004 to discuss BLL's selection of KBC as liaison counsel.  (Keefe Certification Jan. 25, 2008 ("Keefe Certif. I") ¶ 6).  Keefe avers that he and Bernstein discussed KBC's compensation for its services and that they determined that KBC's "fee would be based upon a percentage of

---

[1]  The order of appointment of liaison counsel was entered by the judge who was then presiding over this case.  Unfortunately, that order did not require liaison counsel to enter into fee agreement with lead counsel.

the recovery pursuant to the custom and practice of th[e] District [of New Jersey]."[2]  (Keefe Certif. I ¶ 7).

Bernstein agrees that this telephone conference occurred, noting however that it occurred on July 15, 2004, and that the two discussed KBC's compensation.  (Bernstein Certification Feb. 7, 2008 ("Bernstein Certif.") ¶ 13).  According to Bernstein, he told Keefe that KBC "would be compensated [as liaison counsel] on the basis of his lodestar with the possibility of a multiplier, perhaps similar to any that [BLL] received[,]" to which Keefe agreed.  (Bernstein Certif. ¶ 14).  Bernstein certifies that Keefe mentioned not wanting "to become rich on the case[,]" but rather "would like to start a relationship with [BLL] whereby he would refer clients to us."  (Bernstein Certif. ¶ 14).  As such, Bernstein submits, Keefe "requested an unspecified percentage fee in any future case in which one of his clients acted as lead plaintiff, but expressly disavowed an interest in being paid a percentage of [BLL]'s fee in this case."[3]  (Bernstein Certif. ¶ 14).

In a letter dated July 15, 2004, Bernstein informed Lead Plaintiffs, via the Office of the Attorney General for the Commonwealth of Pennsylvania, that it had selected KBC as liaison counsel.  (Bernstein Certif. Ex. 2).  According to that letter, Bernstein stated that liaison counsel performs ministerial functions and are generally paid on a contingency basis.  (Bernstein Certif. Ex. 2, at 1).  He further explained that BLL "expect[ed] to pay liaison counsel their lodestar, plus some multiplier to account for the contingency risk and delay[,]" and that BLL would compensate liaison counsel from its own recovery of fees in this case.  (Bernstein Certif. Ex. 2, at

---

[2]  To support his statements, Keefe attaches to his certification a recorded activity note from his time records.  (Keefe Certif. I Ex. C).

[3]  Bernstein attaches to his certification his contemporaneous notes of this telephone conference, which substantially correlate to Bernstein's position.  (Bernstein Certif. Ex. 1).

-4-

1).

### 2.    The Dispute Arises

In December 2004, Shell moved to dismiss the Non-U.S. Purchasers' claims for lack of

subject matter jurisdiction, and the Court initially denied the motion without prejudice on August

9, 2005.  *Royal Dutch I*, *supra*, 380 F. Supp. 2d at 548.  On May 23, 2006, in the midst of

extensive discovery conducted in both the United States and in Europe, and pursuant to an

Amended Joint Scheduling Order, the Court scheduled a "May 2007 evidentiary hearing" to

proceed in three sequential phases.  The first of the three phases was to be a "bench trial on

whether the [Non-U.S.] Purchasers satisfy the conduct test[.]"  *In re Royal Dutch/Shell Transp.*

*Sec. Litig.*, 04-374, Amended Joint Scheduling Order at 2 (D.N.J. May 23, 2006).  This bench

trial was referred to as "the mini-trial" in which the Court would have determined whether it

could properly exercise subject matter jurisdiction over the Non-U.S. Purchasers' claims.

However, the mini-trial never occurred because, in the interim, the Non-U.S. Purchasers reached

a settlement agreement with Shell.

It is important to note that BLL, as lead counsel, had no relationship with the Non-U.S.

Purchasers.  The Non-U.S. Purchasers were represented by other counsel and they negotiated

with Shell towards a settlement of their claims outside the confines of this putative class action.

Clearly, lead counsel and liaison counsel, upon notification of Shell's settlement in principle with

the Non-U.S. Purchasers, realized that their potential counsel fees were thereby put in jeopardy;

if the Non-U.S. Purchasers' claims were resolved outside of this case, the value of the common

fund toward which they had been working would be substantially reduced.

