**LAW OFFICES OF JAN MEYER & ASSOCIATES, PC**
Jan Meyer
1029 Teaneck Road
2nd Floor
Teaneck, NJ  07666
Telephone: 201-862-9500

**Liaison Counsel for the Class**

**BERNSTEIN LIEBHARD & LIFSHITZ, LLP**
Stanley D. Bernstein
Jeffrey M. Haber
William A.K. Titelman
Mark T. Millkey
10 East 40th Street
New York, NY  10016
Telephone:  212-779-1414

**Counsel for PSERS and SERS, and**
**Lead Counsel for the Class**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE ROYAL DUTCH/SHELL TRANSPORT SECURITIES LITIGATION | ) ) ) ) ) ) ) |

Civ. No. 04-374 (JAP)
(Consolidated Cases)
Hon. Joel A. Pisano

**RETURN DATE:**  September 26, 2008

## LEAD PLAINTIFF'S MEMORANDUM IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT AGREEMENT, PLAN OF DISTRIBUTION, AND CLASS CERTIFICATION

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. ii

PRELIMINARY STATEMENT ...................................................................................... 1

FACTUAL BACKGROUND ............................................................................................ 2

ARGUMENT ................................................................................................................... 3

I.     THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND
ADEQUATE AND SHOULD BE APPROVED BY THE COURT ...................... 3

     A.     The Law Favors and Encourages Settlements ............................................ 3

     B.     The Role of the Court in Determining Whether to Approve a Class
Action Settlement........................................................................................ 4

     C.     The Settlement Is Presumptively Fair......................................................... 5

     D.     The Third Circuit's Nine Fairness Factors .................................................. 8

     E.     The Settlement Satisfies the Criteria for Approval..................................... 9

           1.     The Complexity, Expense, and Likely Duration of the
Litigation.......................................................................................... 9

           2.     The Reaction of the Class to the Settlement ................................. 12

           3.     The Stage of the Proceedings and Discovery Completed............. 14

           4.     The Risks of Establishing Liability............................................... 16

           5.     The Risks of Establishing Damages ............................................. 18

           6.     The Risks in Maintaining the Class Through Trial....................... 21

           7.     The Ability of Defendants to Withstand a Greater Judgment....... 22

            8.     The Range of Reasonableness of the Settlement in Light of
the Best Possible Recovery and All the Attendant Risks of
Litigation........................................................................................ 23

II.     THE NOTICE TO THE SETTLEMENT CLASS SATISFIED DUE
PROCESS .......................................................................................................... 25

III.     THE PROPOSED DISTRIBUTION PLAN SHOULD BE APPROVED
AS FAIR, REASONABLE AND ADEQUATE ................................................. 27

IV.     CERTIFICATION OF A SETTLEMENT CLASS IS APPROPRIATE.............. 29

CONCLUSION.............................................................................................................. 29

# TABLE OF AUTHORITIES

## CASES

*Apollo Group, Inc. Sec. Litig.*,
Master File No. CV 04-2147-PHX-JAT,
2008 WL 3072731 (D. Ariz. Aug. 4, 2008)..........................................................................24

*AUSA Life Ins. Co. v. Ernst & Young*,
No. 00-9472, 2002 U.S. App. LEXIS 13845
(2d Cir. July 8, 2002)...........................................................................................................25

*Backman v. Polaroid Corp.*,
910 F.2d 10 (1st Cir. 1990)..................................................................................................24

*Bentley v. Legend Corp.*,
849 F. Supp. 429 (E.D. Va. 1994), *aff'd sub nom.*,
*Herman v. Legend Corp.*, 50 F.3d 6 (4th Cir. 1995)............................................................25

*Bryan v. Pittsburgh Plate Glass Co.*,
494 F.2d 799 (3d Cir. 1974)...............................................................................................5, 9

*Carson v. Am. Brands, Inc.*,
450 U.S. 79 (1981)..................................................................................................................4

*Cohen v. Tuttle*,
Nos. 85-2396, 85-2621, 85-3022, 1987 U.S. Dist. LEXIS 1388
(E.D. Pa. Feb. 23, 1987)..........................................................................................................6

*Consol. Edison, Inc. v. Ne. Utils.*,
332 F. Supp. 2d 639 (S.D.N.Y. 2004)...................................................................................27

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993)..........................................................................................................19-20

*Diamond Chem. Co., Inc. v. Akzo Nobel Chems. B.V.*,
205 F.R.D. 33 (D.D.C. 2001)..........................................................................................26, 27

*Dura Pharm. Inc. v. Brondo*,
544 U.S. 336 (2005)...............................................................................................................19

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976)...............................................................................................................16

*Fickinger v. C.I. Planning Corp.*,
646 F. Supp. 622 (E.D. Pa. 1986) .....................................................................................5, 23

*Fisher Bros., Inc. v. Mueller Brass Co.*,
  630 F. Supp. 493 (E.D. Pa. 1985) ........................................................5

*Fisher Bros. v. Phelps Dodge Indus., Inc.*,
  604 F. Supp. 446 (E.D. Pa. 1985) ........................................................5

*Girsh v. Jepson*,
  521 F.2d 153 (3d Cir. 1975)...........................................................8, 23

*Goldsmith v. Tech. Solutions Co.*,
  No. 92 C 4374, 1995 U.S. Dist. LEXIS 15093
  (N.D. Ill. Oct. 10, 1995) .....................................................................16

*Gordon v. Hunt*,
  117 F.R.D. 58 (S.D.N.Y. 1987) ..........................................................26

*Gottlieb v. Wiles*,
  11 F.3d 1004 (10th Cir. 1993) ............................................................26

*In re Aetna Inc. Sec. Litig.*,
  MDL No. 1219, 2001 U.S. Dist. LEXIS 68
  (E.D. Pa. Jan. 4, 2001) .........................................................23, 28, 29

*In re AT&T Corp. Sec. Litig.*,
  455 F.3d 160 (3d Cir. 2006)................................................................24

*In re AremisSoft Corp. Sec. Litig.*,
  210 F.R.D. 109 (D.N.J. 2002)..............................................................10

*In re BankAmerica  Corp. Sec. Litig.*,
  210 F.R.D. 694 (E.D. Mo. 2002) ........................................................22

*In re Cell Pathways, Inc., Sec., Litig. II*,
  No. 01-CV-1189, 2002 U.S. Dist. LEXIS 18359
  (E.D. Pa. Sept. 23, 2002) ....................................................................16

*In re Cendant Corp. Litig.*,
  264 F.3d 201 (3d Cir. 2001)........................................................ *passim*

*In re CIGNA Corp. Sec. Litig.*,
  Civ. A. No. 02-8088, 2007 WL 2071898
  (E.D. Pa. July 13, 2007).........................................................4, 8, 14, 22

*In re Computron Software, Inc.*,
  6 F. Supp. 2d 313 (D.N.J. 1998) ...................................................20, 27

*In re Corel Corp. Sec. Litig.*,
  293 F. Supp. 2d 484 (E.D. Pa. 2003) ........................................................................13, 29

*In re Genta Sec. Litig.*,
  Civ. A. No. 04-2123 (JAG), 2008 WL 2229843
  (D.N.J. May 28, 2008) ........................................................................ 4, 5-6, 20

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
  55 F.3d 768 (3d Cir. 1995)........................................................................3, 4, 9, 12

*In re Gulf Oil/Cities Serv. Tender Offer Litig.*,
  142 F.R.D. 588 (S.D.N.Y. 1992) ........................................................................28

*In re Ikon Office Solutions, Inc., Sec. Litig.*,
  194 F.R.D. 166 (E.D. Pa. 2000)........................................................................9, 11, 27

*In re Intelligroup Sec. Litig.*,
  527 F. Supp. 2d 262 (D.N.J. 2007) ........................................................................18

*In re Linerboard Antitrust Litig.*,
  292 F. Supp. 2d 631 (E.D. Pa. 2003) ........................................................................22

