**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Civil Action No. 04-374 (JAP) |
| | (Consolidated Cases) |
| IN RE ROYAL DUTCH/SHELL | |
| TRANSPORT SECURITIES | Judge Joel A. Pisano |
| LITIGATION | |

RECEIVED

DEC – 9 2008

AT 8:30_____ M
WILLIAM T. WALSH
CLERK

**[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Lead Plaintiffs, the Pennsylvania State Employees' Retirement System ("SERS") and the

Pennsylvania Public School Employees' Retirement System ("PSERS" and, together with SERS,

"Lead Plaintiffs") and defendants Royal Dutch Petroleum Company and The "Shell" Transport

and Trading Company, p.l.c. (together, "Shell") entered into a May 13, 2008 Stipulation of

Settlement that settles the claims made in this class action.[1]  The Court has entered a Judgment

and an Order Approving the Settlement as fair, reasonable and adequate, and dismissing the

Complaint in this Action with prejudice.  In support of the Judgment and Order Approving the

Settlement, the Court makes the following findings of fact and conclusions of law.

**I.      BACKGROUND**

     **A.      Materials Considered by the Court**

     1.      In reaching its decision to approve the settlement, this Court has considered the

written memoranda of the parties.  As discussed below, Lead Counsel and Shell's counsel have

fully briefed the request for approval, and they have supported their request with numerous

---

[1].      Unless otherwise specifically defined in these Findings of Fact and Conclusions of Law,
the capitalized terms have the same meaning as attributed to them in the May 13, 2008
Settlement Agreement.

declarations of fact. Lead Counsel and Shell's counsel were also present at the September 26, 2008 Fairness Hearing and addressed, among other things, the standard for approving a class action settlement and the reasons why the settlement presented in this Action warrants approval.

2.      As discussed in greater detail below, the Court also considered three written objections that were submitted to the Court regarding the Settlement Agreement, as well as a written report of U.S. Trust, an independent fiduciary retained by certain of Shell's ERISA plans (which are Class Members in this Action).

**B.      History of the Litigation**

3.      On January 9, 2004, Shell announced that it was recategorizing certain of its oil and gas reserves. Soon after this announcement, fourteen putative securities class actions were filed in this Court against Shell and certain Shell employees. The actions were assigned to Chief Judge John W. Bissell.

4.      On June 30, 2004, the Court issued an order consolidating into the above-captioned action all such securities class actions. In that order, the Court also appointed SERS and PSERS as Lead Plaintiffs and the law firm of Bernstein Liebhard & Lifshitz, LLP as Lead Counsel. The June 30, 2004 order further provides that Lead Counsel shall be generally responsible for coordinating Lead Plaintiffs' pre-trial activities, including conducting settlement negotiations on behalf of plaintiffs.

5.      On September 13, 2004, Lead Plaintiffs filed a consolidated amended class action complaint for relief in connection with alleged violations of the federal securities laws. The consolidated amended complaint named as defendants Shell, certain individual Shell employees and former employees, and Shell's external auditors.

2

6.    In December 2004, defendants filed motions to dismiss the consolidated and amended complaint based upon a lack of subject matter jurisdiction and failure to state a claim. The Court ruled on these motions on August 9, 2005. *In re Royal Dutch/Shell Transport Sec. Litig.*, 380 F. Supp. 2d 509, *rev'd in part*, 404 F. Supp. 2d 605 (D.N.J. 2005).

7.    The Court dismissed with prejudice certain of the named individuals and one of the auditor defendants (another was ultimately dismissed in a subsequent decision of the Court), and all claims based upon Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). This Court denied defendants' Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction, finding that Lead Plaintiffs had met the "light" burden of demonstrating subject matter jurisdiction at the pleading stage.

8.    Lead Plaintiffs filed their second consolidated amended class action complaint on September 19, 2005. Shell filed its answer to the Complaint on November 17, 2005.

9.    Upon Judge Bissell's retirement in late 2005, the Action was assigned to the undersigned.

10.    In a May 23, 2006 amended joint scheduling order, the Court scheduled a three-week evidentiary hearing to address all issues related to Lead Plaintiffs' motion for class certification. The order provided that the evidentiary hearing would proceed in three sequential phases: (*i*) a bench trial on whether Home Exchange Purchasers satisfy the so-called "conduct test" – *i.e.*, whether defendants engaged in sufficient conduct in the United States in connection with the claims made in the Action – for purposes of the Court's exercising its jurisdiction over the claims of such purchasers, (*ii*) an evidentiary hearing on Shell's proposed summary judgment motion concerning causation, damages and scienter issues and (*iii*) an evidentiary hearing on Lead Plaintiffs' motion for class certification.

3

11.    On April 11, 2007, Shell advised Lead Plaintiffs and the Court that it had entered into a settlement agreement with Home Exchange Purchasers who purchased their Home Exchange shares during the period of April 8, 1999 through March 18, 2004, inclusive, regarding their asserted and unasserted claims arising out of Shell's recategorization of certain of its oil and gas reserves. Shell also advised the Court that the Non-U.S. Settlement Agreement would automatically terminate if the Court determined that it had jurisdiction to consider the claims of the Home Exchange Purchasers. The terms of the Non-U.S. Settlement Agreement are discussed below.

12.    Lead Plaintiffs filed a motion seeking to enjoin Shell from proceeding with the Non-U.S. Settlement Agreement, and Shell moved to sever and dismiss the claims of Home Exchange Purchasers from those of the rest of the putative class. In a second amended joint scheduling order entered by the Court on May 2, 2007, the Court set a briefing schedule for these motions and continued the date of the evidentiary hearing until June 18, 2007.

13.    Subsequent to the entry of the May 2, 2007 scheduling order (and as more fully described below), the Settling Parties met in mediation with retired United States District Judge Nicholas H. Politan. As a result of these mediation sessions, the Settling Parties agreed, among other things, to continue the June 18, 2007 bench trial and to jointly propose to the Court that Judge Politan be appointed a Special Master under Fed. R. Civ. P. 53 to consider and review the extensive evidentiary record on the conduct test issues and report on his findings and recommendations to the Court. The Court appointed Judge Politan as Special Master in a May 24, 2007 order.

14.    On September 18, 2007, the Special Master issued a report and recommendation, based upon the extensive briefing and argument of Lead Plaintiffs and Shell, in which he

4

recommended that the Court "conclude that it lacks subject matter jurisdiction over the Home Exchange Purchasers and must exclude them from the Class because the federal securities laws do not apply to their claims." The Court adopted the Special Master's recommendations and entered an order (which became final in January 2008) dismissing the claims of Home Exchange Purchasers from the action.

15.    On January 14, 2008, the Court issued an order approving Shell's payment of $27 million to Lead Counsel in recognition of Lead Plaintiffs' and Lead Counsel's efforts "in vigorously pursuing through litigation the claims [of Home Exchange Purchasers] for more than three years, in satisfaction of their fiduciary obligations to the proposed class." The Court further noted that these efforts were a "substantial factor" in Shell's decision to enter into the Non-U.S. Settlement Agreement, which agreement will confer a "significant benefit" upon the Home Exchange Purchasers. In addition, on February 4, 2008, the Court issued an order dismissing the remaining individual defendants from the Action with prejudice.

16.    Lead Plaintiffs and Shell entered into the Settlement Agreement on May 13, 2008. Lead Plaintiffs and Shell submitted the Settlement Agreement to the Court on June 17, 2008 and the Court preliminarily approved it.

**C.    Settling Parties and Their Counsel**

17.    **Lead Plaintiffs** – The Court appointed SERS and PSERS as Lead Plaintiffs. Both purchased Shell securities during the Class Period.

18.    **Lead Counsel** – The Court appointed the law firm of Bernstein Liebhard & Lifshitz, LLP as Lead Counsel for plaintiffs. This law firm is knowledgeable about, and experienced in, complex class actions of this nature, including those involving claims under the federal securities laws.

19.    **Shell Defendants** – The Complaint names Royal Dutch Petroleum Company

(a/k/a N.V. Koninklijke Nederlandsche Petroleum Maatschappij) and The "Shell" Transport and

Trading, p.l.c. In December 2005, the Royal Dutch Petroleum Company was merged into Shell

Petroleum N.V. The "Shell" Transport and Trading Company p.l.c. is now known as The Shell

Transport and Trading Company Limited.

20.    **Shell's Counsel** – Shell is represented by Dewey & LeBoeuf LLP and Debevoise

and Plimpton LLP, two firms with extensive experience in complex class actions, including

actions arising under state and federal securities law.

**D.    Related Settlements**

21.    **SEC Fair Funds Settlement** – In August 2004, Shell entered into a settlement

with the SEC regarding its recategorization of certain of its oil and gas reserves. Pursuant to that

settlement, Shell agreed, among other things, to pay a civil penalty of $120,000,000. Consistent

with the Fair Funds for Investors provision of the Sarbanes-Oxley Act of 2002, 15 U.S.C.

§ 7246(a), the United States Court for the Southern District of Texas established a Fair Fund to

hold the monies paid by Shell, together with all interest earned on such monies. Pursuant to the

Fair Funds for Investors provision, individuals and entities who purchased their shares during the

period of April 8, 1999 through March 16, 2004, inclusive, and who otherwise fall within the

definition of Class Members in this Action (whether they have remained in the Class or

requested exclusion from it) or within the definition of Home Exchange Purchasers are eligible

to make claims for a distribution from the Fair Fund. Notice of this distribution was provided to

eligible shareholders at the same time notice was provided regarding the Settlement Agreement.

22.    **ERISA Settlement** – In connection with Shell's announcements of its

recategorization of certain of its oil and gas reserves, four putative class actions were filed in this

6

Court alleging violations of the Employee Retirement Income Security Act of 1974 ("ERISA"). These cases were consolidated into one action pursuant to a June 30, 2004 order.

23.     On April 6, 2005, Shell entered into a settlement with the co-lead plaintiffs in the consolidated ERISA action pursuant to which Shell agreed, among other things, to pay $90,000,000 in settlement relief, to pay the expenses associated with providing notice of the settlement to class members and to reimburse co-lead counsel for up to $1,000,000 of their out-of-pocket expenses. This settlement was approved by the Court on August 30, 2005, and settlement relief was distributed by the first half of 2008. Pursuant to the terms of the ERISA settlement, the ERISA plans that were covered by the ERISA settlement – which are also included in the definition of Class Members in the Settlement Agreement with respect to their purchases of Shell securities during the Class Period – did not release their claims under the federal securities laws. Thus, the ERISA plans that fall within the definition of Class Member may receive relief under the Settlement Agreement if they are entitled to do so under the Settlement Distribution Plan.

24.     An independent fiduciary retained by the certain Shell ERISA plans has concluded that the Settlement Agreement is reasonable in light of the ERISA plans' "likelihood of full recovery, the risks and costs of litigation, and the value of claims foregone," and the fiduciary has thus concluded that the Class Member plans "should participate in the Settlement without objecting to any of the Settlement's provisions."

25.     **Non-U.S. Settlement** – As noted above, on April 11, 2007, Shell reached a settlement with Home Exchange Purchasers who purchased their Home Exchange shares during the period of April 8, 1999 through March 18, 2004, inclusive, of their asserted and unasserted claims arising out of Shell's recategorization of certain of its oil and gas reserves. The Non-U.S.

Settlement (which was executed pursuant to a June 23, 2005 Dutch statute, Wet collectieve afwikkeling massachade) was filed with the Amsterdam Court of Appeals in the Netherlands, which has exclusive jurisdiction under the Dutch statute to review such a settlement and determine whether it should be declared binding as to the persons and entities included within its terms. Parties to the Non-U.S. Settlement Agreement are Shell, a special purpose Dutch foundation, certain of Shell's non-United States institutional investors (including certain non-United States institutional investors who had filed separate individual actions before this Court) and a Dutch shareholder advocacy group.

26.    The Non-U.S. Settlement provides that (subject to the approval of the Amsterdam Court of Appeals) Shell will pay (*i*) settlement relief of $340,100,000 to be distributed to Home Exchange Purchasers pursuant to a plan of distribution; (*ii*) additional settlement relief of $12,500,000 to be divided equally among all Home Exchange Purchasers who submit a valid claim for relief and (*iii*) all fees and expenses (including an agreed amount of attorneys' fees and expenses for the principal counsel for the Home Exchange Purchasers) associated with implementing the settlement. It also contains a provision pursuant to which Shell agreed it would pay additional settlement relief to those persons and entities who are covered by the Non-U.S. Settlement Agreement if it were to agree to pay proportionally more to Class Members (the "Non-U.S. Settlement True-Up Provision").

27.    As set out in the Précis to the Settlement Agreement, Lead Plaintiffs and Shell intended that the Settlement Agreement provide relief to Class Members that is consistent with and proportional to the relief that is provided to Home Exchange Purchasers under the Non-U.S. Settlement Agreement.