On April 11, 2007, Shell notified the Court and Lead Plaintiffs that it had entered into a

Settlement Agreement, filed in the Amsterdam Court of Appeals in the Netherlands, that would resolve all asserted and unasserted claims of the Non-U.S. Purchasers. *Royal Dutch III*, *supra*, 522 F. Supp. 2d at 715. That Agreement provided that Shell will pay $340.1 million to the Non-U.S. Purchasers, plus an additional $12.5 million for the creation of a settlement relief fund. Shell also agreed that it would separately negotiate and pay any attorneys' fees and costs.[4] As a joint request by the parties to that Settlement Agreement, Shell sought the Amsterdam Court of Appeals to declare the Settlement Agreement binding on all Non-U.S. Purchasers pursuant to the Dutch Collective Financial Settlement Act. *Wet Collectieve Afwikkeling Massaschade*, *BW* Art. 907-10 (the Civil Code of the Netherlands) and 14 *Rv* Art. 1013-18 (the Code of Civil Procedure of the Netherlands).

In response, on April 30, 2007, Lead Plaintiffs filed before this Court a motion to enjoin Shell from seeking such a declaration. Consequently, the foreign Settlement Agreement was conditioned in part on this Court's deciding whether to exercise subject matter jurisdiction over the Non-U.S. Purchasers, and, thus, Shell renewed before this Court its motion to dismiss the Non-U.S. Purchasers' claims, pursuant to Federal Rule of Civil Procedure 12(b)(1). On May 2, 2007, the Court rescheduled the mini-trial for June 2007. *In re Royal Dutch/Shell Transp. Sec. Litig.*, 04-374, Second Amended Joint Scheduling Order at 3-4 (D.N.J. May 2, 2007).

At the request of the parties, on May 24, 2007, the Court referred the issue to Special Master Nicholas H. Politan, who ultimately recommended that the Court dismiss the Non-U.S.

---

[4] In addition, Shell agreed to make a settlement offer to the putative Class in this action. In the event Shell settled the Class's claims on terms more favorable than those received by the Non-U.S. Purchasers, Shell would provide additional settlement relief to the Non-U.S. Purchasers.

Purchasers' claims because Plaintiffs failed to show that sufficient conduct occurred in the United States such that the federal securities laws apply to those claims. *Royal Dutch III*, *supra*, 522 F. Supp. 2d at 716. On November 13, 2007, the Court adopted the Report and Recommendation of the Special Master and dismissed the claims asserted by the Non-U.S. Purchasers. *Royal Dutch III*, *supra*.

To assuage BLL's objections to what it considered an "end-run," Shell, on January 14, 2008, submitted to the Court a Memorandum of Approval of Payment, wherein "the Court and Shell recognize[d]" that the efforts of Lead Plaintiffs and lead counsel "in vigorously pursuing through litigation the Non-U.S. Purchasers' claims for more than three years, in satisfaction of their fiduciary obligations to the proposed class, were a substantial factor in Shell's decision to enter into a settlement agreement to resolve the claims of the Non-U.S. Purchasers . . . ."[5] *In re Royal Dutch/Shell Transp. Sec. Litig.*, 04-374, Memorandum of Approval of Payment at 1 (D.N.J. Jan. 14, 2008). Based on BLL's efforts, Shell "agreed to pay Lead Counsel a fee of $27 million to compensate Lead Counsel for its role in achieving this significant benefit for the Non-U.S. Purchasers[ and] in recognition of its vigorous pursuit of the claims asserted on behalf of the Non-U.S. Purchasers[.]" *Id.* at 1-2. That Memorandum also informed the Court that "the agreed-upon fee represents 7.7 percent of the approximately $350 million Shell has agreed to pay the Non-U.S. Purchasers in the Non-U.S. Settlement[.]" *Id.* at 2.

During the pendency of Shell's motion to dismiss, BLL realized that it had a fundamental disagreement with KBC's expectation in recovery its fees. On June 20, 2007, Bernstein

---

[5] This Memorandum of Approval of Payment is consistent with the First Amended Memorandum of Understanding executed by Shell and BLL on May 22, 2007. (Keefe Certif. I Ex. I, at 4).

requested that Keefe submit KBC's time records.  (Bernstein Certif. ¶ 25).  However, KBC did

not submit its time records until after filing this motion.  (Bernstein Certif. ¶ 27).  Rather, Keefe

responded on July 3, 2007, via letter, informing BLL that its then-current expenses totaled

$1,579.00 and that KBC attorneys had recorded approximately 3,527 hours of work on the case,

amounting to a total lodestar calculation of $1,321,713.50.  (Bernstein Certif. Ex. 4).  Keefe

cautioned, however, that those numbers were "based upon a preliminary review and [were]

subject to change upon final review and edit."  (Bernstein Certif. Ex. 4).  Keefe added that KBC,

based on its experience and practice as liaison counsel, sought "full reimbursement of [its] costs

and ten (10%) percent payment of the awarded and/or settled attorneys fee after payment of

expenses to [BLL]."  (Bernstein Certif. Ex. 4).