*In re  Linerboard Antitrust Litig.*,
  296 F. Supp. 2d 568 (E.D. Pa. 2003) ........................................................................23

*In re Linerboard Antitrust Litig.*,
  321 F. Supp. 2d 619 (E.D. Pa. 2004) ........................................................................14, 21

*In re Lucent Techs., Inc., Sec. Litig.*,
  307 F. Supp. 2d 633 (D.N.J. 2004) ........................................................................ 9-10, 11, 29

*In re PNC Fin. Serv. Group, Sec. Litig.*,
  440 F. Supp. 2d 421 (W.D. Pa. 2006)........................................................................16, 19

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
  148 F.3d 283 (3d Cir. 1998)........................................................................3, 11

*In re Ravisent Techs., Inc. Sec. Litig.*,
  No. 00-CV-1014, 2004 U.S. Dist. LEXIS 13255
  (E.D. Pa. July 12, 2004)........................................................................18

*In re Ravisent Techs., Inc. Sec. Litig.*,
  No. 00-CV-1014, 2005 U.S. Dist. LEXIS 6680
  (E.D. Pa. Apr. 18, 2005) ........................................................................4, 9, 21, 23

iv

*In re Rent-Way Sec. Litig.*,
  305 F. Supp. 2d 491 (W.D. Pa. 2003) ...................................................................13

*In re Safety Components Inc. Sec. Litig.*,
  166 F. Supp. 2d 72 (D.N.J. 2001) ...........................................................11, 13, 23

*In re School Asbestos Litig.*,
  789 F.2d 996 (3d Cir. 1986) ..................................................................................21

*In re Warfarin Sodium Antitrust Litig.*,
  391 F.3d 516 (3d Cir. 2004) ........................................................................5, 21, 23

*In re Warner Commc'ns Sec. Litig.*,
  618 F. Supp. 735 (S.D.N.Y. 1985), *aff'd*,
  798 F.2d 35 (2d Cir. 1986) ....................................................................................20

*Krangel v. Golden Rule Res., Ltd.*,
  194 F.R.D. 501 (E.D. Pa. 2000) ....................................................................3, 10, 20

*Krinsk v. Fund Asset Mgmt., Inc.*,
  715 F. Supp. 472 (S.D.N.Y. 1988), *aff'd*,
  875 F.2d 404 (2d Cir. 1989) ..................................................................................25

*Landy v. Amsterdam*,
  815 F.2d 925 (3d Cir. 1987) ..................................................................................25

*Lazy Oil Co. v. Witco Corp.*,
  95 F. Supp. 2d 290 (W.D. Pa. 1997), *aff'd*,
  166 F.3d 581 (3d Cir. 1999) ..................................................................................22

*Lewy v. Weinberger*,
  464 U.S. 818 (1983) ................................................................................................3

*Mashburn v Nat'l Healthcare, Inc.*,
  684 F. Supp. 660 (M.D. Ala. 1988) .......................................................................25

*Meijer, Inc. v. 3M*,
  Civ. No. 04-5871, 2006 U.S. Dist. LEXIS 56744
  (E.D. Pa. Aug. 14, 2006) ..................................................................................15, 22

*Neuberger v. Shapiro*,
  110 F. Supp. 2d 373 (E.D. Pa. 2000) .....................................................................11

*Newman v. Stein*,
  464 F.2d 689 (2d Cir. 1972) ...................................................................................23

v

*Perry v. FleetBoston Fin. Corp.*,
   229 F.R.D. 105 (E.D. Pa. 2005)....................................................................21, 22

*Petrovic v. Amoco Oil Co.*,
   200 F.3d 1140 (8th Cir. 1999) ..............................................................................26

*Protective Comm. v. Anderson*,
   390 U.S. 414 (1968)................................................................................................6

*Radol v. Thomas*,
   772 F.2d 244 (6th Cir. 1985) ................................................................................25

*Rendler v. Gambone Bros. Dev. Co.*,
   182 F.R.D. 152 (E.D. Pa. 1998)............................................................................21

*Robbins v. Koger Props., Inc.*,
   116 F.3d 1441 (11th Cir. 1997) ............................................................................25

*Seidman v. Am. Mobile Sys.*,
   965 F. Supp. 612 (E.D. Pa. 1997) ........................................................................16

*Taft v. Ackermans*,
   No. 02-CV-7951, 2007 U.S. Dist. LEXIS 9144
   (S.D.N.Y. Jan. 31, 2007)......................................................................................19

*United States v. 412.93 Acres of Land*,
   455 F.2d 1242 (3d Cir. 1972)................................................................................20

*Weiss v. Mercedes-Benz of N. Am., Inc.*,
   899 F. Supp. 1297 (D.N.J.), *aff'd*,
   66 F.3d 314 (3d Cir. 1995)......................................................................................3

*White v. NFL*,
   822 F. Supp. 1389 (D. Minn. 1993), *aff'd*,
   41 F.3d 402 (8th Cir. 1994) ..................................................................................28

*Winkler v. NRD Mining, Ltd.*,
   198 F.R.D. 355 (E.D.N.Y. 2000) ..........................................................................25

## STATUTES & RULES

17 C.F.R. § 210.4-10...................................................................................................10

Fed. R. Civ. P. 23(c)(l)(C) ..........................................................................................21

Fed. R. Civ. P. 23(c)(2)(B) ...................................................................................26, 27

Fed. R. Civ. P. 23(e)(1)(C) ........................................................................................4

Fed. R. Civ. P. 50(b) ................................................................................................24

15 U.S.C. § 78u-4(a)(7) ...........................................................................................26

15 U.S.C. § 78u-4(e)(1) ...........................................................................................29

## PRELIMINARY STATEMENT

Lead Plaintiff the Pennsylvania State Employees' Retirement System ("SERS") and the Pennsylvania Public School Employees' Retirement System ("PSERS" and, together with SERS, "Lead Plaintiff") respectfully submit this memorandum in support of their application pursuant to Rule 23(e) of the Federal Rules of Civil Procedure for final approval of the proposed Settlement of the captioned class action (the "Action") and for entry of the accompanying Final Judgment of Dismissal with Prejudice ("Final Judgment").[1] The proposed Settlement has a base value of more than $89.5 million in cash, which includes a "Settlement Amount" of $79.9 million and more than $9.6 million in other cash payments, in addition to the following additional amounts:

- Interest on the Settlement Amount from April 1, 2008 until Shell funds the Settlement;

- Potential additional relief of up to $60.5 million, should certain contingencies occur;

- Payment of all expenses related to implementing the Settlement Agreement, which already exceed $7.78 million;

- Unlimited "most favored nation" upside protection should Shell pay additional settlement relief to the members of a non-U.S. class; and

- Payment of $33 million in counsel fees and expenses (to be paid directly by Shell – over and above the Settlement Amount being paid to the Class).

The base value and additional benefits identified above are referred to as the "Settlement Relief." If the Settlement and fee request are approved, the minimum cash benefit to the Class is over $130 million (including the cash payments to the Class and the fees and

---

[1] All capitalized terms in this memorandum not otherwise defined herein shall have the meaning set forth in the Settlement Agreement executed by the parties on May 13, 2008 (the "Settlement Agreement").

expenses that Shell has agreed to pay). The potential benefit of the Settlement to the Class, including the additional amounts listed above, is well over $180 million.

In addition, the Settlement Agreement complements and obtains additional benefits for those investors participating in a settlement in the Netherlands relating to the same subject matter: a cash payment of $28.342 million, plus interest from April 1, 2008, over and above the substantial contribution Lead Plaintiff and Lead Counsel made to bringing about the approximately $350 million original Non-U.S. Settlement.