28.    The Amsterdam Court of Appeals has set a hearing to consider whether to declare the Non-U.S. Settlement Agreement binding on the individuals and entities covered by its terms for November 20, 2008.

**E.    Discovery**

29.    The parties began discovery in August 2006. From that time until into 2008, the parties engaged in extensive document and deposition discovery. Shell and other defendants produced millions of pages of documents to Lead Plaintiffs and Lead Counsel. The parties also embarked on an ambitious deposition program, taking a total of 85 depositions. Lead Counsel took 70 fact depositions (including those of Shell's most senior executives who were involved in issues relating to the recategorization and of its external auditors) and 5 expert depositions; Shell's counsel took 4 fact depositions and 6 expert depositions.

**F.    Settlement Discussions**

30.    The parties engaged in multiple attempts to settle this Action. The first mediation attempt was made over a two-day session with Judge Politan in July 2006. The discussions were difficult and the parties remained far apart; no settlement was reached. The parties met a second time before Judge Politan on November 27 and 28, 2006. No settlement was reached.

31.    As noted above, on April 11, 2007, Shell advised the Court, Lead Counsel and the public that it had agreed to settle all asserted and unasserted claims arising from the reserves recategorization of Home Exchange Purchasers.

32.    After Shell announced its execution of the Non-U.S. Settlement Agreement, the Court urged the parties to consider whether they could resolve the remaining claims. As a consequence, Shell and Lead Plaintiffs (individually, collectively and through their counsel) met by telephone and in person in mediation sessions with Judge Politan over the course of one and a

half weeks starting on April 23, 2007, and in a full-day, in-person session on May 9, 2007. Also present at the May 9 session were representatives of (*i*) the special purpose Dutch foundation that was formed in connection with, and is a party to, the Non-U.S. Settlement Agreement and (*ii*) the Dutch shareholder advocacy group that is party to the Non-U.S. Settlement Agreement.

33.    These sessions resulted in the agreement between Shell and Lead Plaintiffs (as discussed above) to request that Judge Politan be appointed as a Special Master to consider whether the Court should hear the claims of Home Exchange Purchasers. As also discussed above, Judge Politan, acting as Special Master, later issued findings and recommendations that the claims of Home Exchange Purchasers should not be heard by the Court. After briefing by Shell and Lead Plaintiffs, the Court adopted the findings and recommendations, and dismissed the Home Exchange Purchasers' claims based upon a lack of subject matter jurisdiction.

34.    After engaging in extensive merits discovery during the period starting in September 2007 and ending in February 2008, Lead Plaintiffs and Shell met with Judge Politan for two days of in-person mediation sessions on March 3 and 4, 2008. As a result of these sessions, they reached an agreement in principle to settle all remaining claims in the Action.

35.    Throughout March and April 2008, Lead Plaintiffs and Shell drafted and negotiated the Settlement Agreement (including the documents necessary to implement the Settlement Agreement that are exhibits to it). During that period they also participated in depositions of the remaining auditor defendants.

### G.    June 17, 2008 Preliminary Approval Order

36.    On June 17, 2008, this Court held a hearing to determine whether to approve the settlement preliminarily.

Case 3:04-cv-00374-JAP-JJH    Document 540    Filed 10/27/2008    Page 11 of 61

37.    Based upon the Court's review of the Settlement Agreement and the parties' oral presentations, the Court entered a June 17, 2008 order in which it, among other things: (*i*) preliminarily certified the Class for settlement purposes, (*ii*) found that the Settlement Agreement resulted from extensive arm's-length negotiations, was concluded after Lead Counsel had conducted broad discovery and was sufficiently fair, reasonable and adequate to warrant sending notice of the Action and Settlement Agreement to Class Members and holding a Fairness Hearing on the proposed Settlement Agreement, (*iii*) approved retention of the Administrator, (*iv*) found that the proposed forms and methods of notice met the requirements of the Federal Rules of Civil Procedure, the United States Constitution, the Rules of the Court, the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §§ 78u-4, *et seq.* ("PSLRA") and any other applicable law and (*iv*) established procedures for Class Members to object to the Settlement Agreement or exclude themselves from it.  [Preliminary Approval Order ¶¶ 2-11.]

**H.    Notice to the Class**

38.    Consistent with the Preliminary Approval Order, the parties retained RCB Fund Services LLC as the Administrator, who arranged for the mailing of individual notice to Class Members.  [Declaration of Paul Joslyn Regarding the Administration of the Royal Dutch/Shell Transport Settlement and Mailing of Royal Dutch/Shell Transport Settlement Notice and Proof of Claim ¶ 24 ("Joslyn Decl.")]

39.    The Notice was sent as part of a claim packet (the "Claim Packet"), which was comprised of four documents:  the "Cover Letter" (which provides a general description of the contents of the Claim Packet and general instructions); the Claim Form (including a release instruction sheet); and the Notice (including as appendices the distribution plan and a verbatim copy of the releases and waivers (with relevant definitions)).  [*Id.* at ¶¶ 14 – 15.]  The notice

provided detailed information about the Action, the settlement benefits available to the Class

Members, their right to object to the Settlement Agreement and to appear at the Fairness

Hearing, and their right to request exclusion from the Settlement Agreement.

40.    The Administrator commenced the mailing process on July 25, 2008.  Over 90%

of the Claim Packets (a total of 891,260) were mailed by July 28, 2008.  [Joslyn Decl. ¶ 25]  The

remaining 91,335 Claim Packets were mailed after that date (*i*) in connection with late requests

that resulted from the failure of certain nominees to respond to previous notices and (*ii*) the

Administrator's receipt of some name and address data after July 28, 2008.  [*Id.*]

41.    As of September 15, 2008, the Administrator had mailed a total of 982,595 Claim

Packets.  [*Id.* ¶ 24]

42.    The Administrator arranged for publication of the Summary Notice.  [*Id.* ¶ 2]  The

Summary Notice was published twice in each of *The Wall Street Journal*, the *Houston*

*Chronicle*, the *Times of Trenton*, *The New York Times*, the *Financial Times*, and *USA Today*.

[Declaration of Tamara Ollivier ¶ 5 ("Ollivier Decl.")]  The Summary Notice was also published

once in the newspaper with the highest circulation in each of the fifty states and in the District of

Columbia, in United States territories and possessions, and in the foreign countries in which

substantial numbers of Class Members reside.  [*Id.*]

43.    The Administrator also established a toll-free telephone call center to receive and

respond to Class Member inquiries regarding the Action and the proposed settlement.  The call

center is staffed by trained customer service representatives who fluently speak English, French,

Italian, Spanish, Portuguese, Dutch and German.  [Joslyn Decl. ¶ 9]  Toll-free numbers were

established for eleven countries:  the U.S., Belgium, Canada, France, Germany, Italy, the

Netherlands, Portugal, Spain, Switzerland and the United Kingdom.  [*Id.*]  As of September 15, 2008, the call center had received a total of 9,543 calls.

44.    The Administrator designed and implemented a website dedicated to this settlement at www.ShellClassActionSettlement.com, which became fully operational on July 24, 2008.  [*Id.* ¶ 4]  The website provides general information about the settlement, including eligibility requirements for participation in the settlement, and provides general information regarding the SEC Fair Funds settlement and the Non-U.S. Settlement (including links to the websites concerning each of those two settlements).  [*Id.* ¶ 5]

45.    The Administrator's website also contains links to all the documents provided in hard copy in the Claim Packet, as well as contact information providing the toll-free telephone numbers.  [*Id.* ¶ 6]

46.    The contents of the Claim Packet were also published on Lead Counsel's and Shell's Website.

47.    The Administrator established an email account to field inquiries from potential Class Members.  [*Id.* ¶ 12]  As of September 16, 2008, the Administrator had received and responded to nearly 1,500 email inquiries, and over 40 written inquiries from potential Class Members.  [*Id.* ¶ 13]

### I.    The Fairness Hearing

48.    The parties filed submissions in support of the settlement on September 19 and 22, 2008.  These submissions were accompanied by declarations or affidavits from the following fact witnesses: Stanley Bernstein (Lead Counsel for Plaintiffs); Gerald Gornish (Chief Counsel of PSERS); Brian McDonough (Deputy Chief Counsel of SERS); Paul Joslyn (President of RCB Fund Services LLC); Tamara Ollivier (Director of Legal Communications at GCG

Communications); Sherrie R. Savett (counsel to Thomas Bennet); and Daniel E. Sommers (counsel for plaintiffs Sandra J. Lewis, Melissa Lovell and KBC Asset Management N.V.).

49.    As noted above (and discussed in more detail below), three objections to the Settlement Agreement were filed.  Both Lead Plaintiffs (in a separate memorandum) and Shell (as part of its brief in support of the settlement) responded to the objections.

50.    The Court held a hearing regarding the fairness, reasonableness and adequacy of the Settlement Agreement on September 26, 2008.

51.    Lead Counsel and Shell's counsel both appeared and made presentations in support of the settlement at the Fairness Hearing.  Representatives of Lead Plaintiffs, of Shell and counsel for the external auditor defendants were also present at the Fairness Hearing, and each voiced support for the settlement.  None of the objectors appeared.

## II.    THE TERMS OF THE SETTLEMENT

### A.    The Settlement Fund

52.    The Settlement Agreement requires Shell to pay or cause to be paid the following settlement relief:  $79,900,000 and $6,658,000 (plus interest on both amounts based upon the agreed-upon Interest Rate beginning as of April 1, 2008 and ending as of the date the money is deposited into an escrow account), which amounts will be distributed to Class Members pursuant to a distribution plan prepared by Lead Counsel (and approved by this Court).

53.    The Settlement Agreement also requires Shell to pay or cause to be paid an additional amount of $2,950,000, which amount will be divided equally among all Class Members who submit a valid claim for settlement relief.

54.    The $79,900,000 amount to be provided to Class Members is proportionate to the $340,100,000 that will be paid to Home Exchange Purchasers if the Non-U.S. Settlement

Agreement is approved. Because the additional amount of $6,658,000 that Shell has agreed to provide to Class Members will result in Shell providing Class Members proportionally more than it agreed to pay Home Exchange Purchasers pursuant to the Non-U.S. Settlement Agreement, the Settlement Agreement also requires that Shell provide an additional amount to Home Exchange Purchasers pursuant to the Non-U.S. Settlement True-Up Provision of the Non-U.S. Settlement Agreement.[2] The Settlement Agreement also requires that Shell provide interest on the $340,100,000 and the $28,342,000 amounts to be paid under the terms of the Non-U.S. Settlement Agreement starting on April 1, 2008 and ending as of the date those amounts are paid under the terms of that agreement.

55.    The Settlement Agreement provides for additional relief to Class Members in the event certain events occur.

56.    First, Shell will be required to pay or cause to be paid up to $50,000,000 if, within three years following May 13, 2008, it settles opt-out litigation with one or more opt-outs by paying the opt-out more than what he, she or it would have received under the Settlement Agreement.

57.    Second, upside protection if, within three years following May 13, 2008, Shell agrees to pay additional settlement relief to Home Exchange Purchasers under the Non-U.S. Settlement Agreement. With respect to this relief, the Court finds that, under these circumstances, this additional payment to Class Members is necessary to correct a

---

2.    The amount calculated pursuant to the Non-U.S. Settlement True-Up provision – $28,342,000 – maintains the proportionality of the relief provided to Class Members and Home Exchange Purchasers by providing relief to Home Exchange Purchasers with respect to the $6,658,000 payment to Class Members in the same ratio as the $340,100,000 payment under the Non-U.S. Settlement Agreement is to the $79,900,000 payment under the Settlement Agreement.

disproportionate receipt of settlement relief by Home Exchange Purchasers under the Non-U.S.
Settlement Agreement.

58.    Third, up to $10,500,000 if, based on claims submitted by Class Members, it is
determined that Class Members who were residents or citizens of the United States, or were
incorporated in or created under the laws of the United States (or its states, territories or
possessions) purchased more than 3% of their relevant Shell securities outside of the United
States.  With respect to this relief, the Court finds that, under these circumstances, this additional
payment to Class Members is necessary to correct a disproportionate receipt of settlement relief
by Home Exchange Purchasers under the Non-U.S. Settlement Agreement.

**B.    Payment of Administrative Costs**

59.    The Settlement Agreement also requires Shell to pay or cause to be paid all the
administrative costs associated with implementing the Settlement Agreement.  These
administrative costs are in addition to the payment of the settlement relief described above.  The
administrative costs include, among other things, the cost of printing and mailing the almost one
million individual notices, publishing the Summary Notice in the publications identified above,
staffing the call center, and creating and maintaining the Administrator's website.  To date, over
$7,780,000 in administrative costs have been incurred.  [Joslyn Decl. ¶¶ 9, 11, 23, 28.]

60.    Additionally, Shell will incur significant costs in connection with the continued
implementation of the Settlement Agreement – including costs associated with distributing
settlement relief to Class Members.