       On July 9, 2007, KBC sent a letter to BLL to "define the parameters and fee structure

under which [they] will conduct [their future] professional relationship."  (Keefe Certif. Feb. 19,

2008 ("Keefe Certif. II") ¶ 24, Ex. B, at 1).  According to that letter, KBC stated that it would

perform work "under the direction and control of [BLL]" and would be compensated on a

percentage-of-recovery basis.  (Keefe Certif. II Ex. B, at 1).  The letter specified that, where KBC

served as local/liaison counsel, "the minimum fee will be 10% of the class fee awarded to

counsel representing the class[,]" and, where KBC served as local/liaison counsel and refers the

lead plaintiff client, "the minimum fee may be greater than 10% and most cases []15[%], with

additional consideration for additional work[,] labor[, and] services performed . . . [with] added

[value], but [in] no event greater than 20%."  (Keefe Certif. II Ex. B, at 1).  BLL never

acknowledged or executed this letter agreement.  (Keefe Certif. II ¶ 24, Ex. B, at 2).

       On September 20, 2007, KBC sent BLL yet another letter, discussing the parameters of

their "fundamental disagreements regarding [their] fee issue[.]"  (Bernstein Certif. Ex. 5, at 1).

In that letter, KBC expressed disagreement with BLL's proposal to compensate KBC under a

lodestar method plus a reasonable multiplier.  (Bernstein Certif. Ex. 5, at 1).  KBC again

reiterated that its "lodestar [wa]s $1,321,713.50 as of July 3, 2007[,]" (Bernstein Certif. Ex. 5, at

1), and, despite its disagreement, KBC stated that it "will accept a 1.25 multiplier of [this]

lodestar" to compensate the firm for its efforts as of the date of the letter, (Bernstein Certif. Ex. 5,

at 2).  In respect of the remainder of the case, KBC affirmed that it "will accept a 1.25 multiplier

of [its] total lodestar if the attorney fee to lead counsel is less than $13,000,000[,]" but if the

attorney fee is greater than $13,000,000, then KBC would seek "a 1.5 multiplier of the total

lodestar."  (Bernstein Certif. Ex. 5, at 2).

In response, Bernstein wrote Keefe a letter dated October 3, 2007.  (Bernstein Certif. Ex.

7, at 1).  Bernstein affirmed that BLL would compensate KBC "under a quantum meruit analysis

the fair value of services reasonably performed at [BLL's] request or which were required to be

performed to satisfy whatever obligations [KBC] had as liaison counsel."  (Bernstein Certif. Ex.

7, at 1).  Essentially, BLL disputed the necessity of the work performed by KBC, particularly

because KBC did not submit complete time records to BLL or Lead Plaintiffs, and because BLL

did not assign this work to KBC or even know that it was being done.[6]  In respect of Keefe's

request for a multiple of KBC's lodestar, Bernstein suggested that it would "discuss paying

[KBC] the same multiple which [BLL] achieves as of the date of any interim fee awarded, and,

because [BLL] anticipate[s the multiple] will be . . . negative[,] would also consider recognizing

---

[6]  The certifications of BLL attorneys contain representations that they had never heard of, or met, several of KBC's attorneys who had amassed thousands of hours of work on this matter. It is, thus, understandable that BLL would challenge KBC's stated basis for compensation.

[KBC's] reported lodestar to date against that multiple."  (Bernstein Certif. Ex. 7, at 2).

On January 25, 2008, KBC moved before the Court for an award of attorneys' fees and costs, seeking a percentage of BLL's recovery achieved from its efforts towards the European settlement and any future recovery BLL may obtain in respect of the United States Class.  On February 27, 2008, the Court, upon joint request by KBC and BLL, entered an Order relieving KBC as liaison counsel and substituting Jan Meyer & Associates, P.C. as new liaison counsel. Shortly thereafter, on or around March 6, 2008, Shell and the remaining U.S. Class reached a settlement in principle.  According to the terms of that proposed agreement, Shell would pay $79.9 million to U.S. Class Members in exchange for a complete resolution of their claims, plus an additional $2.95 million for the creation of a settlement fund.  Shell also agreed to compensate BLL up to $30 million in fees plus an additional $3 million in expenses.  This agreement in principle is subject to the execution of a definitive settlement agreement by Shell and Lead Plaintiffs, which is yet to occur as of the date of the entry of this Opinion and which is conditioned on the Court's approval.  As a result of this, KBC seeks a fee based on a 10-15% allocation of $60 million derived from (a) the $27 million BLL recovered as a derivation of the European settlement and (b) the $33 million fee to be awarded to BLL under the U.S. Settlement.