The Settlement was reached after more than four years of hard-fought litigation and intensive arm's-length negotiations, and represents an excellent result for the members of the Class.[2]

## FACTUAL BACKGROUND

For the sake of brevity, Lead Plaintiff respectfully refers the Court to the accompanying Declaration of Stanley D. Bernstein ("Bernstein Declaration") for a

---

[2] "Class" or "Class Members" means all persons and entities (i) who purchased United States Shares or (ii) who (x) purchased Home Exchange Shares (or sold puts) and (y) at the time of such purchase, were residents or citizens of, or were incorporated in or created under the laws of, the United States (or its states, territories or possessions); provided that "Class" or "Class Members" shall not include (i) any person or entity that is a defendant in the Action, (ii) any entity in which a defendant in the Action has a controlling interest, (iii) any person or entity that has a Controlling Interest in a defendant in the Action, (iv) the officers, directors, Affiliates, legal representatives, heirs, predecessors, successors or assigns of any defendant in the Action, (v) any person or entity that submitted a valid and timely request for exclusion from the Class in accordance with the procedures set out in Section VIII of the Settlement Agreement and (vi) any person or entity that settled an actual or threatened lawsuit or other proceeding with the Companies, or any of them, and released the Companies from any further claims concerning the recategorization of certain of the Companies' oil and gas reserves; provided further that persons and entities who purchased United States Shares and at the time of such purchase, were residents or citizens of, or were incorporated in or created under the laws of, any Forum other than the United States (including its states, territories and possessions) shall be Class Members only with respect to their purchase of United States Shares and not with respect to any Home Exchange Shares they purchased.

"Class Period" shall mean the period from April 8, 1999 through March 18, 2004, inclusive.

2

detailed description of the history of the litigation, the claims asserted, the related motion practice, the investigation and discovery undertaken, the negotiations and substance of the Settlement, and the substantial risks and uncertainties presented by and overcome in this litigation, which demonstrate that the Settlement and the application for attorneys' fees and expenses should be approved.

## ARGUMENT

I.    **THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE AND SHOULD BE APPROVED BY THE COURT**

### A.  The Law Favors and Encourages Settlements

Compromises of disputed claims are favored by the courts.  *Lewy v. Weinberger*, 464 U.S. 818, 822 (1983); *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995) ("The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation."); *see also In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 317 (3d Cir. 1998).  This policy is particularly strong in complex class action litigation.  *See*, *e.g.*, *Krangel v. Golden Rule Res., Ltd.*, 194 F.R.D. 501, 504 (E.D. Pa. 2000).  As the court noted in *Weiss v. Mercedes-Benz of N. Am., Inc.*:

> [W]hen parties negotiate a settlement they have far greater control of their destiny than when a matter is submitted to a jury.  Moreover, the time and expense that precedes the taking of such risk can be staggering.  This is especially true in complex commercial litigation.

899 F. Supp. 1297, 1300-01 (D.N.J.), *aff'd*, 66 F.3d 314 (3d Cir. 1995).

3

**B.  The Role of the Court in Determining Whether to Approve a Class Action Settlement**

Federal Rule of Civil Procedure 23(e) provides that "[a] class action shall not be dismissed or compromised without the approval of the court . . . ."  *GMC*, 55 F.3d at 785. Before approving a class action settlement, a court must determine that it is "'fair, reasonable, and adequate'"  *In re CIGNA Corp. Sec. Litig.*, Civ. A. No. 02-8088, 2007 WL 2071898, at *2 (E.D. Pa. July 13, 2007) ) (quoting Fed. R. Civ. P. 23(e)(1)(C)); *In re Ravisent Techs., Inc. Sec. Litig.*, No. 00-CV-1014, 2005 U.S. Dist. LEXIS 6680, at *22 (E.D. Pa. Apr. 18, 2005).

Although a court has a duty to "independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interest of those whose claims will be extinguished," *In re Cendant Corp. Litig.*, 264 F.3d 201, 231 (3d Cir. 2001); *In re Genta Sec. Litig.*, Civ. A. No. 04-2123 (JAG), 2008 WL 2229843, at *1 (D.N.J. May 28, 2008), it should not decide the merits or resolve unsettled legal questions when reviewing a proposed settlement.  *See Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981) ("Courts judge the fairness of a proposed compromise by weighing the [P]laintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement . . . .  They do not decide the merits of the case or resolve unsettled legal questions.") (internal citation omitted). Instead, a court is charged with reviewing the terms of the settlement to ensure that the agreement reached is fair, reasonable, and adequate.

In determining the adequacy of a proposed settlement, this Court should ascertain whether the settlement is within a range that responsible and experienced attorneys could

4

accept, considering all relevant risks. *Fickinger v. C.I. Planning Corp.*, 646 F. Supp. 622, 630 (E.D. Pa. 1986). That analysis "recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Fisher Bros., Inc. v. Mueller Brass Co.*, 630 F. Supp. 493, 499 (E.D. Pa. 1985). Furthermore, the Third Circuit has held that in determining whether to approve a proposed settlement, a court may rely on the judgment of experienced counsel and should avoid transforming the hearing on the settlement into a trial on the merits. *Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799, 804 (3d Cir. 1974); *see also Fisher Bros. v. Phelps Dodge Indus., Inc.*, 604 F. Supp. 446, 452 (E.D. Pa. 1985) (while courts have discretion in determining whether to approve a proposed settlement, they should be hesitant to substitute their judgment for that of the parties who negotiated a proposed settlement). Before Lead Plaintiff entered into the Settlement, Lead Counsel considered numerous factors in deciding to recommend the Settlement, including, but not limited to, the strength of the claims and possible defenses, the risks of establishing liability and damages, and the risk of non-recovery. Lead Counsel, which has extensive experience prosecuting securities class actions, has concluded that the Settlement is fair, reasonable, and adequate, and in the best interests of the Settlement Class.

### C. The Settlement Is Presumptively Fair

A presumption of fairness attaches to a proposed settlement where "'(1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected.'" *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004) (quoting *Cendant*, 264 F.3d at 232 n.18). *See also Genta*, 2008

5

WL 2229843, at *2; *Cohen v. Tuttle*, Nos. 85-2396, 85-2621, 85-3022, 1987 U.S. Dist. LEXIS 1388, at *4 (E.D. Pa. Feb. 23, 1987) ("A compromise settlement is presumed, initially, to be fair and reasonable and should be regarded not as an unlimited victory but as a realistic compromise.") (citing *Protective Comm. v. Anderson*, 390 U.S. 414 (1968)).

Here, the proposed Settlement is entitled to a presumption of fairness. First, the Settlement was negotiated at arm's-length with the assistance of an independent mediator, retired federal judge Nicholas H. Politan. That the negotiations leading to this Settlement were supervised by a former federal judge acting as an independent mediator clearly dispels any possible concern of collusion.

Second, there was more than sufficient discovery from which Lead Plaintiff and Lead Counsel could gain a thorough understanding of the legal and factual issues involved in the litigation. The parties were at the end of fact discovery, during which eighty-five depositions were conducted before the execution of the Settlement Agreement[3] – including the depositions of the most senior Shell officials involved in Shell's recategorization of certain of its oil and gas reserves during the Class Period – and Lead Counsel reviewed well over two million pages of documents. In addition to the document and testimonial discovery, Lead Plaintiff gained a thorough understanding of the legal and factual issues involved in the litigation from the motion practice that preceded the Settlement (including nine separate motions to dismiss, as well as Shell's

---

[3] Between 2005 and early 2008, the parties engaged in extensive discovery relating to both the merits of the underlying claims in the Action and to the question of whether the Court had jurisdiction over the claims of non-United States purchasers who purchased their Shell securities on exchanges outside of the United States.

motion for partial summary judgment), the special master proceeding involving the issue of the Court's subject matter jurisdiction over the claims of the non-U.S. purchasers of Shell securities on non-U.S. exchanges (the "Special Master Proceeding"), and preparation for trial, which was scheduled for the fall of 2008. Based upon this thorough knowledge of the case, Lead Plaintiff and Lead Counsel strongly believe that the Settlement is in the best interests of the Class.