C.    **Attorneys' Fees and Expenses**

61.    The Settlement Agreement provides that Shell will pay or cause to be paid Lead Plaintiffs' attorneys' fees (up to $30,000,000) and expenses (up to $3,000,000) over and above the settlement relief that it will provide to Class Members.

D.    **Payment to Lead Plaintiffs**

62.    The Settlement Agreement provides that Shell will compensate Lead Plaintiffs (up to a total of $150,000) for their reasonable costs and expenses directly relating to their representation of the Class pursuant to 15 U.S.C. § 78u-4(a)(4).  If the payment of the Class Representatives' Expense Award is determined by a court of competent jurisdiction to require an additional payment under the Non-U.S. Settlement True-Up Provision, then Shell will not be obligated to pay the Class Representatives' Expense Award and any payment of such Award that has been made will be promptly reimbursed to Shell.  In such circumstances, Lead Counsel may seek (on behalf of Lead Plaintiffs) an expense award from the Court to be paid from the settlement fund.

E.    **Releases and Waivers**

63.    The Court's Order Approving Settlement incorporates the Releases and Waivers found in Section X.A of the Settlement Agreement.  These provisions provide that all Class Members (including any who are parties to any other litigation, arbitration or other proceeding pending on the Approval Date to the extent such proceedings are based upon a Released Claim and are brought against one or more Releasees), on behalf of themselves and their heirs, executors, administrators, beneficiaries, predecessors, successors, parents, subsidiaries, partners, principals, affiliates (as defined in 17 C.F.R. Part 210.1-02.b), attorneys, successors in interest or assigns, any person claiming by or through any of the Class Members and any person or entity

17

representing one or more Class Members, are permanently enjoined from filing, commencing,

prosecuting, intervening in, participating in (as class members or otherwise), or receiving any

benefits or other relief from, any other lawsuit, arbitration or other proceeding against any or all

Releasees or order in any jurisdiction entered against any or all Releasees that is based upon,

arises out of or relates to any Released Claim that has already been, could have been, or could be

asserted in the Action or in any other pending litigation, arbitration or other proceeding.

Notwithstanding anything in the Settlement Agreement, the Release or the Claim Form, the

Release does not bar Class Members from receiving relief with respect to their Home Exchange

Shares pursuant to the terms of the Non-U.S. Settlement Agreement.

       64.    The Order Approving Settlement and the Judgment further provides that all Class

Members release any Claims, damages and liability as to Lead Counsel, Lead Plaintiffs, Shell,

Shell's counsel, the Administrator, the Escrow Agent and every one of the Releasees that relate

in any way to any or all acts, omissions, nondisclosures, facts, matters, transactions, occurrences,

or oral or written statements or representations in connection with or directly or indirectly

relating to the prosecution, defense or settlement of the Action, except to the extent the claims

relate to the Administrator's and/or the Escrow Agent's gross negligence or willful misconduct,

or the Escrow Agent's breach of the Escrow Agreement.

       65.    Nothing in the Release bars any action or claim by Lead Plaintiffs or Shell to

enforce the terms of the Settlement Agreement, the Order Approving the Settlement or the

Judgment.

       66.    As noted above, the full text of the release (including the definition of

"Releasees") was included as an appendix to the Notice mailed to Class Members.

### III.    JURISDICTION

67.    This Court has subject matter jurisdiction to rule on the proposed settlement. Pursuant to 28 U.S.C. § 1331, the Court has federal question jurisdiction over this action.

68.    The Court also has personal jurisdiction over the named plaintiffs and Class Members. *See, e.g.*, *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985); *Krell v. Prudential Ins. Co. of Am. (In re Prudential Ins. Co. Am. Sales Practices Lit. Agent Actions)*, 148 F.3d 283, 306 (3d Cir. 1998), *cert. denied*, 525 U.S. 1114 (1999).  This Court can exercise personal jurisdiction over all absentee Class Members because Class Members received proper notice of the class action.

### IV.    THE CLASS NOTICE SATISFIES ALL APPLICABLE REQUIREMENTS

69.    When certification is sought under Rule 23(b)(3), class notice must meet the requirements of both Federal Rules of Civil Procedure 23(c)(2) and 23(e).  *Bradburn Parent Teacher Store, Inc. v. 3M*, 513 F. Supp. 2d 322, 328 (E.D. Pa. 2007); *Prudential,* 148 F.3d at 329.  Under Rule 23(c)(2), notice to the class must be "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." *Amchem Prods. v. Windsor,* 521 U.S. 591, 617 (1997).

> "The notice must clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3)."

Fed. R. Civ. P. 23(c)(2)(B)(i)-(vii).  Under Rule 23(e)(1), the Court must "direct notice in a reasonable manner to all class members who would be bound by the proposal."

70.    In its Preliminary Approval Order, the Court approved the forms of notice to be provided to Class Members and instructed the parties to provide notice consistent with the directives set out in the Preliminary Approval Order. [Preliminary Approval Order ¶¶ 6-7] More specifically, the Court found that the notice to be provided to Class Members pursuant to the Preliminary Approval Order was the "best practicable notice and . . . is reasonably calculated, under the circumstances, to apprise Class Members of the pendency of this Action and their claims in the Action, their ability to have access to discovery material produced to the Class Representatives by defendants, their rights to object to the proposed settlement and to appear at the Fairness Hearing, and their right to exclude themselves from the Class." [*Id.* ¶ 7]

71.    The Court also found that the Notice and Summary Notice were written simply and in a manner in which they could be readily understood by Class Members, and that the notice methodology was reasonable, "constituted due, adequate and sufficient notice to all persons entitled to notice," and met the requirements of Rule 23, due process, the PSLRA, the Rules of the Court, and any other applicable law. [*Id.*]

72.    As set out above, notice was provided to Class Members consistent with the Court's directives in the Preliminary Approval Order. The provision of notice in this case – by first class mail to Class Members at their last known addresses, supplemented by publication on the Lead Plaintiffs' and Shell's websites, as well as that of the Administrator, and broad publication of the Summary Notice in national, regional and non-United States newspapers – more than satisfies due process and the requirements of Rule 23. *See, e.g., Zimmer Paper Prods., Inc. v. Berger & Montague, P.C.*, 758 F.2d 86, 90 (3d Cir. 1985).

73.    The Court confirms its findings made in the Preliminary Approval Order. The notice complied with the Rule 23(c)(2) requirements for opt-out classes. It was written in plain

English and included (*i*) the caption of the litigation, (*ii*) a description of the Class, (*iii*) identification of Lead Counsel, (*iv*) notification of the option to enter an appearance personally or through other counsel, (*v*) a description of the Settlement Agreement (including how it relates to other settlements that have been executed in connection with Shell's recategorization of certain of its oil and gas reserves), (*vi*) the procedure for filing objections, (*vii*) the date for the hearing at which the Court would consider whether finally to approve the settlement as fair, reasonable and adequate, (*viii*) the procedure for filing requests for exclusion, (*ix*) the consequences of filing an exclusion, (*x*) the consequences of *not* filing an exclusion (including a complete copy of the Release contained in the Settlement Agreement), (*xi*) the consequences of the Court's approval or disapproval of the Settlement Agreement, (*xii*) a description of Shell's responsibility for payment of attorneys' fees and other costs associated with providing notice and administering the Settlement Agreement, and (*xiii*) a description of Shell's responsibility for payment of Lead Plaintiffs' costs and expenses directly relating to the representation of the Class.

74.     The Summary Notice that was widely published in newspapers throughout the United States and in other countries with the highest concentration of Shell shareholders also contained all the information required by Rule 23 and due process. It also provided a toll-free number, both in the U.S. and in eleven other countries, for potential Class Members to call for further information, and directed them to a website where they could find the full notice and all relevant court documents.

75.     Separately and together, these notices provided sufficient information for Class Members to understand the proposed Settlement Agreement and their options. *See In re Cendant Corp. Sec. Litig.,* 109 F. Supp. 2d 235, 254 (D.N.J. 2000) (finding due process satisfied where

the notice informs class members of (1) the nature of litigation; (2) general terms of the settlement; (3) where to locate complete information; and (4) the place and time of the hearing where objections may be heard).

76.     The Court thus affirms that the notice in this case and the notice methodology are the best practicable notice and meet the requirements of the Federal Rules of Civil Procedure (including Fed. R. Civ. P. 23), the United States Constitution (including the Due Process Clause), the PSLRA, the Rules of this Court and any other applicable law.

## V.     CLASS CERTIFICATION

77.     In its Preliminary Approval Order, the Court preliminarily certified a class for settlement purposes.  [Preliminary Approval Order ¶ 2].  Class Counsel argue that final certification of a settlement class in this Action is both appropriate and warranted.   The Court makes the following findings in support of its decision to grant final certification of the Class, which findings are intended to supplement and affirm the findings in its Preliminary Approval Order.

78.     In order to certify this settlement class, the Court must find that the proposed class meets the four threshold requirements of Federal Rule of Civil Procedure 23(a) – numerosity, commonality, typicality and adequacy of representation – and in addition is maintainable under Rule 23(b).  The Rule 23(b)(3) requirements are that common questions "predominate over any questions affecting only individual members" and that class resolution be "superior to other available methods for the fair and efficient adjudication of the controversy."

79.     In *Amchem Products, Inc.*, the Supreme Court expressly acknowledged that a class may be certified for settlement purposes only.  *Amchem*, 521 U.S. at 618-19, 621-22 ("dominant concern" is "whether a proposed class has sufficient unity so that absent members

can fairly be bound by decisions of the class representatives"; "settlement is relevant to class certification," and is "a factor in the calculus").

### A.    Numerosity

80.    In *Eisenberg v. Gagnon*, 766 F.2d 770, 785-86 (3d Cir. 1985), *cert. denied*, 474 U.S. 946 (1985), the Third Circuit found the numerosity requirement satisfied where the proposed class consisted of "more than 90 geographically dispersed plaintiffs."  Given that as of December 31, 2002, Shell had the equivalent of over 500 million shares available to trade on U.S. exchanges, it is likely there were hundreds of thousands, if not millions, of putative Class Members who purchased Shell securities during the Class Period.  It is thus clear that the numerosity requirement is satisfied in this case.

### B.    Commonality

81.    Rule 23(a)(2) requires that questions of law or fact exist that are common to the class.  Rule 23 does not require that all members of the class be identically situated, as long as there are substantial common questions of either law or fact.  *See Prudential*, 148 F.3d at 310. Indeed, "[t]he commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class."  *Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994).  Because this requirement may be satisfied by the presence of a single common issue, it is "easily satisfied."  *Prudential*, 148 F.3d at 310.

82.    Here, numerous common questions exist with respect to each member of the Class, and include, *inter alia*, the following:

- whether Shell violated Sections 10(b) and 20(a) of the Exchange Act;

- whether Shell engaged in a scheme or acted recklessly to overstate its proved oil and gas reserves;

- whether Shell engaged in a scheme or acted recklessly to conceal any fraud;

- whether Shell materially misrepresented its financial condition during the Class Period;

- whether Shell materially misrepresented the supplemental information it reported to the SEC during the Class Period;

- whether Shell knowingly or recklessly made misrepresentations and omissions as alleged in the Complaint; and

- whether Class Members have sustained damages and, if so, the appropriate measure thereof.

83.    Securities fraud actions addressing these types of common questions have repeatedly been held to be prime candidates for class certification. *Blackie v. Barrack*, 524 F.2d 891, 902-05 (9th Cir. 1975). *See, e.g., In re Honeywell Int'l Inc. Sec. Litig.*, 211 F.R.D. 255 (D.N.J. 2002); *Deutschman v. Beneficial Corp.*, 132 F.R.D. 359, 372 (D. Del. 1990) ("[q]uestions of misrepresentations, materiality, and scienter are the paradigmatic common question[s] of law or fact in a securities fraud class action") (internal quotations omitted).

84.    Because the claims of all Class Members arise from the same nucleus of operative facts and pursuant to the same legal theories, this Court finds that commonality is satisfied.

## C. Typicality

85.    The typicality requirement is satisfied as long as lead plaintiffs and the class "point to the same broad course of fraudulent conduct to support a claim for relief." *Zinberg v. Washington Bancorp, Inc.*, 138 F.R.D. 397, 407 (D.N.J. 1990) (internal quotations omitted). Specifically, courts within the Third Circuit have held that "[i]f the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is established. . . ." *Newton v. Merrill Lynch*, 259 F.3d 154, 183-84 (3d Cir. 2001); *see also Baby Neal*, 43 F.3d at 58 ("cases challenging the same unlawful conduct which affects both the named

Case 3:04-cv-00374-JAP-JJH   Document 540   Filed 10/27/2008   Page 25 of 61

plaintiffs and the putative class usually satisfy the typicality requirement"). The typicality

requirement "does not mandate that all putative class members share identical claims." *Newton*,

259 F.3d at 184; *see also Hassine v. Jeffes*, 846 F.2d 169, 176-77 (3d Cir. 1988). Rather, "even

relatively pronounced factual differences will generally not preclude a finding of typicality

where there is a strong similarity of legal theories." *Baby Neal*, 43 F.3d at 58.