**B.      Keefe Bartels' Actions as Liaison Counsel**

Keefe certifies that the "total number[] of hours expended in this litigation [as of January 25, 2008 wa]s 3,147 hours[, making t]he total lodestar for [KBC] $1,157,700.50."  (Keefe Certif. I ¶ 20, Ex. F).  KBC also submits that its expenses equaled $4,119.20.  (Keefe Certif. I Ex. G). The tasks performed during those hours included service of all pleadings and papers via electronic filing, direct mail, and/or email, (Keefe Certif. I ¶ 15; Certif. II ¶ 19), review of all

documents served for compliance with local practice, (Keefe Certif. II ¶ 21), and monitoring of the Court's electronic filing docket, (Keefe Certif. I ¶ 14).  In addition, KBC attended almost all conferences with the Court, (Stephen T. Sullivan, Jr. Certification Jan. 25, 2008 ("Sullivan Certif. I") ¶ 4), answered questions about local practice rules, reviewed Shell's discovery productions for compliance with the Court-issued protective order, and prepared discovery productions for indexing, (Robert A. Storino Certification Feb. 19, 2008 ("Storino Certif.") ¶ 4).  KBC also performed "unsolicited" research, which it forwarded to BLL.  (Keefe Certif. II ¶ 17-18); (Sullivan Certification Feb. 19, 2008 ("Sullivan Certif. II") ¶ 11).

Finally, KBC submits that the majority of its billed time accrued during its preparation for the mini-trial that was originally to occur in May 2007.  (Sullivan Certif. I ¶ 6).  Both KBC and BLL agree that, on October 20, 2006, Keefe and Patrick J. Bartels ("Bartels"), a co-managing member of KBC, met with Jeffrey M. Haber ("Haber"), a partner at BLL, to discuss the status of the case.  (Haber Certification Feb. 26, 2008 ("Haber Certif.") ¶ 3-4); (Bartels Certification Feb. 19, 2008 ("Bartels Certif.") ¶ 3).  Both firms also agree that the substance of that conference included a discussion on logistics and administrative matters involved in the mini-trial.  (Haber Certif. ¶ 4-5); (Bartels Certif. ¶ 6).

In addition to logistics, the attorneys discussed some substantive issues of the mini-trial, and Keefe inquired as to what substantive work KBC should perform to aid BLL.  (Haber Certif. ¶ 6).  According to Bartels, Haber suggested that Keefe "familiarize himself with the anticipated testimony of the proposed experts and begin his preparation by reviewing their reports and certain other fact witness deposition testimony."  (Bartels Certif. ¶ 5).  Keefe also certifies that Haber suggested that BLL "would require [KBC's] assistance on the pretrial memo and on other

-11-

substantial pretrial filings." (Keefe Certif. II ¶ 13). However, Haber avers that he never "instruct[ed] KB[C] to perform substantive tasks" beyond reviewing some of the relevant documents sufficient to be aware of the issues presented in the proceeding. (Haber Certif. ¶ 7).

Nevertheless, in preparation of the mini-trial, KBC digested key expert issues and familiarized itself with the mini-trial's core issues. (Keefe Certif. II ¶ 13). To do so, Stephen T. Sullivan, Jr. ("Sullivan"), an associate of KBC, requested that BLL forward certain expert reports and depositions for the purpose of reviewing them. (Sullivan Certif. II Ex. C). Between February 2007 and May 2007, KBC summarized expert reports, transcripts, and briefs that were to be proffered during the mini-trial. (Keefe Certif. I ¶ 16); (Storino Certif. ¶ 4-5, Ex. A). Storino, an associate of the firm, prepared most of these summaries, (Storino Certif. Ex. A); (Sullivan Certif. II ¶ 6), and reports that he worked 1,024.75 hours on this case, (Keefe Certif. I Ex. F).

After the Court stayed the mini-trial pending a Report and Recommendation from the Special Master, KBC reviewed the documents submitted by Shell to the Special Master and forwarded notes to BLL. (Sullivan Certif. II Ex. E). Shortly thereafter, the current dispute arose between KBC and BLL regarding KBC's compensation as liaison counsel, culminating in KBC's filing of the present motion for fees and costs. In its motion, KBC submits that the custom in this District is to award liaison counsel a percentage of lead counsel's recovery of fees and costs. As such, KBC claims that it is entitled to 10-15% of BLL's $27 million recovery under the European settlement and any recovery ultimately obtained under the proposed settlement agreement that is pending finalization. In the alternative, KBC argues that it should recover, at a minimum, the

-12-

same percentage that BLL recovers.[7]

On March 3, 2008, BLL filed its opposition to the motion, contending that KBC is entitled to recover on a lodestar basis only for work performed at BLL's direction and within the scope of KBC's responsibilities as liaison counsel.  BLL further proffers that Lead Plaintiffs do not consent to KBC's fee request on a percentage basis.  BLL relies on the Private Securities Litigation Reform Act of 1995 ("PSLRA"), which aims to ensure that a lead plaintiff retains control over class action litigation, to claim that Lead Plaintiffs' and BLL's determination of fees which KBC may recover is entitled to a presumption of correctness.