Third, Lead Counsel has highly experienced and skilled practitioners in the field of securities class action litigation, successfully prosecuting such actions throughout the United States, and they recommend this Settlement to the Court as fair, reasonable, and adequate, and in the best interests of the Class. Bernstein Decl. ¶¶ 111, and 56.

Finally, only three objections have been filed to the Settlement and/or fee and expense request, and only 57 requests for exclusion from the Class (one of which was untimely) were made after more than 959,000 Notice Packets were mailed and an extensive publication notice program was implemented in the United States and abroad.[4] Bernstein Decl. ¶ 10.

---

[4] As set forth in the Joslyn Declaration, 891,260 Notice Packets were mailed to potential Class members before the July 28, 2008 mailing deadline set by the Court in the Preliminary Approval Order. For reasons discussed in the Joslyn Affidavit, 91,335 Notice Packets were mailed after July 28, 2008, but before September 15, 2008. Of the 91,335 Notice Packets, 68,231 Notice Packets were mailed on or before September 1, 2008 (a date that would allow Class members to receive the Notice Packet and submit an objection or request for exclusion by the September 11, 2008 deadline for making such submissions), and 23,104 Notice Packets were mailed after September 1, 2008. Thus, on or before September 1, 2008, the Administrator mailed 959,491 Notice Packets to potential Class members. In total, the Administrator has mailed 982,595 Notice Packets to potential members of the Class.

Lead Plaintiff respectfully submits that the Settlement easily meets all applicable standards for the presumption of fairness to apply. *See CIGNA*, 2007 WL 2071898, at *3.

### D.  The Third Circuit's Nine Fairness Factors

The issue before the Court is whether the proposed Settlement is fair, adequate, and reasonable in accordance with Third Circuit authority. *Cendant*, 264 F.3d at 231. Courts in the Third Circuit use a nine-factor test to make this determination:

1. the complexity, expense and likely duration of the litigation;

2. the reaction of the class to the settlement;

3. the stage of the proceedings and the amount of discovery completed;

4. the risks of establishing liability;

5. the risks of establishing damages;

6. the risks of maintaining the class action through the trial;

7. the ability of the defendants to withstand a greater judgment;

8. the range of reasonableness of the settlement fund in light of the best possible recovery; and

9. the range of reasonableness of the settlement fund in light of all the attendant risks of litigation.

*Cendant*, 264 F.3d at 232 (quoting *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975)).

When examined under the applicable criteria, the Settlement is not only fair, adequate, and reasonable, but an outstanding result for the Class. As in any complex litigation, success is not a foregone conclusion and there are serious questions as to whether any positive outcome – let alone the favorable result achieved here – could be obtained after trial and the inevitable post-trial motions and appeals. The proposed

8

Settlement, which achieves an immediate and substantial recovery for the Class, is even more attractive given the possibility of little or no recovery at all.

### E.  The Settlement Satisfies the Criteria for Approval

#### 1.    The Complexity, Expense, and Likely Duration of the Litigation

Courts in this Circuit have long held that the complexity, expense and likely duration of litigation in a complex securities class action weigh in favor of approving a class action settlement.  *Ravisent Techs.*, 2005 U.S. Dist. LEXlS 6680, at **24-25 (upholding settlement where continuing litigation would "likely require additional discovery, extensive pretrial motions practice (including summary judgment motions), a trial, and, if Lead Plaintiffs were successful, the delay and expense of an appeal.  Absent a settlement, this action likely would not be resolved for several additional years.").  Similarly, in *In re Ikon Office Solutions, Inc., Sec. Litig.*, 194 F.R.D. 166 (E.D. Pa. 2000), the district court noted:

> In the absence of a settlement, this matter will likely extend for months or even years longer with significant financial expenditures by both defendants and plaintiffs.  This is partly due to the inherently complicated nature of large class actions alleging securities fraud:  there are literally thousands of shareholders, and any trial on these claims would rely heavily on the development of a paper trail through numerous public and private documents.

*Id.* at 179; *see also GMC*, 55 F.3d at 812 (quoting *Bryan,* 494 F.2d at 801) ("This factor is intended to capture 'the probable costs, in both time and money, of continued litigation.'").

9

It has long been recognized that federal securities class actions by definition involve complicated issues of law and fact, *see In re Lucent Techs., Inc., Sec. Litig.*, 307 F. Supp. 2d 633, 642 (D.N.J. 2004); *In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109, 123 (D.N.J. 2002) (Pisano, J.); *Krangel*, 194 F.R.D. at 507, and this one is even more complex than the norm. The Complaint, which is more than 200 pages long, alleges fraudulent conduct by four non-U.S. companies relating to the application of a complex federal regulation governing the estimation and reporting of proved reserves: RD, a Dutch company; STT, a U.K. company; KPMG, a Dutch company; and PwC, a U.K. company. The conduct in question – the estimation and categorization of oil and gas reserves – occurred in countries as far flung as Angola, Australia, Brunei, Kazakhstan, Nigeria, Norway, Oman, the Netherlands, and the United Kingdom. The extensive discovery to date has been expensive and logistically difficult, occurring in three different countries.

Trial of the Action would involve the presentation of evidence on numerous issues, but especially scienter. Shell would argue that its misreporting of proved reserves was attributable not to any fraud, but to an honest misapplication of a confusing federal rule, Rule 4-10 of Regulation S-X, 17 C.F.R. § 210.4-10 ("Rule 4-10"), the application of which Shell would claim (and has claimed) was the subject of widespread industry confusion. Shell would argue that even the SEC's understanding of Rule 4-10 changed over the Class Period, and that in any event its own knowledge of its worldwide proved reserves was diffuse, and primarily in the hands of lower-level employees whose knowledge could not evince company-wide scienter.

10

In addition, the parties would have presented evidence, including expert testimony, relating to the following complex factual and legal issues: (1) estimation of oil and gas reserves; (2) Lead Plaintiff's economic loss; (3) whether loss causation could be established; and (4) the complexity of the damages calculation and how much of the drop in price of Shell stock on January 9, 2004 and March 18, 2004 could be attributed to disclosure of the alleged fraud. Indeed, some of these issues were the subject of a motion for partial summary judgment that Shell filed, but later withdrew because of settlement discussions. Had this case not settled, Shell would undoubtedly have re-filed that motion (as it later indicated) in an effort to avoid trial.

Had Lead Plaintiff defeated Shell's summary judgment motion and then prevailed at trial, any judgment rendered after trial would, given the contested nature of these (and other) issues in the litigation, likely have been the subject of post-trial motions and appeals, again further prolonging any possibility for recovery for the Class. *See Prudential*, 148 F.3d at 318 ("[T]he trial of this class action would be a long, arduous process requiring great expenditures of time and money on behalf of both the parties and the court. The prospect of such a massive undertaking clearly counsels in favor of settlement."); *see also Neuberger v. Shapiro*, 110 F. Supp. 2d 373, 378 (E.D. Pa. 2000) (difficulty of presenting issues involving extensive expert testimony at trial weigh in favor of settlement); *Ikon*, 194 F.R.D. at 179.

Thus, continued litigation would be complex, time-consuming and expensive, with a substantial likelihood that, even if Lead Plaintiff ultimately prevailed on liability, the Class might not recover more than the Settlement. *See In re Safety Components Inc. Sec. Litig.*, 166 F. Supp. 2d 72, 85 (D.N.J. 2001) ("even if the Plaintiff Class were to

11

recover a larger judgment at trial, which is not guaranteed, the additional delay caused by a trial, post-trial motions and the appellate process, would delay recovery for years"); *Lucent*, 307 F. Supp. 2d at 648 ("many securities cases have been lost at trial, on post-trial motion, or on appeal"); *GMC,* 55 F. 3d at 812 (concluding that lengthy discovery and ardent opposition from the defendant with "a plethora of pretrial motions" were facts favoring a settlement that offers immediate benefits and avoids delay and expense).

Here, the Settlement secures for the Class an immediate benefit, undiminished by further litigation expenses, without the delay, risk and uncertainty of continued litigation. Therefore, this factor militates strongly in support of approval of the Settlement.