86.     In this case, Lead Plaintiffs stand in the same position as other Class Members.

All claims arise from the same nucleus of alleged operative facts and under identical legal

theories. SERS and PSERS, the proposed class representatives, allege they purchased their

shares from Shell at an artificially inflated price and suffered damages when the truth was

disclosed. The unlawful acts defendants are alleged to have committed affected the entire Class

in the same way, and the legal claims that flow from those allegations are the same for Lead

Plaintiffs as they are for all other Class Members.

87.     Thus, this Court finds that the typicality requirement is satisfied.

**D.      Adequacy of Representation**

88.     The final requirement of Rule 23(a) is that "the representative parties will fairly

and adequately protect the interests of the class."[3] Fed. R. Civ. P. 23(a)(4). The Third Circuit

has held that "adequate representation depends on two factors: (a) the plaintiffs' attorney must

be qualified, experienced, and generally able to conduct the proposed litigation; and (b) the

plaintiffs must not have interests antagonistic to those of the class." *Hoxworth v. Blinder*,

---

3.      As a result of the 2003 amendments to the Federal Rules of Civil Procedure, the issue of
        appropriate class counsel is guided by Rule 23(g), rather than 23(a)(4). *See* 2003
        Advisory Comm. Notes to Rule 23 ("Rule 23(a)(4) will continue to call for scrutiny of
        the proposed class representative, while [Rule 23(g)] will guide the court in assessing
        proposed class counsel as part of the certification decision."). For the sake of
        convenience, however, the adequacy of counsel is discussed here.

*Robinson & Co.*, 980 F.2d 912, 923 (3d Cir. 1992) (internal quotes and citations omitted); *accord Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 247 (3d Cir. 1975); *Campbell v. A-P-A Transp. Corp. (In re A-P-A Transp. Corp. Consol. Litig.)*, No. 02-3480, 2005 U. S. Dist. LEXIS 28122, at *5 (D.N.J. Nov. 15, 2005).

89.    As to the first factor, Lead Plaintiffs have retained attorneys who are qualified, experienced, and able to conduct this litigation.  Lead Counsel is an experienced securities law firm and was recently selected by at least two legal magazines as among the top in the country. Moreover, Lead Counsel has significant skill in litigating complex class actions such as this action and are "ready, willing and able to devote the resources necessary to litigate this case vigorously." *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 515 (S.D.N.Y. 1996).  As discussed during the Fairness Hearing [Tr. at 52:2-8], this Court has no hestitancy in complimenting Lead Counsel for the extraordinary legal work it performed in this matter.

90.    As to the second factor, Lead Plaintiffs have no interests that are antagonistic to those of the absent Class Members.  Because the proposed Class Representatives are institutional investors that purchased a substantial number of Shell shares in both the United States and abroad, PSERS and SERS, together with Lead Counsel, have prosecuted this Action as fiduciaries acting in the best interests of all members of the Class.  Lead Plaintiffs' (and Lead Counsel's) efforts have been vigorous in the exercise of their fiduciary duties, in compliance with their obligation to "fairly and adequately protect the interests of the class."  The central issues in this case are common to the claims of the Lead Plaintiffs and the absent Class Members.  In advancing these common issues, Lead Plaintiffs further the absent Class Members' claims no less than their own. *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 251 (D. Del. 2002).  The adequacy requirement is therefore satisfied here.

### E.    Predominance of Common Questions

91.    Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623.

> There are no bright lines for determining whether common questions predominate. Instead, considering the facts of the case presented, a claim will meet the predominance requirement when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class member's individual position. Common questions need only predominate: they need not be dispositive of the litigation."

*Zuccarini v. Hoechst (In re Cardizem CD Antitrust Litig.)*, 200 F.R.D. 326, 339 (E.D. Mich. 2001) (internal quotation marks and citations omitted). "The predominance requirement is satisfied unless it is clear that individual issues will overwhelm the common questions and render the class action valueless." *Id.* (internal quotation marks and citation omitted). The test is "'readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws.'" *Jones v. Allercare, Inc.*, 203 F.R.D. 290, 303 (N.D. Ohio 2001) (*quoting Amchem*, 521 U.S. at 625).

92.    As noted above, numerous important questions of law and fact are common to the members of the Class. These questions predominate over any conceivable individual question, because defendants' alleged misconduct affected the members of the Class in the same manner. The alleged misrepresentations and omissions by Shell involve a series of statements that were uniformly disseminated to the investing public. The Supreme Court has stated that "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." *Amchem*, 521 U.S. at 625; *see also In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 178 (E.D. Pa. 2000) (although individual claims will differ

depending on when and what type of stock was acquired, these issues "cast no doubt on the finding of predominance"). Indeed, there are no liability issues that are not common to all members of the Class. The Class thus readily satisfies the predominance requirement.

      **F.**     **A Class Action is Superior to Other Available Methods for the Fair and Efficient Adjudication of this Controversy**

93.     Finally, Rule 23(b)(3) requires the Court to find "that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). As stated in the Manual for Complex Litigation (Fourth) § 21.142 (2004), to analyze whether a class action is superior, "the judge must determine whether there are individual issues of fact and how they relate to the common issues and then examine how the class action process compares to available alternatives."

94.     "Even if a significant percentage of [class members] did bring suit, pursuing each claim in a separate action requiring weeks or months of trial time, the burden to the courts would be enormous, the needless duplication of effort would be extremely expensive for all parties, and the possibility of conflicting outcomes is readily apparent." *In re Corrugated Container Antitrust Litig.*, 80 F.R.D. 244, 252 (S.D. Tex. 1978). "Obviously, individual actions designed to prove identical elements would completely destroy any notions of judicial economy." *In re Catfish Antitrust Litig.*, 826 F. Supp. 1019, 1034 (N.D. Miss. 1993).

95.     In contrast to the inefficiency of duplicative individual lawsuits, "[t]he efficacy of resolving all plaintiffs' claims in a single proceeding is beyond discussion." *Sollenbarger v. Mountain States Tel. & Tel. Co.*, 121 F.R.D. 417, 436 (D.N.M. 1988). The class action mechanism will "conserve judicial resources and will eliminate the risk of inconsistent

adjudications on the issues common to the class." *Davis v. S. Bell Tel. & Tel. Co.*, No. 89-2839, 1993 U. S. Dist. LEXIS 20033, at *28 (S.D. Fla. Dec. 23, 1993).

96.     Judicial economy as well as fairness to Shell makes the litigation and resolution of such claims in one action far more desirable than numerous separate actions litigating the same issues.

97.     Because Lead Plaintiffs have satisfied all of the requirements under Fed. R. Civ. P. 23(a) and the requirements of Fed. R. Civ. P. 23(b)(3), this Court certifies for settlement purposes the Class described in the Order Approving Settlement.

## VI.     FAIRNESS OF THE SETTLEMENT AGREEMENT

### A.     The Settlement Agreement Enjoys a Presumption of Fairness

98.     In the Third Circuit, a court affords a presumption of fairness to a settlement, if: "(1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." *Texas v. Organon USA, Inc. (In re Remeron End-Payor Antitrust Litig.)*, No. 02-2007, 2005 U.S. Dist. LEXIS 27011, at *44 (D.N.J. Sept. 13, 2005).

99.     Here, the settlement negotiations occurred at arm's length over a period of many months, with the assistance of a retired United States District Judge acting as mediator.  The Settlement Agreement was reached after extensive formal and confirmatory discovery.  Both Lead Counsel and Shell's counsel are experienced in class actions such as the one at bar.  The Court made clear its opinion at the Fairness Hearing [Tr. at 52:6-8; 61:2-4] that the legal work of Lead Counsel and Shell's counsel was of the highest professional order, and that the lawyers in this case have conducted themselves in the highest professional manner.  Moreover, as discussed below, the Class' reaction to the Settlement Agreement has been overwhelmingly positive, and

only a very small fraction of the Class has requested exclusion from, or objected to, the

settlement. The Settlement Agreement thus enjoys a presumption of fairness.

     **B.**     **The Settlement is Fair, Adequate and Reasonable**

     100.     The Third Circuit has articulated nine factors to evaluate a settlement's fairness,

adequacy, and reasonableness:

> (1) the complexity, expense and likely duration of the litigation;
> (2) the reaction of the class to the settlement; (3) the stage of the
> proceedings and the amount of discovery completed; (4) the risks
> of establishing liability; (5) the risks of establishing damages; (6)
> the risks of maintaining the class action through the trial; (7) the
> ability of the defendants to withstand a greater judgment; (8) the
> range of reasonableness of the settlement fund in light of the best
> possible recovery; and (9) the range of reasonableness of the
> settlement fund to a possible recovery in light of all the attendant
> risks of litigation.

*Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975) (quoting *City of Detroit v. Grinnell Corp.*, 495

F.2d 448, 463 (2d Cir. 1974)). The Settlement Agreement satisfies each of these factors.

     101.     **Complexity, Expense and Likely Duration of the Litigation** – The first *Girsh*

factor "aims to capture the monetary costs and time involved in pursuing the litigation to trial

and beyond." *Perry v. FleetBoston Fin. Corp.*, 229 F.R.D. 105 (E.D. Pa. 2005); *Varacallo v.*

*Mass. Mut. Life. Ins. Co.,* 226 F.R.D. 207, 236 (D.N.J. 2005). Settlement is favored under this

factor if litigation is expected to be complex, expensive and time consuming. *Id.* at 236.

Federal securities class actions by definition involve complicated issues of law and fact. *See In*

*re Lucent Techs., Inc. Sec. Litig.*, 307 F. Supp. 2d 633, 642 (D.N.J. 2004).

     102.     This litigation has been particularly complex, expensive and time consuming –

and would have continued to be so if it had proceeded to trial. The Complaint, which is more

than 200 pages long, alleges fraudulent conduct by Shell and its external auditors relating to the

application of a complex federal regulation governing the estimating and reporting of proved

reserves. Trial of the Action would require evidence on numerous issues, including scienter,

estimation of reserves, calculation of loss and causation, and extensive expert witness testimony

on both merits and damages. The conduct in question occurred in several countries, and

expensive and logistically difficult discovery has occurred in three different countries. Litigation

has already lasted over four years and has resulted in significant costs and expenses to all parties.

Over 1,500,000 pages of documents and 474,000 electronic documents have been produced by

Shell to Lead Plaintiffs, and Lead Counsel has conducted over 70 factual depositions. A litigated

resolution of the claims in this Action would impose a great expense on all parties, including this

Court, without any guarantee of a greater recovery for the Class.

103.    There is no question that this factor weighs in favor of approval of the Settlement

Agreement.

104.    **The Reaction of the Class to the Settlement** – The second *Girsh* factor

examines the support of Class Members for the Settlement Agreement. *Prudential*, 148 F.3d at

318. The Court will gauge the reaction of the Class by considering the number of Class

Members requesting exclusion, and the number of objectors and the vigor with which they

object. *Id.* A small percentage of objecting class members weighs heavily in favor of the

settlement. *See, e.g., In re Cendant Corp. Litig.*, 264 F.3d 201, 235 (3d Cir. 2001) ("[t]he vast

disparity between the number of potential class members who received notice of the Settlement

and the number of objectors creates a strong presumption that this factor weighs in favor of the

Settlement . . ."); *Stoetzner v. United States Steel Corp.*, 897 F.2d 115, 118-19 (3d Cir. 1990)

(holding that objections of only 29 members of a 281 member class weighed in favor of the

settlement); *In re Lucent*, 307 F. Supp. 2d at 644 ("[t]he absence of objections from the

overwhelming majority in response to the Notice to Class Members should be considered in approving the Settlement."); *Lenahan v. Sears, Roebuck &Co.*, No. 02-0045, 2006 U.S. Dist. LEXIS 60307, at *38 (D.N.J. July 10, 2006) (approving a settlement where 1.2% of the class opted out), *aff'd*, 2008 U. S. App. LEXIS 3798 (3d Cir. 2008).

105.    Though almost one million notices were mailed and notice was published in newspapers with the highest circulation in each of the fifty states and foreign countries in which substantial numbers of Class Members reside, an extremely low number of objections and requests for exclusion were made.

106.    Only three objections – which, based on the numbers of Notices that were mailed, represents well under 0.01% of those receiving Notice – have been submitted regarding the Settlement. *See* Bernstein Decl. ¶ 10. Moreover, as discussed below, one objector is not a member of the Class, one expresses no specific objection to the particular terms of the settlement, and one asserts a meritless objection to the fee, without challenging the settlement itself.