## II.   DISCUSSION

### A.      Judicial Authority to Allocate Fees

A district court exercises discretion in fixing the amount of attorneys' fees and expenses. *In re Lucent Tech., Inc. Sec. Litig.* ("*Lucent*"), 327 F. Supp. 2d 426, 430 (D.N.J. 2004); *see also Silberman v. Bogle*, 683 F.2d 62, 64-65 (3d Cir. 1982) ("[A]n award of reasonable attorneys' fees is within the district court's discretion.").  "A necessary corollary to court appointment of lead and liaison counsel . . . is the power to assure that these attorneys receive reasonable compensation for their work."  *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 644, 653 (E.D. Pa. 2003) (citing *in re Air Crash Disaster at Fla. Everglades on Dec. 29, 1972*, 549 F.2d 1006 (5th Cir. 1977)); *see also State of N.J. Dep't of Envtl. Prot. v. Gloucester Envtl. Mgmt.*, 138

---

[7] Even if the Court were to grant KBC's request to recover its fees on a percentage basis, the Court cannot at this point determine the percentage received by BLL.  Indeed, the Court is unaware of the effect of Shell's separate agreement to compensate BLL for its efforts in reaching the European settlement on BLL's fee recovery in the instant action.  Moreover, the Court refrains from passing judgment at this juncture on the propriety of Shell's proposed payment to BLL under the settlement in principle which the Court must approve upon its finalization.

F.R.D. 421, 428 (D.N.J. 1991) ("This court has the clear authority . . . to require parties to compensate Liaison Counsel for administrative services and expenditures on behalf of the group's members.").  A fee application invokes the Court's equitable review function, and the Court maintains the authority "to reject agreements allocating fees among class counsel whenever there is cause to do so."  *Allapattah Serv., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1225 (S.D. Fla. 2006).

> **B.**     **Analysis**

In considering a motion for attorneys' fees, a court must begin its analysis with the traditional attorney-client relationship.  *In re Cendant Corp. Litig.* ("*Cendant I*"), 264 F.3d 201, 254 (3d Cir. 2001); *in re Cendant Corp. Litig.* ("*Cendant II*"), 404 F.3d 173, 186 (3d Cir. 2005). Generally, upon formation of an attorney-client relationship, the attorney sets forth in writing the method by which he or she will be compensated, and the New Jersey Rules of Professional Conduct require "[a] contingent fee agreement [to] be in writing and [to] state the method by which the fee is to be determined . . . ."  N.J. R.P.C. 1.5(c).[8]  Where such an agreement exists, a court should not enforce attorney-client fee agreements as "ordinary commercial contracts." *Ryan v. Butera, Beausang, Cohen & Brennan*, 193 F.3d 210, 215 (3d Cir. 1999).  "Rather, a court must evaluate the contract as to its reasonableness both as of the time the parties entered into it and in light of subsequent circumstances concerning performance and enforcement, which may make a contract unfair in its enforcement."  *Ibid.* (internal quotation marks omitted).

As a threshold matter, the Court construes BLL as KBC's "client" for purposes of

---

[8]  Neither KBC nor BLL contend the fact that KBC served as liaison counsel on a contingency basis.

determining the method of calculating KBC's compensation for its legal services.  The Court

finds that KBC's service as liaison counsel was to the benefit, and under the direction, of BLL.

The Court reaches this conclusion in light of the traditional role of liaison counsel and lead

counsel, as well as the specific procedural history of this action.

Typically, Courts appoint liaison counsel to act on behalf of other counsel and parties and

traditionally define the role of liaison counsel according to the *Manual for Complex Litigation*

(*Fourth*) ("*MCL*") § 10.221 (2004).  *See, e.g.*, *in re Sterling Fin. Corp. Sec. Class Action*, 2007

WL 4570729, *5 (E.D. Pa. 2007) (quoting *MCL*); *State of N.J. Dep't of Envtl. Prot.*, *supra*, 138

F.R.D. at 428 (quoting *MCL* (*Second*)).  The *MCL* defines liaison counsel as being

> [c]harged with essentially administrative matters, such as communications between
> the court and other counsel (including receiving and distributing notices, orders,
> motions, and briefs on behalf of the group), convening meetings of counsel, advising
> parties of developments, and otherwise assisting in the coordination of activities and
> positions.  Such counsel may act for the group in managing document depositories
> and in resolving scheduling conflicts.  Liaison counsel will usually have offices in
> the same locality as the court.  The court may appoint (or the parties may select) a
> liaison for each side, and if their functions are strictly limited to administrative
> matters, they need not be attorneys.