### 2.    The Reaction of the Class to the Settlement

The reaction of the Class underscores the propriety of the Settlement.  Here, there is no question that virtually the entire Class has embraced the proposed Settlement.

Pursuant to the Preliminary Approval Order, approximately 980,000 copies of the Notice were mailed to potential Class Members.  *See* Declaration of Paul Joslyn of RCB Fund Services, the Administrator in this Action (the "Joslyn Decl."), ¶¶ 24 and 25.  Lead Counsel caused to be published a Summary Notice in *The Wall Street Journal*, *The Houston Chronicle*, *The Times of Trenton*, *The New York Times*, *The Financial Times*, and *USA Today*, and in the newspaper with the highest circulation in each of the fifty states, the District of Columbia, the United States territories, and the foreign countries in which substantial numbers of Class Members reside.  *See* Declaration of Tamara Olliver, Director of Legal Communications at GCG Communications, a division of The Garden City Group, Inc., which was retained to implement the publication component of the notice program set forth in the Preliminary Approval Order, at  5.  Additionally, the

notice and Claim Form have been posted on the Internet through a dedicated website
hosted by the Claims Administrator and on the websites of Lead Counsel and Shell.  The
Notice informed Class Members of their right to object to the Settlement, and the
September 11, 2008 deadline for objecting.

      To date, there have been only three objections to the Settlement and/or the
requested attorneys' fees and reimbursement of expenses.  *See* Bernstein Decl. ¶ 10.  This
paucity of objections argues in favor approving the Settlement.  *Safety Components,* 166
F. Supp. 2d at 85.  "The vast disparity between the number of potential class members
who received notice of the Settlement and the number of objectors creates a strong
presumption that this factor weighs in favor of settlement."  *Cendant*, 264 F.3d at 235.

      Indeed, the case law makes clear that the near absence of objections to a proposed
class settlement is strong evidence that the settlement is fair and reasonable.  *See*
*Cendant*, 264 F.3d at 234 (settlement approved where "only four class members objected
. . . and only two non-class members objected"); *In re Corel Corp. Sec. Litig.*, 293 F.
Supp. 2d 484, 490 (E.D. Pa. 2003) (settlement approved where only five class members
objected); *In re Rent-Way Sec. Litig.*, 305 F. Supp. 2d 491, 501 (W.D. Pa. 2003)
(approving settlement where only three class members objected).

      Moreover, Lead Counsel has received only 57 requests for exclusion (one of
which was untimely).  The receipt of only 57 requests for exclusion, given the nearly one
million identified Class Members, evidences the overwhelming support the Settlement
has received from the Class.

### 3.    The Stage of the Proceedings and Discovery Completed

This factor focuses on whether the parties have obtained sufficient information to assess the strengths and weaknesses of their respective positions, and requires the Court to consider the extent of the discovery completed by the parties.  *In re Linerboard Antitrust Litig.*, 321 F. Supp. 2d 619, 630 (E.D. Pa. 2004); *see also Cendant*, 264 F.3d at 235 ("This factor captures the degree of case development that class counsel have accomplished prior to settlement.  Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating.") (citation and internal quotation marks omitted).

The case settled near the end of fact discovery.  Lead Counsel reviewed over two million pages of internal Shell documents relating to the estimation of oil and gas reserves and the Recategorization, as well as the records and testimony in related proceedings conducted by the SEC and Financial Services Authority (the United Kingdom's market regulator).  Lead Counsel also reviewed documents from third-parties who possessed information relevant to the estimation of oil and gas reserves during the Class Period.  Lead Counsel took 70 fact depositions and 5 expert depositions, and Shell's counsel took 4 fact depositions and 6 expert depositions.  The deponents included Sir Philip Watts (the former Chairman of Shell's Committee of Managing Directors), Judith Boynton (the former Chief Financial Officer of Shell), and Walter van de Vijver (the former head of Shell's Exploration and Production unit).  Bernstein Decl. ¶ 35. Thus, Lead Counsel had sufficient information upon which to evaluate the merits of Lead Plaintiff's claims, the strengths of the defenses asserted and likely to be asserted by Defendants, and the value of Lead Plaintiff's causes of action for purposes of settlement.

14

*See CIGNA*, 2007 WL 2071898, at *3 (noting that the case settled "after extensive discovery" and pending summary judgment motions).

In addition to merits discovery, the parties had also exchanged expert reports and conducted expert discovery (not limited to judgment recognition) related to those reports. Lead Counsel received and analyzed the reports of the current and then-Defendants' oil and gas experts and took the depositions of those individuals. Lead Plaintiff proffered its oil and gas expert and damages expert to opine and testify as to issues of loss causation and damages.

Moreover, Lead Counsel was actively preparing for trial. The trial of the Action had been generally scheduled to begin in October/November 2008. At the time of the Settlement, Lead Counsel was marshalling the evidence necessary to sustain Lead Plaintiff's burden in proving Defendants' violations of the securities laws.

The depositions, document review, damage analysis, expert discovery, presentation before the mediator, and preparation for trial confirmed for Lead Counsel that it had sufficient knowledge of the strengths and weaknesses of each side's case, and that the Settlement was an excellent result for the Class. *See*, *e.g.*, *Meijer, Inc. v. 3M*, Civ. No. 04-5871, 2006 U.S. Dist. LEXIS 56744, at *46 (E.D. Pa. Aug. 14, 2006) (parties had "an adequate appreciation of the merits" of case at time settlement negotiated when class counsel had, *inter alia*, reviewed hundreds of thousands of pages of documents and depositions and consulted extensively with an economic expert, and the parties had

engaged in mediation, including the exchange of mediation statements regarding the merits of their respective positions, in order to inform and facilitate negotiations).[5]

### 4.    The Risks of Establishing Liability

"Proving liability and damages in securities fraud cases is almost always a daunting task for Plaintiffs." *Seidman v. Am. Mobile Sys.*, 965 F. Supp. 612, 619 (E.D. Pa. 1997).  To succeed on claims under Section 10(b) of the Exchange Act, a plaintiff must establish, *inter alia*, that:  (i) each defendant was responsible for an omission or a misstatement; (ii) the false statement or omission was material; (iii) the false statement or omission was made with scienter; and (iv) the Class was damaged thereby.  *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976); *In re PNC Fin. Servs. Group, Sec. Litig.*, 440 F. Supp. 2d 421,434 (W.D. Pa. 2006) (citation omitted).

Lead Counsel believes that all of the liability issues, but particularly scienter, would be sharply disputed at trial, and that the uncertainty over Lead Plaintiff's ability to prevail on each issue created a substantial risk that Lead Plaintiff could be unsuccessful if this Action were not resolved.

Proof of scienter is rarely easy to establish in a securities case, and it would not be easy in this case.  Indeed, convincing a jury of fraudulent intent would be particularly

---

[5] *See also In re Cell Pathways, Inc., Sec., Litig. II*, No. 01-CV-1189, 2002 U.S. Dist. LEXIS 18359, at *14 (E.D. Pa. Sept. 23, 2002) (finding that Class counsel conducted adequate review where they reviewed thousands of documents and conducted interviews); *Goldsmith v. Tech. Solutions Co.*, No. 92 C 4374, 1995 U.S. Dist. LEXlS 15093, at *15 (N.D. Ill. Oct. 10, 1995) (noting that plaintiffs' counse1's endorsement of the settlement "bears particularly significant weight" where counsel reviewed thousands of pages of documents, took several depositions, and worked closely with accounting and damages experts in evaluating the claims and estimating the potential recovery).

difficult because the usual indicia of scienter are absent.  For example, there was no

insider selling by any of the former Individual Defendants during the Class Period, and,

although there were recategorizations of oil and gas reserves, and governmental or SEC

investigations of the former Individual Defendants, those investigations did not result in

any civil or criminal proceeding.[6]  Former Defendant Philip Watts asserted this very

argument in a motion in limine that the Court denied without prejudice to re-file.[7]

Bernstein Decl. ¶ 118.