107.    Only 55 potential Class Members – again representing well under 0.01% of those to whom Notices were mailed – have requested exclusion, and over half of the requests submitted appear not to be from Class Members. None of the requests for exclusion was submitted by an institutional shareholder even though institutional shareholders comprise the overwhelming majority of Shell's shareholders.

108.    The exceedingly low numbers of objections and requests for exclusion show strong Class support for the Settlement. Thus, the second *Girsh* factor weighs heavily in favor of approval of the Settlement Agreement.

109.    **The Stage of the Proceedings and the Amount of Discovery Completed** – The third *Girsh* factor focuses on whether the parties have obtained sufficient information to assess the strengths and weaknesses of their respective positions, and requires the Court to consider the extent of the discovery completed by the parties. *In re Linerboard Antitrust Litig.*, 321 F. Supp. 2d 619, 630 (E.D. Pa. 2004); *In re Cendant Corp.*, 232 F. Supp. 2d 327, 334 (D.N.J. 2002). Under this factor, the Court considers "the degree of case development that Class Counsel have accomplished prior to the Settlement, including the type and amount of discovery already undertaken." *Desantis v. Snap-On Tools Co., LLC*, No. 06-CV-2231, 2006 U.S. Dist. LEXIS 78362, at *19 (D.N.J. Oct. 27, 2006) (internal citations omitted); *see also Simon v. KPMG*, No. 05-CV-3189, 2006 U.S. Dist. LEXIS 35943, at *30 (D.N.J. June 2, 2006) (approving a settlement where plaintiffs filed a 100-page complaint that showed extensive factual research, plaintiffs' review of over 200,000 documents, and lengthy settlement discussions).

110.    This case settled near the end of fact discovery.  Not only did Lead Plaintiffs conduct an investigation before filing their initial complaints, but, over the course of this litigation, Lead Counsel reviewed over two million pages of documents, conducted many interviews, took over 70 depositions (including the deposition of a number of experts), and exchanged expert reports with the defendants.  Lead Plaintiffs and Shell also litigated pre-trial motions and engaged in extensive settlement negotiations.

111.    The extensive discovery and case development conducted by Lead Plaintiffs have enabled them to fully appreciate the merits of the case before and during negotiation of the Settlement Agreement.  This factor thus weighs in favor of approval.

112.    **The Risks of Establishing Liability** – The fourth *Girsh* factor evaluates the risks that plaintiffs would face in establishing liability if they had to try their claims on the merits.

*Girsh*, 521 F.2d at 157. In considering this factor, courts are required to examine the potential costs and benefits of continued litigation of the case, *see In re Safety Components Int'l, Inc.*, 166 F. Supp. 2d 72, 89 (D.N.J. 2001), and to weigh the likelihood of a successful outcome of trial against the benefits of settlement, *id. (citing Prudential*, 148 F.3d at 319). This factor does not require the court to adjudicate the disputed issues or decide unsettled questions, but rather to assess the risks of litigation against the certainty of recovery under the settlement. In balancing the potential gains of a successful trial against the benefits of an immediate settlement, courts should, to some extent, rely upon the class counsel's estimation of the likelihood of success. *See In re Lucent*, 307 F. Supp. 2d at 644-645; *In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109, 124-25 (D.N.J. 2002) ("court should avoid conducting a mini-trial and must, to a certain extent, give credence to the estimation of the probability of success proffered by class counsel") (internal quotations omitted).

113.    "Proving liability and damages in securities fraud cases is almost always a daunting task for Plaintiffs." *Seidman v. Am. Mobile Sys.*, 965 F. Supp. 612, 619 (E.D. Pa. 1997). As an initial matter, plaintiffs have to sufficiently plead, and then prove, all the elements of their claims under Section 10(b) of the Exchange Act.

114.    Lead Counsel believes that liability issues in this Action would be sharply disputed at trial, as defendants would present expert testimony on a number of disputed matters. Scienter would be particularly difficult to prove, as the case lacks any of the usual indicia of scienter (such as insider selling) and Shell would provide expert testimony about industry-wide confusion regarding the categorization of oil and gas reserves. Thus there is a substantial risk that the Action would be unsuccessful.

115.    When the risk that plaintiffs would face in being able to prove the defendants'

liability is balanced against the immediate and certain benefits of a settlement agreement, it

weighs heavily in favor of approval. *See In re Elec. Carbon Prods. Antitrust Litig.*, 447 F. Supp.

2d 389, 401 (D.N.J. 2006) ("[a]ll things considered, the uncertainties of recovery also

demonstrate the wisdom of avoiding the risk of no recovery through a prudent settlement").

Such is the case in this Action.

116.    **The Risks of Establishing Damages** – The fifth *Girsh* factor balances the

potential damages if the case went to trial against the benefits of an immediate settlement.

*Prudential*, 148 F.3d at 319.  Even if Lead Plaintiffs were to succeed on each and every one of

the liability issues, Lead Plaintiff still must prove damages and loss causation.

117.    Lead Plaintiffs' allegations of damages would require complicated analysis and

proving damages would involve sophisticated expert opinions.  Shell and the other defendants

would likely counter any of Lead Plaintiffs' experts with their own expert testimony arguing that

losses were caused by other factors and that damages did not occur.  The resulting "battle of the

experts" would have unpredictable results.  In contrast, the certainty of recovery through the

Settlement Agreement weighs in favor of approval. *See Desantis*, 2006 U.S. Dist. LEXIS 78362

at *21 (holding that approval of settlement was warranted when "this case could easily become a

battle of the experts, lessening Plaintiffs' likelihood of success"); *In re Elec. Carbon*, 447

F. Supp. 2d at 401 (approving settlement when trial would likely involve a battle of the experts

"which can become an esoteric exercise with unpredictable results."); *In re Remeron Direct*

*Purchaser Antitrust Litig.*, No. 03-0085, 2005 U.S. Dist LEXIS 27013, at *22 (D.N.J. Nov. 9,

2005) (approving settlement when parties offered competing expert testimony on damages).

118.    **The Risks of Maintaining the Class Action Through Trial** – Because of the impact that obtaining certification has on the potential range of recovery, the sixth *Girsh* factor measures "the likelihood of obtaining and keeping a class certification if the action were to proceed to trial." *In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 537 (3d Cir. 2004).  As courts have noted, "[w]hat the district court giveth, the district court may taketh away . . . ." *Perry v. FleetBoston Fin. Corp,* 229 F.R.D. at 116 (citations omitted).   Even if Lead Plaintiffs had obtained certification of a class in this Action, they would still face the risk of decertification at a later stage.[4]  This factor therefore also weighs in favor of approval.

119.    **Defendants' Ability to Withstand Greater Judgment** – The seventh *Girsh* factor considers "whether the defendants could withstand a judgment for an amount significantly greater than the settlement." *In re Lenahan,* 2006 U.S. Dist. LEXIS 60307, at *45 (quoting *In Re Cendant Corp. Litig.,* 264 F.3d at 537).   While Shell may have the ability to withstand a greater judgment, this does not prevent the Court from approving the Settlement. *See In re Warfarin,* 391 F.3d at 538 (stating that defendants' ability to pay more "does not mean that [they are] obligated to pay any more than what. . . class members are entitled to."  Indeed this factor may carry little or no weight when considering obstacles the class would face in establishing its case); *Meijer, Inc. v. 3M,* No. 04-5871, 2006 U.S. Dist. LEXIS 56744, at *46 (E.D. Pa. Aug. 14, 2006) ("this determination in itself does not carry much weight in evaluating the fairness of the Settlement"); *In re Lenahan,* 2006 U.S. Dist. LEXIS 60307, at *45-6 (approving settlement even though no evidence on defendant's ability to pay was presented); *In re Remeron,* 2005 U.S. Dist.

---

4.    The Third Circuit has observed that the risk of decertification is present throughout class actions, and thus the inquiry into this factor as it relates to a settlement "would appear to be perfunctory." *Prudential,* 148 F.3d at 321.

LEXIS 27011, at *67 ("[M]any settlements have been approved where a settling defendant has had the ability to pay greater amounts.").

120.    Furthermore, as discussed above, in addition to this Settlement Agreement, Shell has entered into other settlement agreements in connection with the recategorization of certain of its oil and gas reserves pursuant to which it has undertaken additional monetary obligations.[5] The total paid in connection with all of these settlements – as well as the fees and costs of settling this class action that Shell will pay in addition to the settlement relief provided – are taken into account when evaluating this *Girsh* factor.

121.    Thus, even though Shell could withstand greater judgment, considering the additional monetary obligations undertaken as well as the risks to Class Members of continued litigation, this factor does not weigh against approval of Settlement Agreement.

122.    **The Range of Reasonableness in Relation to Potential Recovery** – The eighth and ninth *Girsh* factors, together, "ask whether the settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case went to trial." *Prudential*, 148 F.3d at 322. In evaluating the reasonableness of the settlement amount, the sum that plaintiffs could recover if successful is discounted "for the risks of not prevailing." *Simon*, 2006 U.S. Dist. LEXIS 35943, at *34 (quoting *In re Lucent*, 307 F. Supp. 2d at 647). The determination of "reasonable" settlement is not susceptible to a mathematical equation. Rather, "in any case there is a range of reasonableness," *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972), and "[courts should] guard against demanding too large a settlement based on the court's view of the merits of

---

5.    In addition, Class Members (as well as Home Exchange Purchasers) are eligible to receive additional relief in connection with the distribution of the $120,000,000 Shell paid in connection with the settlement with the SEC.

37

Case 3:04-cv-00374-JAP-JJH    Document 540    Filed 10/27/2008    Page 38 of 61

the litigation." *In re Aetna Inc. Sec. Litig.*, MDL No. 1219, 2001 U.S. Dist. LEXIS 68, at **34-35 (E.D. Pa. Jan. 4, 2001).

123.    In this case, the cash settlement amount alone is sizeable – $89 million, which represents nearly 18.2% of the maximum likely-case recoverable damages according to Lead Plaintiffs' analysis – and the Settlement Agreement provides for definite and prompt benefits, which are more valuable than a speculative future payment. *See, e.g., In re Safety Components*, 166 F. Supp. 2d at 85; *In re Computron Software, Inc. Sec. Litig.*, 6 F. Supp. 2d 313, 317 (D.N.J. 1998) ("even if the Plaintiff Class were to recover a larger judgment at trial, which is not guaranteed, the additional delay caused by a trial, post-trial motions and the appellate process, would delay recovery for years"); *see also In re AT&T Corp. Sec. Litig.*, 455 F.3d 160, 170 (3d Cir. 2006) (district court did not abuse discretion in finding settlement was an "excellent" result in light of the risk of establishing liability and damages despite the fact that settlement possibility represented only 4% of the total damages claimed).

124.    Thus, the relief provided by the Settlement Agreement falls within the range of reasonableness and the eighth and ninth *Girsh* factors weigh in favor of approval.

125.    **The Settlement Resulted from Arm's-Length Negotiations** – In addition to considering the *Girsh* factors, courts must also ensure that settlement did not result from collusion. Courts should give deference to the views of counsel where the Settlement Agreement resulted from contentious arm's-length negotiation. *Perry*, 229 F.R.D. at 115. Counsel in this case possessed the requisite expertise to negotiate a fair settlement and engaged in intensive, protracted and adversarial negotiations under the auspices of a retired United States District Judge. The Court thus finds that the proposed settlement does not present any indication of collusion or coercion.

126.    **Evaluation of the Independent Fiduciary** – In this case, another factor – unique to a settlement involving ERISA plans – also weighs in favor of approval of the settlement.  As noted above, certain Shell ERISA plans that are Class Members engaged an independent fiduciary in reviewing the terms of the settlement.  [Memorandum of Law of Defendants Royal Dutch Petroleum Company and The "Shell" Transport and Trading Company, p.l.c. in Support of Class Action Settlement, Exhibit A at 2.]  This retention complied with a class exemption promulgated by the United States Department of Labor, which requires that such review be undertaken to avoid the possibility that an ERISA plan's participation in a settlement be construed to be a "prohibited transaction" under the ERISA statute, 29 U.S.C. §§ 1106(a)-(b).

127.    After its investigation, the independent fiduciary concluded that the Settlement Agreement is reasonable in light of the ERISA plans' "likelihood of full recovery, the risks and costs of litigation, and the value of claims foregone," and the fiduciary has thus concluded that the plans "should participate in the Settlement without objecting to any of the Settlement's provisions."  [Exhibit A at 2.]