*MCL* § 10.221 (footnote omitted).  *Accord in re Nice Sys. Sec. Litig.*, 188 F.R.D. 206, 223-24

(D.N.J. 1999) ("It appears the responsibilities of liaison counsel typically involve advising lead

counsel on local procedural matters, coordinating administrative matters, distributing

communications between the Court and other counsel, convening meetings of counsel and

advising parties of developments in the case." (internal quotation marks omitted)).  Importantly,

"[c]ounsel designated by the court also assume a responsibility to the court and an obligation to

act fairly, efficiently, and economically in the interests of all parties and parties' counsel."  *MCL*

§ 10.22.

The Order appointing KBC did not define KBC's responsibilities of liaison counsel, apart from referring to the Order mandating BLL to retain liaison counsel. Moreover, the Order requiring the appointment of liaison counsel only specified that liaison counsel would effect service on all parties in accordance with the Court's applicable orders. Absent a clear enunciation of KBC's responsibilities, the firms now dispute the extent of KBC's role as liaison counsel. Nevertheless, KBC and BLL agree that KBC's role as liaison counsel included attending most conferences held before this Court, answering questions posed by BLL regarding local practice and procedure, locating relevant sample briefs presented to this Court in other matters, reviewing papers before filing to ensure compliance with local rules of practice and procedure, and advising BLL on the manner in which BLL should approach the Court following the announcement of Shell's settlement with the Non-U.S. Purchasers. The firms dispute, however, whether KBC's substantive preparation for the mini-trial was encompassed within its role and under the direction of BLL.

In contrast, lead counsel serves a broader and more substantive role. The *MCL* defines lead counsel as being

> [c]harged with formulating (in consultation with other counsel) and presenting positions on substantive and procedural issues during the litigation. Typically they act for the group–either personally or by coordinating the efforts of others–in presenting written and oral arguments and suggestions to the court, working with opposing counsel in developing and implementing a litigation plan, initiating and organizing discovery requests and responses, conducting the principal examination of deponents, employing experts, arranging for support services, and seeing that schedules are met.

*MCL* § 10.221. In this case, the Court endowed BLL, as lead counsel, with the sole authority to distribute, assign, and oversee the work performed by other Plaintiffs' counsel, including liaison

-16-

counsel.  As a result, KBC's responsibilities were limited to those duties imposed by the Court's

orders—which merely required KBC to effect service—and those duties allocated to it by BLL.[9]

Because BLL retained almost exclusive control over KBC's rendition of legal services, and

because BLL was to solely bear the cost of KBC's services, the Court finds that BLL is the

"client" for purposes of this motion.

Having defined the relationship between KBC and BLL, the Court must determine

whether the firms entered into an agreement as to the method by which KBC would be

compensated.  Indeed, KBC and BLL did not enter into an express written or oral agreement.

However, absent an express agreement as to the method of compensation, the conduct or intent

of KBC and BLL, or any customary practice, may indicate the existence of an implied agreement

as to this issue.  *See in re Penn Cent. Transp. Co.*, 831 F.2d 1221, 1228 (3d Cir. 1987) ("An

implied-in-fact contract is a true contract arising from mutual agreement and intent to promise,

but where the agreement and promise have not been verbally expressed[; t]he agreement is

inferred from the conduct of the parties.").

Upon review of the record, the Court finds no basis for concluding that an implied

agreement existed as to the issue of KBC's fees.  The firms dispute what their intentions were at

the formation of their relationship in respect of the method by which KBC's fee is to be

determined.  According to KBC, the firms intended that KBC would be compensated 10-15% of

the total recovery of attorneys' fees.  In contrast, BLL submits that it intended to compensate

KBC on a lodestar basis from its fee recovery.  In support of its opposition, BLL submits a

---

[9]  The Court emphasizes that BLL was capable of fulfilling all duties allocated to KBC, but retained liaison counsel only upon court order.  It is logical, then, that BLL assigned to KBC only those tasks that are necessary and not duplicative of BLL's efforts.

corroborating letter to Lead Plaintiffs.  Despite their positions, the expressed intent and conduct

of either KBC or BLL do not irrefutably demonstrate a clear agreement as to this issue.  As a

result, the Court refrains from finding an implied agreement as to the method of KBC's recovery

of fees and costs.

In addition, no custom or practice in this District dictates that liaison counsel be paid on a

percentage-of-recovery basis from the total recovery of attorneys' fees in a class action.