Moreover, Shell would argue that its overstatement of proved reserves was the

product of an honest application of Rule 4-10, about which Shell would provide expert

testimony of industry-wide confusion, and that it relied on its auditors in making the

statements it did.  Shell would further argue that even the SEC's understanding of Rule 4-

10 evolved over the Class Period, and that Shell's own knowledge of its worldwide

proved reserves was diffuse, and primarily in the hands of lower-level employees whose

knowledge could not evince company-wide scienter.  Shell has also used some of the

many depositions taken in the case to explain away emails that appear, on their fact, to

support a finding of scienter.

---

[6] Although Shell entered into settlements with both the SEC and the FSA following its internal investigation, Shell neither admitted nor denied the regulatory authorities findings and conclusions.

[7] In brief, Watts argued that the decision by the FSA's Regulatory Decisions Committee ("RDC") to discontinue action against Watts for market abuse in connection with the Recategorization asserted by the FSA's Enforcement Division in a Warning Notice was relevant to Lead Plaintiff's ability to demonstrate liability under the Exchange Act.  Watts argued that the Notice of Discontinuance issued by the RDC reflected factual findings that the RDC made (after 21-months of investigation and hearings) in rejecting the FSA's allegations of market abuse, allegations that were substantially the same as those asserted in the Complaint.

Indeed, even though motive is not a required element of proof, a jury might conclude that Defendants had no motive to defraud and, thus, might not give credence to Lead Plaintiff's allegations, a theme that Defendants advocated throughout discovery.

Since Lead Plaintiff would have to prove scienter by circumstantial evidence of Defendants' conscious or reckless behavior, it is impossible for Plaintiffs to predict whether a jury would find the circumstantial evidence sufficiently convincing to meet the standard of proof required for scienter. *See In re Ravisent Techs., Inc. Sec. Litig.*, No. 00-CV-1014, 2004 U.S. Dist. LEXIS 13255, at *31 (E.D. Pa. July 12, 2004).

Proof of scienter is further complicated by the fact that most of the testimony in this case would come from witnesses predominantly, if not exclusively, controlled by Defendants, each of whom could be expected to be well prepared and appear credible. *See*, *e.g.*, *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 283 (D.N.J. 2007) ("scienter is based on the defendant's state of mind and, as such, may be difficult to prove with direct evidence"). This was, in fact, the case during many of the depositions that Lead Counsel conducted. Thus, although Lead Plaintiff strongly believes in its ability to demonstrate Defendants' scienter, it is not unmindful that it would, nevertheless, be difficult to convince a jury that Defendants acted with the required intent.

These serious risks of continued litigation confirm that the Settlement is fair, reasonable, adequate, and in the best interest of the Class.

### 5.    The Risks of Establishing Damages

Even if Lead Plaintiff succeeds on each and every one of the liability issues and overcomes Defendants' numerous defenses and potential defenses, Lead Plaintiff still must prove damages and loss causation. *See Ravisent Techs.*, 2004 US. Dist. LEXIS

18

13255, at *30 (recognizing difficulty of proving damages in securities actions); *Dura Pharm. Inc. v. Brondo*, 544 U.S. 336, 346 (2005). Although damages and causation are inextricably linked, *Taft v. Ackermans*, No. 02-CV-7951, 2007 U.S. Dist. LEXIS 9144, at **21-22 (S.D.N.Y. Jan. 31, 2007), each issue involves its own distinct problems, and at trial Defendants would be sure to contest both causation and damages.

Defendants would surely argue that the Class can recover only those actual out-of-pocket losses that Lead Plaintiff proves were proximately caused by the disclosure of Defendants' alleged fraud – not losses caused by other factors, such as market forces, or losses incurred after the market was on notice of the alleged fraud. *See Dura Pharm.*, 544 US. at 346. Plaintiffs bear the burden of proving that the Class was, in fact, damaged by reason of Defendants' conduct and the amount of damages caused by such conduct. If Lead Plaintiff were to fail to satisfy its burden on either issue, the Class would receive nothing. This was of particular concern because the issue of loss causation was heavily contested with respect to the period after January 9, 2004, and the subject of Shell's motion for summary judgment. *See* Bernstein Decl. ¶¶ 82 and 83.

Aside from proving loss causation, Plaintiffs would have considerable risk in proving damages. Proving damages involves, among other things, the presentation of evidence on the impact of varying economic factors, including general market conditions and the impact of various disclosures, in *PNC Financial*, 440 F. Supp. 2d at 434-35, as well as the presentation of complex valuation models that require supporting testimony of expert witnesses qualified in the field of financial economics. Before any such valuation model may be presented to a jury, the Court would have to determine, in the first instance, that it is admissible as evidence. *Daubert v. Merrell Dow Pharm.*, Inc., 509

19

U.S. 579 (1993).  Assuming Lead Plaintiff could withstand such a review (which

Defendants were most certainly going to move the Court to undertake), the proper

measure of damages is then a question for the jury to determine after listening to the

conflicting expert testimony.  *See Cendant*, 264 F.3d at 239 (parties' efforts to dispute

damages at trial undoubtedly would result in "'battle of experts,' with each side

presenting its figures to the jury and with no guarantee whom the jury would believe.").

The reaction of a jury to such complex expert testimony is highly unpredictable,

and expert testimony about damages could rest on many subjective assumptions, any of

which could be rejected by a jury as speculative or unreliable.  *See Krangel*, 194 F.R.D.

at 508 ("the experts' damage calculations would probably vary significantly and therefore

generate a 'battle of the experts'"); *see also Genta*, 2008 WL 2229843, at *7 ("competing

expert testimony likely would have created sufficient uncertainty regarding the exact

amount of damages that could be recovered"); *In re Computron Software, Inc.*, 6 F. Supp.

2d 313, 320 (D.N.J. 1998).

Lead Counsel recognizes that, in such a battle, a jury might be swayed by

Defendants' experts, who would seek to minimize or eliminate the amount of Lead

Plaintiff's losses by showing that the losses were attributable to factors other than the

alleged misstatements and omissions.  *See United States v. 412.93 Acres of Land*, 455

F.2d 1242, 1247 (3d Cir. 1972) ("The jury . . . is under no obligation to accept as

completely true the testimony of any expert witness.  It may adopt as much of the

testimony as appears sound, reject all of it, or adopt all of it."); *accord In re Warner

Commc'ns Sec. Litig.*, 618 F. Supp. 735, 744-45 (S.D.N.Y. 1985), *aff'd,* 798 F.2d 35 (2d

Cir. 1986) (approving settlement where "it is virtually impossible to predict with any

certainty which testimony would be credited, and ultimately, which damages would be found to have been caused by actionable, rather than the myriad nonactionable factors such as general market conditions."). Thus, a jury could find that damages were only a fraction of the amount that Lead Plaintiff claims, or even that neither Lead Plaintiff nor the Class have suffered any compensable damages.

The possibility that Lead Plaintiff could not establish damages or loss causation is a substantial hurdle that militates strongly in support of approval of the Settlement.

### 6. The Risks in Maintaining the Class Through Trial

"What the district court giveth, the district court may taketh away: the court may decertify or modify a class at any time during the litigation should the class prove to be unmanageable." *Perry v. FleetBoston Fin. Corp.*, 229 F.R.D. 105, 116 (E.D. Pa. 2005) (citing *Linerboard*, 321 F. Supp. 2d at 631 (citing *In re School Asbestos Litig.*, 789 F.2d 996, 101 1 (3d Cir. 1986)), and *Rendler v. Gambone Bros. Dev. Co.*, 182 F.R.D. 152, 160 (E.D. Pa. 1998) (class certification is always conditional and subject to reconsideration by court)).