C.    **Findings as to Settlement**

128.    For the foregoing reasons, this Court finds the Settlement Agreement to be fair, reasonable and adequate.

## VII.    FAIRNESS OF THE SETTLEMENT DISTRIBUTION PLAN

129.    "As with settlement agreements, courts consider whether distribution plans are fair, reasonable, and adequate." *In re Lorazepam & Cholarazepate Antitrust Litig. V. Mylan Labs*, 205 F.R.D. 369, 381 (D.D.C. 2002); *see also In re Vitamins Antitrust Litig.*, No. 99-197, 2000 U.S. Dist. LEXIS 8931, at *6 (D.D.C. Mar. 31, 2000) (internal citation omitted).  "[I]n evaluating the formula for apportioning the settlement fund, the Court keeps in mind that district

courts enjoy broad supervisory powers over the administration of class action settlements to allocate the proceeds among the claiming class members equitably." *Hammon v. Barry*, 752 F. Supp. 1087, 1095 (D.D.C. 1990) (internal quotations and citations omitted); *accord In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 179, 181 (2d Cir. 1987).

130.    In determining the fairness, reasonableness and adequacy of a proposed plan of allocation, courts give great weight to the opinion of qualified counsel. *See In re PaineWebber Ltd. P'ships. Litig.*, 171 F.R.D. 104, 133 (S.D.N.Y. 1997); *In re NASDAQ*, MDL No. 1023, 2000 U.S. Dist. LEXIS 304, at *5 ("[a]n allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent Class Counsel").

131.    The proposed Settlement Distribution Plan, which was included as an appendix to the Notice mailed to the members of the Settlement Class and was available on the Administrator's, Lead Counsel's and Shell's websites, was prepared by Lead Counsel, with the assistance of economic experts, in such a way as to fairly allocate the recovery among Class Members in accordance with plaintiffs' theories of potential damages in the Action.

132.    This Settlement Distribution Plan reflects an assessment of the damages that could have been recovered, as well as an assessment of the individual Class Members' damages, based on when they bought and sold their Shell securities, and will result in a fair distribution of the available proceeds among Class Members who submit timely and valid claims. Notably, no Class Member has objected to the fairness of the proposed Settlement Distribution Plan.

133.    For the reasons set out above, this Court finds that the Settlement Distribution Plan is reasonable and adequate. As such, the Court approves the Settlement Distribution Plan as fair, adequate and reasonable.

## VIII.  LEAD COUNSEL'S REQUEST FOR FEES

134.    Unlike most common funds, the fee sought by Lead Counsel was negotiated between Lead Counsel and Shell, with Lead Plaintiffs' participation and approval.  Shell has agreed to pay an attorneys' fee of up to $30 million (as well as expenses up to $3 million) above and beyond, and completely independent of, the common fund established for the Class.  Were the Court to award something less than the $30 million requested, the Class's recovery would be neither increased nor diminished.

135.    Significantly, both SERS and PSERS, Lead Plaintiffs in the Action, have approved the requested fee as consistent with the fee arrangement they negotiated with Lead Counsel at the outset of the case (as discussed in the declarations of Brian McDonough of SERS and Gerald Gornish of PSERS).

136.    In *Cendant*, the Third Circuit recognized that, in enacting the PSLRA, Congress expressed its strong belief that an institutional lead plaintiff would be in a better position than the court to protect the interests of the class by monitoring lead counsel throughout the litigation and by negotiating a reasonable fee for counsel's representation.  *In re Cendant Corp. Litig.*, 264 F.3d at 276 (Congress believed that "institutional investors would likely do a better job than courts at selecting, retaining, and monitoring counsel than courts have traditionally done").  Accordingly, the Court held that a fee negotiated between a properly selected lead plaintiff and its counsel should be accorded a "presumption of reasonableness." *Id.* at 282.

137.    Because SERS and PSERS have approved the requested fee, which is consistent with their fee agreement with Lead Counsel, the presumption of reasonableness applies here.

138.    The Supreme Court has held that the percentage of the recovery approach is an appropriate methodology for awarding plaintiffs' counsel's fees in a common fund case. *See, e.g., Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984) ("under the common fund doctrine . . . a reasonable fee is based on a percentage of the fund bestowed on the class"). In accordance with this approach, the Third Circuit has ruled that the percentage of recovery method, rather than the lodestar/multiplier method, is the preferred approach for determining attorneys' fee awards in common fund cases. *See In re AT&T*, 455 F.3d at 164; *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.* ("*GMC*"), 55 F.3d 768, 821 (3d Cir. 1995); *In re Cendant Corp. Litig.*, 264 F.3d at 256.

139.    There is no general rule as to what percentage of the common fund should be awarded as attorneys' fees. The Third Circuit has observed that fee awards range from 19% to 45% of the settlement fund. *GMC*, 55 F.3d at 822; *see also In re Ikon*, 194 F.R.D. at 194 ("Percentages awarded have varied considerably, but most fees appear to fall in the range of nineteen to forty-five percent."); *In re Computron*, 6 F. Supp. 2d at 322-23 ("There is no set standard, however, on how to determine a reasonable percentage. Awards utilizing the percentage-of-recovery method can range from nineteen percent to forty-five percent of a settlement fund . . . . [T]he percentage awarded, should, and generally does, increase commensurate with increased quality of representation.").

140.    In light of the unusual way the case developed, there are a number of ways to calculate the fee request as a percentage of the total relief that Shell will provide. However one performs the calculations, Lead Counsel's application passes muster.

141.    For example, considering both this settlement and the Non-U.S. Settlement together, the total fee of $57 million sought by plaintiffs' counsel (the $27 million already paid

to Lead Counsel for the Non-U.S. Settlement pursuant to the Court's January 14, 2008 order,

plus the $30 million requested here) represents only 10.6% of the global base cash settlement

amount of $538.23 million (excluding interest and contingent relief, but including counsel fees,

the expense award, and the costs of administration to date). This percentage is far *below* the

range of percentages the Third Circuit has recognized as reasonable.[6] *See, e.g., GMC*, 55 F.3d at

822.

      142.    Even if one takes into account the $43 million that will be paid to the attorneys

involved in the Non-U.S. Settlement,[7] the total fee amount of $100 million ($57 million plus $43

million), as a percentage of the global base cash benefit of $581.23 million (excluding interest

and contingent relief, but including global counsel fees, the expense award, and the costs of

administration to date), is 17.2%, which is still well below the range of acceptable fee

percentages observed by the Third Circuit. *GMC*, 55 F.3d at 822 (19% to 45%).

      143.    Considering the Non-U.S. Settlement in the analysis is appropriate under the

substantial benefit doctrine, *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 393 (1970), which

entitles counsel who confer a benefit on an ascertainable group through litigation efforts to the

payment of attorneys' fees, even if that benefit is realized in a different action. *See, e.g., In re

Linerboard Antitrust Litig.*, 292 F. Supp. 2d 644, 668-69 (E.D. Pa. 2003) (court prospectively

sequestered a percentage of funds from future settlements or judgments in tag-along actions to

compensate class counsel for the substantial benefits the tag-along plaintiffs would obtain from

---

6.     If one includes interest, contingent relief, and/or the future costs of administration in the
       denominator of the equation – all of which provide a substantial benefit to the Class – the
       percentage goes down even further. That is true of the other percentage calculations
       discussed below, as well.

7.     SERS and PSERS have taken no position with respect to the attorneys' fees paid for the
       Non-U.S. Settlement.

class counsel's work); *Joy Mfg. Corp. v. Pullman-Peabody Co.*, 729 F. Supp. 449, 453 (W.D. Pa. 1989) ("where [a] party has by his or her effort and expense through litigation created a benefit for others a fee award is appropriate whether or not the litigation is mooted before judgment and regardless of whether there is a monetary fund created from which fees may be paid"); *In re Infinity Broadcasting Corp. S'holders Litig.*, 802 A.2d 285, 291 (Del. 2002) ("Counsel pursuing litigation in any jurisdiction is entitled to a share of attorneys' fees in a settlement of a Delaware action if their efforts elsewhere conferred a benefit realized as part of the Delaware settlement."); *In re William Lyon Homes Shareholder Litig.*, C.A. No. 2015-N, 2007 WL 270428, at *2 (Del. Ch. Jan. 18, 2007) (counsel who can demonstrate "a causal connection between their efforts and . . . [the] benefits achieved through the settlement of the Delaware Action" are entitled to a fee). *Cf. Zucker v. Westinghouse Elec. Corp.*, 265 F.3d 171, 176 (3d Cir. 2001) (fee may be awarded to plaintiff in derivative litigation if benefit conferred on corporation).

144.   Even if one takes the narrowest view of the result achieved, ignoring the Non-U.S. Settlement completely, the $30 million requested fee represents 23% percent of the base cash value of $130.3 million (excluding interest and contingent relief, but including counsel fees, the expense award, and the costs of administering the settlement to date). That percentage falls well within the range of percentages noted by the Third Circuit. *See, e.g., GMC*, 55 F.3d at 822 (recognizing range of 19% to 45% of the settlement fund); *see also In re AT&T*, 455 F.3d at 172 n.8, 173 (endorsing a fee award of 21.5% and a multiplier of 1.28).

145.   The Third Circuit has also said it is appropriate, in considering a fee request, to perform a lodestar cross check. *See, e.g., In re AT&T*, 455 F.3d at 164 ("we have recommended that district courts use the lodestar method to cross-check the reasonableness of a percentage-of-recovery fee award"); *but see* Third Circuit Task Force on Selection of Class Counsel, 208

F.R.D. 340, 422-23 (Jan. 15, 2002) ("We . . . emphasize that even if the lodestar cross-check is to

be conducted, it is only a 'cross-check' and not a full-blown lodestar inquiry."). When

considering the time plaintiffs' counsel committed to this case at the prevailing rates in the

markets where the services were rendered, the fee request is almost exactly the same as the

lodestar. Plaintiffs' counsel worked 133,815.90 hours on this litigation, for a total lodestar of

$56,891,317.50. Thus, the requested fee, together with the $27 million already awarded,

represents a multiplier of only 1.002. This outcome, with a virtually non-existent multiplier, is

unprecedented in this Court's experience, and in all the cases with which the Court is familiar.

*See, e.g., In re Rite Aid Corp. Sec. Litig.*, 362 F. Supp. 2d 587, 589 (E.D. Pa. 2005) (6.96

multiplier); *In re Aetna*, 2001 U.S. Dist. LEXIS 68, at *49 (3.6 multiplier); *In re Safety*

*Components*, 166 F. Supp. 2d at 81 ("a [lodestar] multiplier of 2.81 appears reasonable"); *In re*

*Ikon*, 194 F.R.D. at 195 (2.7 multiplier); *In re Remeron*, 2005 U.S. Dist. LEXIS 27013, at **47-

48 (approving a 33 1/3% fee while noting that the 1.8 multiplier was "on the low end of the

spectrum" in recent cases).

      146.    In assessing the fee request, the Court must also consider the factors set out in

*Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190 (3d Cir. 2000):

> (1) the size of the fund created and the number of persons
> benefitted; (2) the presence or absence of substantial objections by
> members of the class to the settlement terms and/or fees requested
> by counsel; (3) the skill and efficiency of the attorneys involved;
> (4) the complexity and duration of the litigation; (5) the risk of
> nonpayment; (6) the amount of time devoted to the case by
> plaintiffs' counsel; and (7) the awards in similar cases.

*Id.* at 195 n.1; *see also* Third Circuit Task Force on Selection of Class Counsel, 208 F.R.D. at

423 ("[T]here is a well-developed body of case law that will assist the district court in setting a

reasonable percentage fee after the litigation.") (citing *Gunter*).

147.    In addition to being reasonable under the percentage of the recovery approach, the fee request satisfies the *Gunter* factors:

148.    **The size of the fund created and the number of persons benefited** – This factor supports the fee request. The number of persons benefited by this settlement will in all likelihood exceed several tens of thousands, at least. As of September 16, 2008, 21,654 claims had been received by the Claims Administrator, and the deadline for filing Claim Forms is not until November 9, 2008.

149.    Moreover, as already noted, the settlement amount is large – $130.3 million (excluding interest and contingent relief, but including counsel fees, the expense award, and the costs of administering the settlement to date), which represents nearly 26.6% of the maximum likely case recoverable damages of approximately $489 million, according to the analysis of the expert retained by Lead Counsel and Lead Plaintiffs. This benefit, which is both certain and prompt, is especially valuable compared to a speculative future payment. *See, e.g., In re Safety Components*, 166 F. Supp. 2d at 85; *In re Computron*, 6 F. Supp. 2d at 317.

150.    **The presence or absence of substantial objections by members of the class** – Only three objections were asserted in response to the dissemination of over 959,000 Notices (as of September 1, 2008), and the publication of the Summary Notice in scores of publications in the United States and abroad. Of these three, none was made by an institutional investor, and at least one was asserted by a non-Class Member with no standing to object.