Presently, Keefe certifies that the market practice in this jurisdiction is to award court-appointed

liaison counsel 10-15% of the gross award of attorneys' fees.  In contrast, BLL proffers the

certification of Mark C. Gardy ("Gardy"), an attorney with more than twenty years of experience

in complex litigation and who has served as liaison counsel in at least twenty states.  Gardy

certifies that, traditionally, "the lead counsel determines [liaison counsel's] fee based upon its

analysis of liaison counsel's contributions and lodestar."  (Bernstein Ex. Certif. 11, ¶ 4).

Accordingly, the Court finds that KBC has not met its burden of proving that such a custom or

practice exists in this District; Keefe's certification that he has previously recovered 10-15% as

liaison counsel on another matter is insufficient to establish a custom in the industry.  Therefore,

the Court concludes that no custom exists in this District as to a specific percentage paid to

liaison counsel.

Despite the absence of an express or implied agreement, KBC may recover its fees under

the theory of *quantum meruit*.  Indeed, "[t]he failure to properly memorialize a contingent fee

arrangement . . . will not prevent counsel from recovering fees."  *In re Safety Components, Inc.*

*Sec. Litig.*, 166 F. Supp. 2d 72, 107 (D.N.J. 2001).  Absent "a fully compliant contingency fee

arrangement, . . . counsel can still recover a reasonable fee based on the services actually

-18-

rendered." *Ibid.* (internal quotation marks omitted).  *Accord Starkey, Kelly, Blaney & White v. Estate of Nicolaysen*, 172 N.J. 60, 68 (2002) ("Where an attorney performs legal services for another at his request, but without any understanding as to the remuneration, the law implies a promise on the party who requested such services to pay a just and reasonable compensation." (internal quotation and editing marks omitted)); *Glick v. Barclays De Zoete Wedd, Inc.*, 300 N.J. Super. 299, 310 (App. Div. 1997) ("An attorney hired on a contingent fee basis and later discharged before completion of the services is not entitled to recover fees on the basis of such contingent agreement; instead, he or she may be entitled to recover on a *quantum meruit* basis for the reasonable value of the services rendered.").

"Quantum meruit is a quasi-contractual remedy in which a contract is implied-in-law under a theory of unjust enrichment; the contract is one that is implied in law, and not an actual contract at all." *Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 447 (3d Cir. 2000) (internal quotation marks omitted).  *Quantum meruit* essentially permits "recovery of as much as is deserved." *Glick*, *supra*, 300 N.J. Super. at 310.  A court imposing by law quasi-contractual obligations need not consider the parties' intent.  *Ibid.*  Rather, under New Jersey law, to recover under a *quantum meruit* theory, a plaintiff must establish: "(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they were rendered, (3) an expectation of compensation therefore, and (4) the reasonable value of the services." *Starkey*, *supra*, 172 N.J. at 68.  Specifically, an attorney seeking payment of fees, absent an agreement as to remuneration, "must demonstrate that the former client would be unjustly enriched by the receipt and retention of a benefit without compensation, where the attorney, in conferring the benefit, expected to be paid." *Glick*, *supra*, 300 N.J. Super. at 310.

Here, KBC has demonstrated that it performed legal services in good faith in the form of liaison counsel with the expectation of payment.  Accordingly, KBC may recover under a *quantum meruit* theory the reasonable value of the services rendered to the benefit of, and accepted by, BLL.  Moreover, "[b]ecause the proper measure of compensation under *quantum meruit* is as much as is deserved, the crucial factor in determining the amount of recovery is the contribution which the lawyer made to advancing the client's cause." *Id.* at 310-11 (citation omitted).  This is consonant with the requirement that the plaintiff seeking to recover under *quantum meruit* prove that its services were accepted by the person to whom they were rendered.  Based on those principles, coupled with BLL's exclusive control over KBC's responsibilities, the Court finds that KBC cannot recover for those services, although performed in good faith, that BLL did not accept or from which BLL did not benefit.

Although findings of fact are necessary to determine what specific services performed by KBC were authorized by BLL or benefitted BLL, the Court recognizes that the present record supports the conclusion that BLL neither accepted nor benefitted from KBC's substantive preparation for the mini-trial.[10]  Presently, KBC proffers that its attorneys digested expert reports and testimony that were to be produced during the mini-trial in respect of the issue of whether the

---

[10]   The Court is able to reach such a conclusion because KBC proffers in support of its motion the work product of its substantive preparation for the mini-trial. Although the Court finds the record insufficient to reach a determination as to whether BLL accepted or benefitted from other particular services rendered by KBC, the Court notes that BLL did not accept those services KBC performed outside the scope of liaison counsel's administrative function as limited by BLL's court-ordered oversight authority.  Indeed, BLL presently argues that it is possible that some of KBC's other efforts included in its reported 3,147 hours of professional time were outside the scope of its duties as liaison counsel.  As such, BLL submits that it is entitled to review KBC's complete time records to determine what services BLL accepted and what services benefitted BLL.