Although this Action has been preliminarily certified for settlement purposes, there is always the risk that the Court would reconsider or amend its decision at any time before final judgment. Indeed, counsel for Shell has indicated that, absent this Settlement, it would argue for a shortened Class Period, ending on January 9, 2004, rather than March 18, 2004. *See* Fed. R. Civ. P. 23(c)(l)(C); *see also Warfarin* , 391 F.3d at 537 ("A district court retains the authority to decertify or modify a class at any time during the litigation if it proves to be unmanageable."); *Ravisent Techs.*, 2005 U.S. Dist. LEXIS 6680, at *31 ("[d]efendants might also seek to decertify the class prior to trial").

21

Thus, the inherent risks of maintaining this Action as a class action, when weighed against a very substantial and favorable settlement for the Class, also favor approval of the Settlement.

> **7.    The Ability of Defendants to Withstand a Greater Judgment**

This factor addresses whether Defendants "could withstand a judgment for an amount significantly greater than the [proposed] settlement." *Cendant*, 264 F.3d at 240. While Defendants may have the ability to withstand a greater judgment, this does not prevent the Court from approving the Settlement. *See Meijer*, 2006 U.S. Dist. LEXIS 56744, at *46 ("this determination in itself does not carry much weight in evaluating the fairness of the Settlement") (citing *Perry*, 229 F.R.D. at 116 ("Fleet could certainly withstand a much larger judgment as it has considerable assets. While that fact weighs against approving the settlement, this factor's importance is lessened by the obstacles the class would face in establishing liability and damages.")); *Lazy Oil Co. v. Witco Corp.*, 95 F. Supp. 2d 290, 318 (W.D. Pa. 1997), *aff'd*, 166 F.3d 581 (3d Cir. 1999) ("The Court presumes that Defendants have the financial resources to pay a larger judgment. However, in light of the risks that Plaintiffs would not be able to achieve any greater recovery at trial, the Court accords this factor little weight in deciding whether to approve the proposed Settlement."); *CIGNA*, 2007 WL 2071898, at *3; *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 642 (E.D. Pa. 2003) (same); *see also In re BankAmerica Corp. Sec. Litig.*, 210 F.R.D. 694, 702 (E.D. Mo. 2002) (finding that even when defendant had ability to pay greater judgment, factor did not weigh against approval of settlement).

22

Thus, even though Defendants could withstand a greater judgment, in light of the risks of continued litigation and trial, this factor should not weigh against approval of the Settlement.

> **8.    The Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and All the Attendant Risks of Litigation**

These two *Girsh* factors look at "how the settlement compares to the best and worst case scenarios" by "evaluat[ing] whether the settlement represents a good value for a weak case or a poor value for a strong case." *Ravisent*, 2005 U.S. Dist. LEXIS 6680, at *32; *Warfarin*, 391 F.3d at 538; *see also Safety Components*, 166 F. Supp. 2d at 92 ("[i]n conducting this evaluation, it is recognized 'that settlement represents a compromise in which the highest hopes for recovery are yielded in exchange for certainty and resolution and [courts should] guard against demanding too large a settlement based on the court's view of the merits of the litigation'") (quoting *In re Aetna Inc. Sec. Litig.*, MDL No. 1219, 2001 US. Dist. LEXIS 68, at **34-35 (E.D. Pa. Jan. 4, 2001))

The determination of a "reasonable" settlement is not susceptible to a mathematical equation yielding a particularized sum. Rather, "in any case there is a range of reasonableness with respect to a settlement." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972); *see also Fickinger*, 646 F. Supp. at 630 (same). In assessing the Settlement, the Court should balance the benefits afforded the Class, including the immediacy and certainty of a recovery, against the continuing risks of 1itigation. *In re Linerboard Antitrust Litig.*, 296 F. Supp. 2d 568, 579 (E.D. Pa. 2003) (finding immediate benefit of the settlement to Class Members weighed in favor of approving settlement in light of potential difficulties in proving liability plaintiff faced).

23

The immediate base value of the Settlement (over $89 million) is nearly 18.2% of the maximum likely case recoverable damages (approximately $489 million) – which were particularly difficult to calculate, because they include the damages of U.S. investors who purchased their shares worldwide – determined by Lead Plaintiff's damage experts. *Compare with In re AT&T Corp. Sec. Litig.*, 455 F.3d 160, 170 (3d Cir. 2006) (district court did not abuse discretion in finding settlement was an "excellent" result in light of the risk of establishing liability and damages despite the fact that settlement possibly represented only 4% of the total damages claimed). In addition, given that the median settlement of securities class actions in 2005 was $9.25 million and the median recovery of estimated damages in 2005 was 3.1%, the immediate cash component of the Settlement is at the high end of securities class action settlements.

Many securities class actions brought under the Exchange Act have been lost at trial, on post-trial motion, or on appeal. Just last month, in *Apollo Group, Inc. Sec. Litig.*, Master File No. CV 04-2147-PHX-JAT, 2008 WL 3072731 (D. Ariz. Aug. 4, 2008), the district court granted judgment for defendants as a matter of law under Fed. R. Civ. P. 50(b) after a jury verdict in favor of the plaintiff class. In another case, the class won a $38 million jury verdict and a motion for judgment n.o.v. was denied. *Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990). On appeal, however, the judgment was

24

reversed and the case dismissed, resulting in a total loss after ten years of active litigation.[8]

In light of the risks of establishing liability and damages at trial, Lead Plaintiff believes that the Settlement of an immediate cash recovery of $89 million, in addition to the other substantial benefits provided by the Settlement, constitutes a substantial recovery, falls within the range of reasonableness and is unquestionably better than the other possible alternatives – little or no recovery.

## II.    THE NOTICE TO THE SETTLEMENT CLASS SATISFIED DUE PROCESS

Due process requires that in a class action, notice of the settlement and an opportunity to be heard be given to absent class members. *Mashburn v Nat'l Healthcare, Inc.*, 684 F. Supp. 660, 667 (M.D. Ala. 1988) ("This Court is of the opinion that the notice given to members of the plaintiff class by publication and by mail, as aforesaid, complied with all the requirements of due process, all requirements of Rule 23 of the Federal Rules of Civil Procedure, and constituted the best practicable notice under the circumstances."). Trial courts are given substantial latitude to determine fair and

---

[8] *See also Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (jury damages award of over $81 million for plaintiffs reversed on appeal for failure to prove loss causation); *AUSA Life Ins. Co. v. Ernst & Young*, No. 00-9472, 2002 U.S. App. LEXIS 13845 (2d Cir. July 8, 2002) (affirming district court's dismissal after full bench trial and earlier appeal and remand); *Landy v. Amsterdam*, 815 F.2d 925 (3d Cir. 1987) (directed verdict for defendants after five years of litigation; affirmed on appeal); *Radol v. Thomas*, 772 F.2d 244 (6th Cir. 1985) (summary judgment and jury verdict in favor of defendants in action challenging Marathon/U.S. Steel merger); *Winkler v. NRD Mining, Ltd.*, 198 F.R.D. 355 (E.D.N.Y. 2000) (granting defendants' motion for judgment as matter of law after jury verdict for plaintiffs); *Bentley v. Legend Corp.*, 849 F. Supp. 429 (E.D. Va. 1994), *aff'd sub nom.*, *Herman v. Legend Corp.*, 50 F.3d 6 (4th Cir. 1995) (directed verdict in favor of defendants after plaintiffs' presentation of its case to jury); *Krinsk v. Fund Asset Mgmt., Inc.*, 715 F. Supp. 472 (S.D.N.Y. 1988), *aff'd*, 875 F.2d 404 (2d Cir. 1989) (verdict for defendants after trial).

expedient procedures. *See*, e.g., *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1153 (8th Cir. 1999); *Gottlieb v. Wiles*, 11 F.3d 1004, 1013 (10th Cir. 1993) (finding the content and form of notices are left to the court's discretion). The generally accepted method to provide notice to class members is by direct mail and publication in newspapers. *Diamond Chem. Co.*, *Inc*. v. *Akzo Nobel Chems. B.V.*, 205 F.R.D. 33 (D.D.C. 2001) (approving of such notice plan); *see also Gordon v. Hunt*, 117 F.R.D. 58, 63 (S.D.N.Y. 1987) (combination of mailed and published notice is "long-accepted norm in large class actions").