151.    Moreover, as discussed more fully below, none of the objections was substantial or meritorious. Thus, this factor supports a conclusion that the requested fee is fair. *See, e.g., In re Genta Sec. Litig.*, No. 042123 (JAG), 2008 WL 2229843, at *8 (D.N.J. May 28, 2008); *Ravisent Tech.*, No. 00-CV-1014, 2005 U.S. Dist. LEXIS 6680, at *39-*40; *In re Cell Pathways,*

*Inc.*, No. 01-CV-1189, 2002 U.S. Dist. LEXIS 18359, at *24 (E.D. Pa. Sept. 23, 2002) (existence

of only one objection shows that class does not object to thirty percent requested by attorneys

and supports approval of fee petition); *In re Rent-Way Sec. Litig.*, 305 F. Supp. 2d 491, 502

(W.D. Pa. 2003) (finding absence of substantial objections supports award of requested fee); *In*

*re Aetna*, 2001 U.S. Dist. LEXIS 68, at *48 ("[T]he Class members' view of the attorneys'

performance, inferred from the lack of objections to the fee petition, supports the fee award.").

152.    **The skill and efficiency of the attorneys involved** – As noted above, Lead

Counsel is knowledgeable about, and experienced in, complex class actions of this nature,

including those involving claims under the federal securities laws.  Lead Counsel effectively and

efficiently litigated this Action from its inception, during more than four years of contentious

litigation against more than able defense counsel.  Because the quality of Lead Counsel's

representation of the Class has been high, this factor supports the requested fee.

153.    **The complexity and duration of the litigation** – Securities class actions, by their

very nature, are complex, and this case is no exception.  As discussed in connection with the first

*Girsh* factor above, this case, commenced in January 2004, has been particularly complex,

expensive, and time consuming.  For all the reasons given above, this factor weighs in favor of

approving the requested fee.

154.    **The risk of nonpayment** – Lead Counsel undertook representation of plaintiffs

and the Class on a contingent basis.  Although there was little doubt about Shell's ability to pay,

the risk of not recovering anything for the Class as a result of a dismissal or unfavorable verdict

at trial was real.  *Lindy Bros. Builders, Inc. v. Am. Radiator & Standard Sanitary Corp.*, 540 F.2d

102, 117 (3d Cir. 1976) (*en banc*); *In re Ikon*, 194 F.R.D. at 194.  Given the many factual and

legal complexities in the case, including loss causation and scienter, Lead Counsel could have

prosecuted this case through trial (and any appeals that followed) and, at the end of the day, recovered nothing for the Class – and thus nothing for themselves. Thus, this factor supports the fee request.

155.    **The amount of time devoted to the case by plaintiffs' counsel** – As set forth above in the discussion of the multiplier, plaintiffs' counsel worked almost 134,000 hours on this litigation, for a total lodestar of $56,891,317.50. Thus, the requested fee, together with the $27 million already awarded, represents a multiplier of only 1.002. This is an outstanding result that fully supports the fee request.

156.    **The awards in similar cases** – The Court need look no further than the Third Circuit's decision in *AT&T* to know that this factor is satisfied. There, the Third Circuit approved a fee of $21.25 million on a settlement fund of $100 million, representing a percentage of 21.25 and a multiplier of 1.28 – even though the recovery represented only 4% of the total damages claimed. *In re AT&T*, 455 F.3d at 163, 170, 173.

157.    As noted above, there are any number of ways to calculate the fee request here as a percentage of the total relief that Shell will provide. Even doing so in the narrowest possible way, the fee request here is comparable to, and arguably more modest than, the one approved in *AT&T*.

158.    Plaintiffs' counsel request a fee of $30 million, representing 23% of the base cash settlement value of $130.3 million (excluding interest and contingent relief, but including counsel fees, the expense award, and the costs of administering the settlement to date). Although this percentage is slightly higher than the 21.25% approved in *AT&T*, the settlement achieved here is superior to that achieved in *AT&T*. Whereas the settlement in *AT&T* represented only 4% of the total damages claimed, 455 F.3d at 170, the $130.3 million base cash value here represents

48

26% of the likely recoverable damages, according to the analysis of the expert retained by Lead Counsel and Lead Plaintiffs.

159.   In addition, there are many securities class action settlements of comparable or larger size in other circuits where courts have awarded comparable or larger percentage fees than plaintiffs' counsel is requesting here. *Prudential-Bache Energy, Inc. P'ship Sec. Litig.*, No. MDL 888, 1994 U.S. Dist. LEXIS 6621, at *1 (E.D. La. May 18, 1994) (awarding a fee of 25% in a $90 million securities settlement); *In re Nat'l Health Labs. Sec. Litig.*, Nos. 92-1949, 93-1694 (S.D. Cal. Aug. 15, 1995) (fee of 30% of a $64 million settlement) (cited in *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1052 (9th Cir. 2002)); *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 912 F. Supp. 97 (S.D.N.Y. 1996) (fee of 27% of a $110 million settlement); *In re Prison Realty Sec. Litig.*, No. 3:99-0458, 2001 U.S. Dist. LEXIS 21942 (M.D. Tenn. Feb. 9, 2001) (fee of 30% of a $104 million settlement); *In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323 (S.D. Fla. 2001) (fee of 25% of a $110 million settlement); *In re Xcel Energy, Inc. Sec., Derivative & "ERISA" Litig.*, 364 F. Supp. 2d 980 (D. Minn. 2005) (fee of 25% of an $80 million settlement).

160.   Because all of the *Gunter* factors, as well as percentage of the recovery approach and the lodestar crosscheck, support the requested fee, the requested fee is hereby approved.

## IX.   REIMBURSEMENT OF PLAINTIFFS' COUNSEL'S EXPENSES

161.   Attorneys who create a common fund for the benefit of a class are entitled to reimbursement of reasonable litigation expenses and costs from the fund. *See In re Aetna*, 2001 U.S. Dist. LEXIS 68, at *40; *In re Ikon*, 194 F.R.D. at 192. Plaintiffs' counsel are seeking approval of the payment by Shell, independent of the common fund established for the Class, of up to $3 million as reimbursement of costs and expenses incurred in prosecuting this Action on

behalf of the Class. Because plaintiffs' counsel's actual costs and expenses, which exceed the amount requested, are reasonable, the Court approves the request.

## X.    REIMBURSEMENT OF LEAD PLAINTIFFS' EXPENSES

162.    In addition to agreeing to pay the requested fee, Shell has also agreed (subject to the Court's approval) that it will pay or cause to be paid up to $150,000 to Lead Plaintiffs to compensate them for their reasonable costs and expenses directly relating to their representation of the Class pursuant to 15 U.S.C. § 78u-4(a)(4).[8] As set forth in the declarations of Gerald Gornish and Brian E. McDonough, this amount is less than the amount actually expended by the Lead Plaintiffs in their direct representation of the Class. Payment of the requested amount, which will be made by Shell in addition to the settlement relief described above, is approved.

## XI.    OBJECTIONS TO THE SETTLEMENT AGREEMENT

163.    Only three objections were received – an exceedingly low number. Of the three, one objector – E.R. Dring of Surrey, England – objected on the ground that he was not covered by the Settlement Agreement. Indeed, it appears that Mr. Dring is not a Class Member for three reasons. First, he appears to be a Home Exchange Purchaser. As such, his shares were purchased overseas and he does not fall within the Class definition. Second and third, the Class includes only individuals and entities who purchased their shares during the Class Period. Mr. Dring's objection states that he did not purchase his shares but inherited them, and it appears that his shares were originally purchased before the Class Period. Because he is not a member of the

---

8.    The Settlement Agreement provides that if this payment to Lead Plaintiffs were to be determined by a court of competent jurisdiction to require an additional payment under the Non-U.S. Settlement True-Up Provision, then Shell would not have to make the payment (and any payment that had already been made would have to be reimbursed to Shell). If this were to occur, Lead Plaintiffs could seek Court approval for payment of an expense award to be made out of the settlement relief.

Class, he has no standing to object. In any event, the Court finds his objection not to be substantial or meritorious.

164.    Another objection was submitted by Donald Allen, who summarily objects to the amount of the settlement and the amount of attorneys' fees requested. Mr. Allen offers no proof that he is a Class Member, and therefore has not demonstrated he has standing to object. Moreover, his objection is vague at best. He does not address why he thinks the settlement amount is too small, or the fee request too large. Indeed, he appears to be objecting to class actions generally, which is not an appropriate basis for objection. *See, e.g.*, *Wilson v. Airborne, Inc.*, No. 07-770-VAP, 2008 WL 3854963, at **7-8  (C.D. Cal. Aug. 13, 2008) (rejecting objections that do not address the terms of the settlement).

165.    Attorney Edward F. Siegel asserts numerous objections to the fee request on behalf of Mr. Daniel Stolzer and The Melissa A. Ost Rollover IRA (the "Stolzer/Ost Objectors"). Mr. Siegel, whose website lists "Class Action Objections" as one of his three practice areas, is a professional objector – that is, one who routinely objects to settlements and requests for attorneys' fees. In this instance, Mr. Siegel objects only to the fee request; he does not assert any objection to the terms of the settlement itself. Although the Court agrees with the statement that "[f]ederal courts are increasingly weary of professional objectors," *Varacallo*, 226 F.R.D. at 240, the Court has fully considered each of Stolzer/Ost Objectors' largely boilerplate objections (the "Stolzer/Ost Objections"), and finds them to have absolutely no merit.

166.    At the outset, it is not clear that the Stolzer/Ost Objectors even have standing to object. Although they both purchased Shell securities during the Class Period, and are therefore Class Members, it is undisputed that both objectors actually made a profit on their Class Period purchases of Shell securities. As such, they are not entitled to any relief under the Settlement

Agreement.  The Court need not decide this issue, however, because their objections are without
merit.

167.    It is also worth noting at the outset that the Stolzer/Ost Objections, if successful,
will confer no benefit on the Class.  As discussed, Shell agreed to pay the requested fee wholly
independent of the common fund created for the Class.  Thus, even if the Court were to deny or
reduce the requested fee, there would be no resulting increase in the relief available to the Class.
Those funds would simply revert to Shell.

168.    In the first of their six grounds for objection, the Stolzer/Ost Objectors rely on a
September 17, 2007 letter from certain academics to the ABA Standing Committee on Ethics and
Professional Responsibility (the "Academics' Letter").  Citing the Academics' Letter, the
Stolzer/Ost Objectors argue that it was improper and unethical for Lead Counsel to negotiate a
fee with counsel for Shell, even though that fee is to be paid separate and apart from the common
fund established for the Class.  The thrust of the Academics' Letter is that defendants generally
have a specific sum for which they are willing to settle an action, and are indifferent to how that
sum is allocated between the plaintiffs and their counsel.  This indifference, according to the
letter, permits unethical plaintiffs' counsel to take a disproportionately large piece of the
available pie at their clients' expense.  The Stolzer/Ost Objectors do not present any evidence
that that occurred here.

169.    In addition to the absence of any evidence, the Court rejects this argument for
three reasons.  First, Federal Rule of Civil Procedure 23(h) requires this Court to review the fee
agreement specifically to determine if it is fair and reasonable.  Indeed, the Court has a fiduciary
duty to "protect absent class members," *Hughes v. InMotion Entm't*, No. 07-CV-1299, 2008 WL
3889725, at *8 (W.D. Pa. Aug. 18, 2008), and to ensure that fee requests are "fair and

reasonable," *In re Lucent*, 327 F. Supp. 2d at 442. As discussed, in the Third Circuit the preferred method for determining a fair and reasonable fee is the percentage-of-the-recovery method. *In re Cendant Corp. Litig.*, 264 F.3d at 256; *see also* 15 U.S.C. § 78u-4(a)(6). That is, courts evaluate a fee, in part, by determining the percentage of the total recovery it represents. By its very nature, this method ensures that the allocation of the total pie, as between the plaintiffs and their attorneys, is equitable and proportionate – the very concern expressed in the Academics' Letter. *See, e,g., GMC*, 55 F.3d at 822 (observing that fee awards range from 19% to 45% of the settlement fund).

170.    Indeed, the Third Circuit has established no fewer than seven factors that district courts must consider in determining whether a fee request is fair and reasonable. These are the *Gunter* factors that the Court discussed above, concluding that each factor supports the requested fee request.

171.    Second, as noted, the settlement and fee negotiations were overseen by Judge Politan, who acted as a court-appointed special master in this action, as well as an independent mediator. Judge Politan's oversight of the fee negotiation acted as an additional safeguard of the Class' best interests.

172.    Finally, the mediation at which the fee was negotiated was attended by in-house legal representatives of the two sophisticated institutional investors acting as lead plaintiff in this lawsuit – SERS and PSERS. Based upon the declarations of Gerald Gornish of PSERS and Brian E. McDonough of SERS, there is no doubt that PSERS and SERS have taken their fiduciary obligations seriously, including their responsibility to ensure the fairness of the fee request. They approved the settlement because they believed it to be the "best settlement that could be achieved," and they approved the fee request because they believed it "represents fair

and reasonable compensation to Lead Counsel for its efforts, for the excellent result achieved,

and the substantial risks undertaken in this case."

173.     Thus, because there were numerous safeguards ensuring that Lead Counsel acted

in the bests interests of the Class, the Court rejects the Stolzer/Ost Objectors' first objection.