Court maintained subject matter jurisdiction over the Non-U.S. Purchasers' claims.  However, BLL did not request that KBC perform this work and was not even aware that KBC was performing such substantive work.  Not only was the work not authorized by BLL, who retained control over KBC's services, but this substantive work also went beyond the traditional scope of the administrative duties traditionally assigned to liaison counsel.  Furthermore, KBC never presented its work product to BLL such that BLL could benefit from KBC's rendition of these substantive services.  As a result, KBC's efforts in respect of the substantive issues that were to be presented at the mini-trial were not requested, required, or beneficial.  Accordingly, the Court finds that KBC cannot recover for these services that were neither accepted by nor beneficial to the "client," BLL.

Finally, to recover under a *quantum meruit* basis, KBC must establish the reasonable value of its services.  In determining the reasonable value of services,

> "a district court may not set attorneys' fees based upon a generalized sense of what is customary or proper, but rather *must* rely upon the record.  The plaintiff bears the burden of producing sufficient evidence of what constitutes a reasonable market rate for the essential character and complexity of the legal services rendered in order to make out a prima facie case.  Once the plaintiff has carried this burden, [the] defendant may contest that prima facie case only with appropriate record evidence.  In the absence of such evidence, the plaintiff must be awarded attorney's fees at her requested rate.  If the hourly rates are disputed, the district court must conduct a hearing to determine the reasonable market rates."

*Hurley v. Atlantic City Police Dep't*, 174 F.3d 95, 131 (3d Cir. 1999) (quoting *Smith v. Philadelphia Hous. Auth.*, 107 F.3d 223, 225 (3d Cir. 1997)).  Upon review of the record, the Court finds that KBC has not met its burden of establishing the reasonable market rate for its services rendered on behalf of BLL.  Although KBC proffers a summary of its costs incurred, hours expended by each attorney, and "reasonable" hourly rates of each of those attorneys, the

Court finds this summary insufficient to establish the reasonable value of its services.

Nevertheless, the Court reiterates that the reasonable value of KBC's services must be calculated

in light of the following factors: (1) the limited administrative role of liaison counsel; (2) the

Court's Order specifying only that liaison counsel was responsible for effecting service; and (3)

BLL's lack of a need for liaison counsel to perform those administrative functions.

The Court, therefore, determines that the record presented on this motion precludes the

Court from (1) itemizing the services rendered by KBC as liaison counsel that were accepted by

and/or beneficial to BLL and (2) concluding the reasonable value of liaison counsel's services.

Traditionally, to make such specific findings of fact, a court may hold a plenary hearing to

evaluate a claim for *quantum meruit*.  *See, e.g.*, *Glick*, *supra*, 300 N.J. Super. at 312.  In New

Jersey, however, state courts refer an attorney fee dispute to a "Fee Arbitration Committee."  N.J.

Ct. R. 1:20A-1.  The Supreme Court of New Jersey has granted that Committee jurisdiction "to

arbitrate fee disputes between clients and attorneys[.]"  N.J. Ct. R. 1:20A-2.  The Court now

adopts that model here to calculate KBC's *quantum meruit* claim.  In doing so, the Court

recognizes the extensive history and background of the issue, as well as the Court's involvement

in aiding KBC and BLL reach a resolution.  The Court, thus, finds that the interests of fairness

and judicial economy warrant the issue to be resolved through arbitration.

Accordingly, the Court refers to a panel of three arbitrators appointed by the Court the

issue of calculating the reasonable value of KBC's services that it may recover under a *quantum*

*meruit* theory in accordance with this Opinion.  That panel shall make all findings of fact

necessary to make such a calculation, including (1) a determination as to all services rendered by

KBC that (a) BLL accepted and authorized and (b) benefitted BLL; and (2) a calculation of the

reasonable value of KBC's services based on the record.

**III.     CONCLUSION**

In sum, the Court denies KBC's application for fees and expenses on a percentage-of-recovery basis.  Rather, the Court holds that KBC is entitled to recover under the *quantum meruit* theory the reasonable value of the services it rendered for the benefit, and under the direction, of BLL.  The Court directs KBC and BLL to submit to a panel of arbitrators who will calculate the reasonable value of KBC's services in accordance with this Opinion.  An appropriate Order accompanies this Opinion.


/s/ Joel A. Pisano
JOEL A. PISANO, U.S.D.J.


Dated:  April 17, 2008

-23-