Rule 23(e) requires that notice fairly apprise class members of the terms of the proposed Settlement. The Court-approved Notice has been mailed approximately 980,000 potential Class Members, informing them of the Settlement. *See* Joslyn Declaration ¶ 24. The mailing went to all Class Members who could be identified either from transfer records or from stockbrokers in the United States who were requested to provide names to the Administrator. In addition to other pertinent information regarding the Settlement, the Notice included all the information required by 15 U.S.C. § 78u-4(a)(7) and Federal Rule of Civil Procedure 23(c)(2), including the following: (a) the amount of the settlement proposed to be distributed to the parties to the action; (b) an explanation regarding the attorneys' fees and costs sought; (c) the name, telephone number, and address of Lead Counsel who will be reasonably available to answer questions from Class Members concerning any matter contained in the Notice; (d) a statement explaining the reasons why the parties propose the Settlement; (e) a description of the proposed Plan of Allocation; and (f) the rights of every Class Member, including their right to object to the Settlement, the requested attorneys' fees and expenses, and/or the Plan of Allocation.

As such, the Notice fairly apprised the potential Class Members of the Settlement and their individual rights with respect thereto. *Consol. Edison, Inc. v. Ne. Utils.*, 332 F. Supp. 2d 639, 652 (S.D.N.Y. 2004) (due process requires that the notice to class members "fairly apprise the . . . members of the class of the terms of the proposed settlement and of the options that are open to them in connection with [the] proceedings.") (citations omitted).

In addition, a summary notice was published in *The Wall Street Journal*, *The Houston Chronicle*, *The Times of Trenton*, *The New York Times*, *The Financial Times*, and *USA Today*, and in the newspaper with the highest circulation in each of the fifty states, the District of Columbia, the United States territories, and the foreign countries in which substantial numbers of Class Members reside. This notice program represents an extraordinary effort, especially when compared with the publication program in the usual case, which often involves publication in *The Wall Street Journal* and/or *The New York Times.*

There can be no question that the notice provided for in the Settlement constituted the "best notice practicable under the circumstances," satisfying the requirements of Fed. R. Civ. P. 23(c)(2)(B). *Diamond Chem.*, 205 F.R.D. at 34.

## III.    THE PROPOSED DISTRIBUTION PLAN SHOULD BE APPROVED AS FAIR, REASONABLE AND ADEQUATE

The approval of a plan of allocation of settlement is "governed by the same standards of review applicable to the settlement as a whole: the distribution plan must be fair, reasonable and adequate." *See Ikon*, 194 F.R.D. at 184 (citing *Computron*, 6 F. Supp. 2d at 321). An allocation formula need only have a reasonable, rational basis,

particularly if recommended by "experienced and competent" class counsel.  *White v. NFL*, 822 F. Supp. 1389, 1420 (D. Minn. 1993), *aff'd*, 41 F.3d 402 (8th Cir. 1994); *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 142 F.R.D. 588, 596 (S.D.N.Y. 1992).  "Courts generally consider plans of allocation that reimburse class members based on the type and extent of their injuries to be reasonable."  *Aetna*, 2001 US. Dist. LEXIS 68, at *36.

The objective of a plan of allocation is to provide an equitable basis upon which to distribute the settlement among eligible class members.  Here, the Distribution Plan, which is attached to the Notice, was formulated by Lead Counsel in consultation with Forensic Economics, Inc., and based on the Expert Report in this matter submitted by Lead Plaintiff's damages expert, Professor Gregg Jarrell, Ph.D., CFA, a former Chief Economist at the SEC.  The Distribution Plan reflects an assessment of the damages that could have been recovered, as well as an assessment of the individual Class Members' damages, based on when they bought and sold their Shell securities, and will result in a fair distribution of the available proceeds among those Class members who submit timely and valid claims.

The plan provides a recovery to investors based on the losses caused to investors by Shell's disclosures on January 9, 2004, and March 18, 2004.  The measure of losses is based on a constant percentage limited by constant dollar methodology, which reflects the percentage by which the stock price was inflated prior to disclosure, net of market and industry returns for RD/STT securities on the disclosure dates.  No Class Member has objected to the Distribution Plan.

The decisions cited above recognize that the goal of an equitable plan is fairness to the Class, taking into account the strength of claims based on available facts and

evidence.  The Distribution Plan is based on such principles and falls within the mainstream of allocation plans routinely approved by the courts.  *See Lucent*, 307 F. Supp. 2d at 649 ("A plan of allocation that reimburses class members based on the type and extent of their injuries is generally reasonable."); *Corel*, 293 F. Supp. 2d at 493 (courts "'generally consider plans of allocation that reimburse class members based on the type and extent of their injuries to be reasonable'") (quoting *Aetna*, 2001 U.S. Dist. LEXIS 68, at *36).

Additionally, the proposed Distribution Plan comports with Section 21D of the PSLRA, 15 U.S.C. § 78u-4(e)(1).  The Distribution Plan treats Class members in an equitable manner.

Therefore, it is respectfully submitted that the Distribution Plan is fair and equitable and should be approved.

## IV.    CERTIFICATION OF A SETTLEMENT CLASS IS APPROPRIATE

On June 17, 2008, the Court preliminarily certified the Class for settlement purposes.  Because the standards for final approval of class certification are no different from those for preliminary approval, Lead Plaintiff respectfully submits that for the reasons set forth in the memorandum in support of preliminary approval, the Court should finally certify the Class for settlement purposes.

## CONCLUSION

For the reasons set forth above and in the accompanying Bernstein Declaration, Lead Plaintiff respecfullly submits that the Court should grant final approval to the Settlement, the Plan of Allocation, and certification of the Class.

29

DATED:  September 19, 2008             Respectfully submitted,

**LAW OFFICES OF JAN MEYER & ASSOCIATES, PC**


By:_____/s/_____
      Jan Meyer
1029 Teaneck Road
2nd Floor
Teaneck, NJ  07666
Telephone:  201-862-9500
Jmeyer@janmeyerlaw.com

**Liaison Counsel for the Class**


**BERNSTEIN LIEBHARD & LIFSHITZ, LLP**
Stanley D. Bernstein
Jeffrey M. Haber
William A.K. Titelman
Mark T. Millkey
10 East 40th Street
New York, NY  10016
Telephone:  212-779-1414
Bernstein@bernlieb.com
Haber@bernlieb.com
Titelman@bernlieb.com
Millkey@bernlieb.com

**Counsel for SERS and PSERS, and Lead Counsel for the Class**

**OFFICE OF ATTORNEY GENERAL**
**LITIGATION SECTION**
Thomas W. Corbett, Jr., Attorney General
Susan J. Forney,
  Chief Deputy Attorney General
Sarah C. Yerger
   Senior Deputy Attorney General
15th Floor, Strawberry Square
Harrisburg, PA  17120
Tel: 717-787-2944
Fax:  717-772-4526

**OFFICE OF GENERAL COUNSEL**
Barbara Adams, General Counsel
Robert Pratter, Executive Deputy General Counsel
333 Market Street, 17th Floor
Harrisburg, PA  17101
Tel: 717-783-6563
Fax:  717-772-8570

**PENNSYLVANIA PUBLIC SCHOOL**
**EMPLOYEES' RETIREMENT SYSTEM**
Gerald Gornish, Chief Counsel
5 North Fifth Street, 5th Floor
Harrisburg, PA  17101
Tel:  717-720-4912
Fax:  717-783-8010

**PENNSYLVANIA STATE EMPLOYEES'**
**RETIREMENT SYSTEM**
Samuel Yun, Chief Counsel
Brian E. McDonough, Deputy Chief Counsel
30 North Third Street, 5th Floor
Harrisburg, PA  17101
Tel:  717-237-0248
Fax:  717-787-5751