174.     Second, the Stolzer/Ost Objectors cite a 2003 study by the consulting firm of

Logan, Moshman and Moore (the "Logan Study") to argue that the Court should limit Plaintiffs'

Counsel to a fee "not exceeding approximately 15% of the Settlement Fund." They *fail* to cite,

however, a 2006 decision by the Third Circuit rejecting this very argument (citing the same

study), even though Mr. Siegel was one of the lawyers asserting that argument on appeal. *In re

AT&T*, 455 F.3d at 172.

175.     In *AT&T*, the Third Circuit recited this objection as follows:

> Objectors contend "courts are increasingly finding that class
> counsel can be reasonably compensated by a fee award that is
> substantially less than 20% of the settlement fund." (Appellants'
> Br. 14.) They cite a study, which they cited to the District Court,
> concluding the average award for fees and costs in class action
> cases whose settlements were valued over $100 million was
> 15.1%, and the average award for fees and costs in all cases was
> 18.4%. See Stuart J. Logan, Jack Moshman, and Beverly C.
> Moore, Jr., Attorney Fee Awards in Common Fund Class Actions,
> 24 Class Action Rep. 169 (2003).

455 F.3d at 172.

176.     The Third Circuit rejected this argument. Rather than impose an arbitrary cap of

15% (or any other percentage) on fee awards in "mega" class actions, the Court emphasized the

importance of a district court's undertaking a "fact-intensive" analysis to determine an

appropriate fee. The Court wrote:

> [W]hile it may be appropriate in some circumstances for fee
> percentages in large recovery cases to be smaller than those in

54

> smaller recovery cases, "there is no rule that a district court must
> apply a declining percentage reduction in every settlement
> involving a sizable fund." *Rite Aid*, 396 F.3d at 303. In *Rite Aid*,
> we held the district court did not abuse its discretion in declining to
> apply a percentage fee scale that decreased as the size of the
> settlement increased, concluding *"the declining percentage
> concept does not trump the fact-intensive Prudential/Gunter
> analysis." Id.*

*Id.* at 174 (emphasis added). Concluding that the district court had undertaken the required fact-intensive analysis, the Court endorsed the district court's fee award of 21.5%, and a multiplier of 1.28. *Id.* at 172 n.8, 173.

177.    Moreover, the Logan Study is far too broad to be of any use to the Court. Rather than focus on the recoveries in securities class actions, the Study includes "consumer, labor, mass tort, and other types of class actions as well as securities and antitrust cases." This Court has rejected a similar study in another case for precisely this reason. *See In re Lucent,* 327 F. Supp. 2d at 444 (rejecting objection that fee was excessive in part because objection was based on an "overly broad study that covers every type of class action").

178.    Third, the Stolzer/Ost Objectors urge the Court, in performing the lodestar cross check, to "carefully scrutinize[] the use of contract or temporary attorneys." Their concern is that "firms often pay employment agencies some minimal hourly rate ($50 to $75/hr) for each temporary/contract attorney, and bill the time out at hourly rates in the $300+ range." Whether or not this is a legitimate concern in other cases, it is not a concern here.

179.    Even if Lead Counsel reduces plaintiffs' counsel's total lodestar by $7,287,396.25 (the lodestar of the discovery attorneys employed by Lead Counsel) – from $56,891,317.50 to $49,603,921.25 – that reduction increases the multiplier only from 1.002 (based upon the total fee of $57 million) to 1.15, an immaterial difference. A multiplier of 1.15 is less than the 1.28

multiplier the Third Circuit approved in *In re AT&T*, 455 F.3d at 173, and is well within the range of multipliers awarded by the courts within this Circuit.[9] *See, e.g.*, *Rite Aid*, 362 F. Supp. 2d at 589 (6.96 multiplier); *In re Aetna.*, 2001 U.S. Dist. LEXIS 68, at *49 (E.D. Pa. Jan. 4, 2001) (3.6 multiplier); *In re Safety Components*, 166 F. Supp. 2d at 81 ("a [lodestar] multiplier of 2.81 appears reasonable"); *In re Ikon*, 194 F.R.D. at 195 (2.7 multiplier); *In re Remeron*, 2005 U.S. Dist. LEXIS 27013, at **47-48 (approving a 33 ⅓% fee while noting that the 1.8 multiplier was "on the low end of the spectrum" in recent cases). Accordingly, the Court rejects this objection.[10]

179.     Fourth, the Stolzer/Ost Objectors argue that the Court should consider the earlier award of $27 million to Lead Counsel in connection with the Non-U.S. Settlement in evaluating the appropriate fee here. Lead Counsel does not disagree, and in fact has asked this Court to consider the total fee of $57 million as a percentage of the total base cash benefit in both this settlement and the Non-U.S. Settlement. As discussed above, that percentage is 10.6%, well below the range of acceptable fee percentages recognized by the Third Circuit. *GMC*, 55 F.3d at 822 ("Percentages awarded have varied considerably, but most fees appear to fall in the range of nineteen to forty-five percent."). Indeed, it is below the 15.1% cap the Stolzer/Ost Objectors argue for in their Objections. Thus, the Court rejects this objection.[11]

_____

9.     The Third Circuit has held that "the resulting multiplier need not fall within any predefined range, provided that the District Court's analysis justifies the award." *Rite Aid Corp.*, 396 F.3d at 307.

10.     Nothing in the Stolzer/Ost Objectors' Supplemental Objections alters this conclusion.

11.     As discussed above, even if one includes the $43 million fee that counsel in the Non-U.S. Settlement will receive as part of the calculation (for a total fee to all counsel of $100 million), the percentage is still only 17.2% of the worldwide base cash benefit, at the low end of the range of acceptable fee percentages observed by the Third Circuit. *GMC*, 55 F.3d at 822 (19% to 45%).

Case 3:04-cv-00374-JAP-JJH    Document 540    Filed 10/27/2008    Page 57 of 61

181.    Fifth, the Stolzer/Ost Objectors contend that, to award an appropriate fee, the Court must determine, possibly after a full evidentiary hearing, whether some percentage of the common fund is attributable to the SEC. The SEC had conducted an investigation into Shell's recategorization of its oil and gas reserves, resulting in an August 2004 consent decree pursuant to which Shell agreed to pay a $120 million civil penalty (the "Consent Decree").

182.    The Court rejects this objection. In the Consent Decree, Shell explicitly denied any liability relating to its recategorization of oil and gas reserves. Moreover, in the four years since the entry of the Consent Decree, Shell has vigorously defended itself against Lead Plaintiffs' allegations of liability. It has produced millions of pages of documents, which Lead Counsel has reviewed, and produced scores of witnesses for deposition. Shell's defense has included, among other things, the filing of two motions to dismiss and a motion for partial summary judgment. Furthermore, Lead Counsel have represented that they received no direct assistance from the SEC in their prosecution of this lawsuit.

183.    Thus, this case is distinguishable from *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261 (D.C. Cir. 1993), on which the Stolzer/Ost Objectors rely. In *Swedish Hospital*, a quantifiable portion of the class action settlement relief (relating to the reimbursement of photocopying expenses by the Department of Health and Human Services ("HHS")) had already been achieved in a separate action. Nonetheless, class counsel sought a percentage-of-the-fund fee award of 20% of the entire settlement amount. The district court rejected this request, concluding that counsel could "claim credit only for enhancing" the fund in the amount of approximately $.02 more per page than the $.05 a page that HHS had already put "'on the table when negotiations opened.'" *Id.* at 1264 (quoting *Swedish Hop. Corp. v. Sullivan*, No. 89-1693, 1991 WL 319154, at *2 (D.D.C. Dec. 20, 1991)). Accordingly, the district judge awarded class

counsel a fee of $2 million, or 20% of the $10 million portion of the settlement fund for which class counsel was responsible. 1 F.3d at 1264.

184.    The D.C. Circuit affirmed, observing that the class plaintiffs' attorneys had, in part, "piggyback[ed]" (a phrase used by the Stolzer/Ost Objectors) on the success of a related litigation; faced no chance of a zero recovery because the central legal issue had been resolved in that related action; faced no collectability issues because the government was the defendant; and did not have to litigate a motion for class certification because the government had "acquiesced" to class action treatment. *Id.*

185.    Here, by contrast, the cash benefit Lead Counsel achieved was above and beyond the $120 million penalty Shell previously paid pursuant to the Consent Decree. Moreover, Lead Counsel developed and prosecuted the case on its own without any direct assistance from the SEC or any governmental agency, and confronted a serious risk of no recovery given the many disputed legal and factual issues that Shell raised throughout the litigation (such as in the motion for partial summary judgment). Given that the risks and hurdles faced by plaintiffs' counsel in this case were far more substantial than those in *Swedish Hospital* and other class actions where liability and collectability appear far less problematic, the Stolzer/Ost Objectors' reliance on *Swedish Hospital* must be rejected.

186.    Finally, the Stolzer/Ost Objectors, citing no authority, object that Lead Counsel violated Rule 23(h)(2) by "not giving the class members adequate notice of their fee petition which is, in fact, a motion." Their interpretation of Rule 23(h) is not only unsupported by its text, but also by its context. Unlike Rule 23(c)(2), which requires "best notice practicable under the circumstances," the far more relaxed standard of Rule 23(h)(1) – notice in a "reasonable manner" – applies here.

187.    Lead Counsel provided notice of this motion in the Notice and Summary Notice. In both instances, Class Members were advised that Lead Counsel would move for the approval of the attorneys' fees and expense payment of up to $30 million and $3 million, respectively, at the time of the Fairness Hearing.  For example, the front page of the Notice, under the heading "Statement Regarding Fees and Expenses," notes that "Class Counsel will make, and Shell agrees not to oppose, an application for attorneys' fees and expenses at *the time of the fairness hearing* in an amount not to exceed $30,000,000 in fees and $3,000,000 in expenses.  Shell will pay or cause to be paid the attorneys' fee award and the attorneys' expenses award in such or lesser amounts as awarded by the Court." (emphasis added).  A similar statement was made under Question 34, "How will Class Counsel for the class be paid."

188.    The Stolzer/Ost Objectors also suggest that Rule 23(h) requires Lead Counsel to file its papers in support of the motion for attorneys' fees before the deadline for objections. Rule 23(h), however, does not so state and the Stolzer/Ost objectors do not cite any authority so holding.

189.    Rule 23(h) requires that "[a] claim for an award of attorney fees . . . must be made by motion . . . *at a time set by the court.*"[12]  In the Preliminary Approval Order of July 17, 2008 (Paragraph 5.j.), the Court clearly stated that it would consider the attorneys' fees and expense application at the September 26, 2008 Fairness Hearing.  Lead Counsel served and filed the papers in support of plaintiffs' counsel's motion on Friday, September 19, 2008.  Having seven days before the Fairness Hearing "to understand the asserted factual and legal basis for the legal

---

12.    The plain meaning of quoted language of Rule 23(h) does not require the moving attorney disseminate the entire text of the memoranda and declarations supporting the motion for fees, only that notice of the motion be given.

fees being sought in the motion" was more than a reasonable time for the Stolzer/Ost Objectors and their counsel to consider the motion and submit a reply.[13]

190.    A substantively identical objection that the full motion papers in support of the fee application should have been filed before the deadline for objections was rejected by the court in *In re American Express Financial Advisors Securities Litigation*, No. 04-CV-1773, slip op. (S.D.N.Y. July 18, 2007).

191.    Thus, Lead Counsel have complied with Rule 23(h), and this last objection is rejected.

XII.    CONCLUSION

192.    The Settlement Agreement is comprehensive in its scope, is fair and even-handed in its application, and is of substantial economic benefit to the Class. The Court therefore approves the Settlement Agreement as fair, adequate and reasonable.

193.    Lead Counsel's request for attorneys' fees satisfies all of the *Gunter* factors, and represents a reasonable percentage of the common fund created for the benefit of the Class. The Court therefore approves the $30 million fee Shell has agreed to pay independent of the common fund established for the Class as fair and reasonable.

194.    For all the reasons given above, the Court approves the payment by Shell of up to $3 million as reimbursement of plaintiffs' counsel's costs and expenses incurred in prosecuting this Action on behalf of the Class as fair and reasonable. The Court also approves the payment by Shell of up to $150,000 as reimbursement to Lead Plaintiffs of their costs and expenses incurred in their direct representation of the Class as fair and reasonable.

---

13.    The supporting papers were served by e-mail on Siegel and Cochran on the same day on which they were filed.

195.    Finally, for all the reasons given above, the Court rejects on the merits each of the

objections to the settlement and the fee request asserted by E.R. Dring, Donald C. Allen, Daniel

Stolzer, and The Melissa A. Ost Rollover IRA.

ENTERED this  8  day of  December, 2008.


_____
HONORABLE JOEL A. PISANO
UNITED STATES DISTRICT COURT JUDGE